**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> KPMG, LLP, DIEBOLD, INC., GREGORY T. GESWEIN, KEVIN J. KRAKORA, and SANDRA MILLER, <br><br> Defendants. | CASE NO. <br><br><br> JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

1.    Plaintiff, Louisiana Municipal Police Employees Retirement System ("LAMPERS"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' press releases, Securities and Exchange Commission ("SEC") filings by Diebold Inc. ("Diebold" or the "Company"), the civil securities fraud complaints that the SEC filed on June 2, 2010 against Diebold, Gregory Geswein, Diebold's former Chief Financial Officer ("CFO"), Kevin Krakora, Diebold's former Controller and later its CFO, and Sandra Miller, Diebold's former Director of Corporate Accounting,  and media reports about the Company.

## NATURE OF THE ACTION

2.      This is a securities class action on behalf of Plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired Diebold securities (the "Class") during the period June 30, 2005 through January 15, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## SUMMARY OF THE ACTION

3.      This action involves earnings management fraud by the financial management of Diebold, an Ohio corporation that manufactures and sells automated teller machines ("ATMs"), bank security systems, and electronic voting machines.  Diebold, Gregory Geswein, Diebold's former CFO, Kevin Krakora, Diebold's former Controller and later its CFO, Sandra Miller, Diebold's former Director of Corporate Accounting, and KMPG, LLP, Diebold's auditor (collectively, "Defendants"), engaged in fraudulent accounting practices to inflate earnings to meet forecasts – or, in the case of Defendant KPMG, failed to withdraw its unqualified audit opinions after learning that Diebold's prior year financial statements were materially false.  From at least 2002 to 2007, these fraudulent practices included:

 (i)  improper use of "bill-and-hold" accounting;

 (ii)  improper recognition of revenue on a lease agreement subject to an undisclosed side buy-back agreement;

 (iii)  manipulating reserves and accruals;

 (iv)  improperly delaying and capitalizing expenses; and

 (v)  improperly writing up the value of used inventory.

4.      As a result of these practices, Diebold filed numerous annual, quarterly, and current reports with the SEC, issued dozens of press releases, and otherwise made public statements that contained material misstatements and omissions concerning the Company's financial performance and financial condition.  In addition, KPMG issued reports containing unqualified audit opinions that were false and misleading for annual audits conducted for 2003 through 2006.  Diebold's fraudulent accounting practices misstated the Company's reported pre-tax earnings by at least $127 million, and skewed the revenue and earnings trends that analysts and investors used to value Diebold's stock.  To correct the most recent misstatements, on September 30, 2008, Diebold restated its financial statements for the years 2003 through 2006, and the first quarter of 2007 ("1Q07"), in its belatedly filed Form 10-K for 2007.  In addition, on June 2, 2010, the SEC charged Defendants Diebold, Geswein, Krakora and Miller with civil securities fraud.  Defendant Diebold settled the complaint with the payment of a $ 25 million civil penalty.  By engaging in the practices and transactions alleged in this Complaint, Diebold, and Geswein, Krakora and Miller (the "Individual Defendants"), and Diebold's independent auditor, KPMG, violated Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Exchange Act Rule 10b-5.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.  The claims asserted herein arise under Sections 10(b), 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a)), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5 (17 C.F.R. §240.10b-5); and Section 304 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. §7243).

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).   Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this District.  In addition, Diebold maintains its principal executive offices in this District.   In connection with the acts, conduct and other wrongs complained of herein, Defendants used the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of national securities exchanges.

## PARTIES

**A.      Plaintiff**

**LAMPERS**

7.      Plaintiff is the Louisiana Municipal Police Employees Retirement System ("LAMPERS").  LAMPERS purchased shares of Diebold stock at artificially inflated prices during the Class Period as described in the attached certification (*see* Exhibit A), and, when the truth was revealed, was damaged thereby.

**B.      Defendants**

**Diebold, Inc.**

8.      Defendant Diebold, Inc. ("Diebold" or "the Company"), an Ohio corporation with its principal offices at 5995 Mayfair Road, Canton, Ohio  44720, is engaged primarily in the sale, manufacture, installation and service of Automated Teller Machines ("ATMs").   Defendant Diebold supplies software that is needed to operate the ATMs and voting machines, and it provides its customers with a wide array of services and follow-up technical support in connection with its ATMs and electronic voting machines.  Its main customers are banks and

financial institutions on the ATM side of the business, and state and local municipalities for the electronic voting machines.

### Gregory T. Geswein

9.      Defendant Gregory T. Geswein ("Geswein") is a certified public accountant and served as Diebold's Senior Vice-President and Chief Financial Officer ("CFO") from April 2000 until he abruptly resigned on August 8, 2005.  In his capacity as Senior Vice-President and CFO, Geswein was responsible for and oversaw all aspects of the Company's Finance and Accounting Departments, including the improper revenue recognition and other wrongful accounting practices.  Defendant Geswein signed Sarbanes-Oxley ("SOX") certifications, falsely attesting to the accuracy of Diebold's financial reporting and adequacy of its internal controls, as well as the Forms 10-K for the fiscal years ending 2003 and 2004, and all Forms 10-Q for 2003, 2004 and the first two quarters of 2005.  Defendant Geswein participated in all conference calls with analysts from the beginning of the Class Period until he resigned on August 8, 2005 in which he made false statements about the Company's earnings.

### Kevin J. Krakora

10.     Defendant Kevin J. Krakora ("Krakora") is a certified public accountant who served as Diebold's Executive Vice-President and Corporate Controller from the beginning of the Class Period until August 12, 2005, when he took over for Defendant Geswein as Diebold's CFO.  He served as CFO until the end of the Class Period.  Defendant Krakora signed false and/or misleading SOX certifications, and the Forms 10-K for 2005 and 2006, and all Forms 10-Q filed from August 12, 2005 through the end of the Class Period.  Defendant Krakora also signed and republished false and misleading financial reports for 2003 and 2004.  Defendant Krakora participated in numerous conference calls with analysts during the Class Period in

which he made false statements about the Company's revenue recognition and other wrongful accounting practices.

**Sandra Miller**

11.     Defendant Sandra Miller ("Miller") is a resident of Paris, Ohio.  She was Diebold's Director of Corporate Accounting from 2002 to 2006.  During her tenure at Diebold, Miller reported to Krakora.  Miller is a certified public accountant licensed in Ohio, and along with the other individual Defendants, was responsible for Diebold's false and misleading financial reports.

**KPMG, LLP**

12.     Defendant KPMG, LLP ("KPMG") served as Diebold's outside auditor during the Class Period.  Diebold's audits were performed out of KPMG's Cleveland office.  For its 2003 through 2006 annual audits, KPMG issued unqualified audit opinions that certified Diebold's false and misleading financial statements, and which the Company attached to its Form 10-Ks.

**THE FRAUDULENT SCHEME**

*Defendants' Earnings Management*

13.     On June 2, 2010, the SEC filed separate complaints alleging civil violations of the Exchange Act against Diebold, William O'Dell (Diebold's former CEO) and Geswein, Krakora and Miller.  The complaint against Geswein, Krakora and Miller which contains specific allegations of accounting violations and the wrongdoing of these officers (the "SEC Complaint"), is attached hereto as Exhibit B, and the allegations relating to the accounting violations and the wrongdoing of the Individual Defendants are incorporated by reference herein.

14.     From 2002 to 2007, Diebold management conducted meetings known as monthly business reviews ("MBRs"), in which each Diebold business unit would review the past month's

financial performance and that quarter's projected results.  Geswein, and later Krakora, would then compare the Company's projections to stock analysts' consensus earnings projections for Diebold.  Typically, Diebold's internally projected earnings were lower than the analyst consensus earnings projection.  Toward the end of most quarters, Krakora compiled "opportunity lists" of ways to close the gap between the Company's actual financial results and analyst forecasts.  Krakora reviewed such lists with Geswein.  While some items on the "opportunity lists" represented legitimate business opportunities, others were fraudulent accounting transactions designed to improperly recognize revenue or otherwise inflate Diebold's financial performance.

15.    As quarters came to a close, Geswein and Krakora received "flash reports," sometimes on a daily basis, comparing Diebold's actual earnings to analyst consensus earnings forecasts, which were often referred to as "required" or "necessary" earnings.  Geswein and Krakora used the often improper "opportunities" from the "opportunity lists" that they devised to reach this earnings target.  Miller made various manual accounting entries corresponding to these "opportunities" to Diebold's books.  Miller knew, or was reckless in not knowing, that these "opportunities" and the corresponding manual journal entries were improper.  In light of their job responsibilities and the pervasiveness and nature of the accounting manipulations, the Individual Defendants knew or were reckless in not knowing that their actions were causing Diebold to report materially false financial results to the public.

16.    As described in Exhibit B, and below, Geswein, Krakora and Miller each orchestrated and/or participated in one or more of the following fraudulent accounting practices, which caused Diebold to report materially false and misleading financial results to the public: (i) improper use of "bill-and-hold" accounting; (ii) improper recognition of revenue on a lease

agreement subject to an undisclosed side buy-back agreement; (iii) manipulating reserves and accruals; (iv) improperly delaying and capitalizing expenses; and/or (v) improperly writing up the value of used inventory. As a result of these fraudulent accounting schemes, Geswein and Krakora made numerous material false and misleading statements and omissions of material fact in press releases, to investment analysts on conference calls, and in Diebold's Forms 8-K, 10-Q, and 10-K filed with the SEC.  By a restatement appearing in footnote 2 to the financial statements contained within Diebold's 2007 Form 10-K filed September 30, 2008 (the "Restatement"), Diebold admitted materially misstating its 2003 through 1Q07 financial reports for each of these accounting practices.  A copy of the Restatement is attached as Exhibit C, and the information contained in Exhibit C is specifically incorporated by reference into this Complaint (see, in particular, pages 62-73 of Exhibit C).

<u>Improper Use of "Bill-and-Hold" Accounting to Prematurely Recognize Revenue</u>

*Background on Diebold's Use of "Bill-and-Hold" Accounting*

17.     Under Generally Accepted Accounting Principles ("GAAP"), a seller of goods generally may not recognize revenue until, among other things, the product is delivered to the customer.  A narrow exception exists, however, for what is known as "bill-and-hold" transactions. If a transaction meets the criteria for "bill-and-hold" treatment, the seller may be permitted to recognize the revenue under GAAP before delivery of the product to the customer.

18.     For a transaction to qualify as "bill-and-hold" (thus allowing revenue recognition under GAAP before delivery to the customer), the following criteria must be satisfied: (i) the buyer, not the seller, requests that the transaction be on a bill-and-hold basis, (ii) the buyer has a substantial business purpose for ordering on a bill-and-hold basis, (iii) there is a fixed delivery schedule that is reasonable and consistent with the buyer's business purpose, (iv) the seller does

not retain any specific performance obligations such that the earnings process is incomplete, and (v) the products are ready for shipment.

19.     From at least 2002 through 2007, Diebold designated numerous sales contracts as "F-term" orders, or "Factory" orders.  Diebold recognized revenue on F-term orders when the products were shipped from Diebold's factory to a Diebold warehouse, rather than when the products were delivered and installed at the customer's location.  Thus, Diebold recognized revenue under all of its F-term orders on a bill-and-hold basis.

20.     To satisfy the delivery requirement under GAAP, as described above, recognition of revenue when the products were shipped from Diebold's factory to its warehouse – such as in Diebold's F-term orders – would only be proper if those transactions met the criteria for bill-and-hold transactions.

*Diebold Improperly Used Bill-and-Hold Accounting*

21.     As detailed below, during at least the period of 2002 through early 2007, Diebold routinely recognized revenue on products before the Company delivered the products to the customer (*i.e.*, under F-term orders), even though many of those transactions did not meet the bill-and-hold criteria for doing so.  As a result, Diebold prematurely recognized material amounts of revenue and earnings.  This caused Diebold's reported financial results to be materially false and misleading.

22.     Geswein, Krakora, and Miller knew or were reckless in not knowing that Diebold systematically recognized revenue on F-term orders prematurely, in violation of GAAP, and that, therefore, Diebold's reports filed with the SEC, as well as Diebold's press releases and other statements to the public, made false and misleading statements and omissions of material fact about Diebold's financial performance.

9

23.     Geswein and Krakora knew or were reckless in not knowing that F-term orders did not meet the bill-and-hold criteria, but did not want to eliminate this improper accounting because it would reduce Diebold's reported revenue in the short term, and also force the disclosure of Diebold's widespread bill-and-hold practices.

24.     After the SEC's Staff Accounting Bulletin 104 was published in December 2003 (which, among other things, reiterated the criteria for bill-and-hold accounting), Defendants became concerned that Diebold's revenue recognition practices would not withstand scrutiny.

25.     Beginning in 2004, Defendants carried out plans to create and rely on form documents that purported to show that many of Diebold's sales supposedly met the criteria for bill-and-hold revenue recognition under GAAP, even though the Defendants knew or were reckless in not knowing that the documents were untrue in many transactions, and those transactions did not legitimately qualify for bill-and-hold treatment.

26.     For example, in early 2004, Krakora, with Miller's assistance, redrafted the Company's form sales contract, known as a Memorandum of Agreement ("MOA") in an effort to make it appear that Diebold customers using the MOA were requesting a product on a bill-and-hold basis for the customer's business purposes even if the customers had not actually requested this and/or did not have a business purpose for bill-and-hold.

27.     Geswein, Krakora and Miller knew, or were reckless in not knowing, that notwithstanding the revisions to the MOA, the transactions did not meet the criteria for bill-and-hold treatment to recognize revenue under GAAP because, for example, customers were not generally requesting products on a bill-and-hold basis, and bill-and-hold treatment was not being used for the customers' own business purposes.  Thus, Geswein, Krakora and Miller knew or

were reckless in not knowing that Diebold could not properly recognize revenue before delivery of the products to the customer.

*Improperly Converting Contracts to Bill-and-Hold Status*

28.     In 2004, Krakora and Miller also drafted a standard form contract to convert "I-term" orders – orders for which Diebold recognized revenue upon installation at the customer site -to purported bill-and-hold transactions.  With regard to customers who agreed to sign this form at Diebold's request, rather than at the customer's request and for the customer's business purposes, Diebold improperly recognized revenue on the transaction when the product was shipped from Diebold's factory to its warehouse.

29.     As discussed previously, the accounting criteria for bill-and-hold transactions require that, in order for Diebold to recognize revenue before delivery to the customer, the customer – not Diebold – must request that the transaction be on a bill-and-hold basis, and the buyer must have a substantial business purpose for ordering on a bill-and-hold basis.

30.     Contrary to the above requirements for bill-and-hold accounting, Geswein, Krakora and other Diebold management encouraged its sales force to request that customers execute the forms to convert "I-term" orders to bill-and-hold transactions.  Geswein and Krakora often did this on "make the quarter" calls, notwithstanding concerns raised by sales personnel. For example, in June 2005, a Diebold sales manager wrote an e-mail that was forwarded to Krakora stating that the sales staff was "trying to help Diebold's revenue recognition drive," but raised concerns about asking customers to sign bill-and-hold forms in instances when Diebold was at fault for installation delays.  Krakora took no action at the time to correct this improper practice.  Another employee responded to the sales manager's original e-mail stating: "This is like the crazy aunt in the cellar no one wants to talk about."

31.     As an example of the improper efforts to create the false appearance that customers had requested bill-and-hold transactions in the fourth quarter of 2004, a Diebold sales representative had a customer, Charter One Bank ("Charter One"), sign a bill-and-hold form to convert a $4 million I-term order into a purported bill-and-hold transaction.   The sales representative was carrying out instructions from his superiors to get a bill-and-hold form from Charter One, rather than responding to a request from Charter One for bill-and-hold treatment.

32.     In late 2004, Diebold personnel informed Geswein that Charter One would sign a bill-and-hold form but that Charter One was unwilling to actually pay for the equipment until it was installed.

33.     Geswein nevertheless instructed his subordinates to have Charter One sign the bill-and-hold form, even though he knew that Charter One had not requested bill-and-hold and would not pay until installation.

34.     The Charter One transaction did not meet the criteria for bill-and-hold treatment and recognition of the revenue from the sale in the fourth quarter of 2004 ("4Q04").

35.     In a later conference call among Geswein and other Diebold personnel in early 2005, Geswein was again told that Charter One had signed the bill-and-hold form (which by its terms required payment upon receipt of the invoice sent when Diebold shipped the products to its own warehouse), but that Charter One would not pay for the ATMs before they were installed. Geswein's response was that the Company should take the revenue, and "we'll worry about the receivables later."   Geswein thus caused Diebold to improperly recognize revenue on the transaction for 4Q04, and Geswein and Krakora republished this false accounting when, in August 2005, they signed off on a restatement of 2004 earnings.

36.     Geswein and Krakora knew, or were reckless in not knowing, that Diebold could not properly recognize the revenue from the Charter One transaction in the 4Q04 results.  Even though Charter One was invoiced in 4Q04, Diebold did not pay for this transaction until the second quarter of 2005 ("2Q05"), after Diebold delivered and installed the products.  This transaction inflated Diebold's earnings reported for 4Q04 by about $2 million.

37.     By prematurely including the revenue from the Charter One transaction, Diebold was able to report that it met the low end of its projected earnings for 4Q04.  Without including the revenue from the Charter One transaction in that quarter, Diebold would have missed its projected earnings.

38.     Geswein announced and discussed Diebold's 4Q04 revenues and earnings in a press release and conference call with analysts on January 26, 2005.  On or about March 4, 2005, Geswein signed Diebold's Form 10-K for 2004, which included Diebold's 4Q04 revenues and earnings.  On June 30, 2005 Diebold issued a press release announcing that it was lowering its earnings guidance, and on August 12, 2005 Diebold restated its 2004 earnings without removing this prematurely recognized item.

*Improperly Recognizing Revenue Regarding Incomplete Products*

39.     By at least 2005, Krakora and Miller knew or were reckless in not knowing that many of Diebold's supposed bill-and-hold sales of ATMs failed to meet another of the bill-and-hold criteria: that the products must be complete and that the seller must not retain any specific performance obligations.  In fact, many of the ATMs sold under purported bill-and-hold terms were not complete because key software had not been loaded by the time Diebold recognized revenue from the sales.  Krakora and Miller knew, or were reckless in not knowing, that Diebold was prematurely recognizing revenue on such incomplete products.

*Improperly Recognizing Revenue for Professional Services and Upgrades*

40.     Additionally, by at least 2005, Krakora and Miller knew or were reckless in not knowing that Diebold was recognizing revenue for professional services and upgrades on a bill-and-hold basis.  Krakora and Miller knew, or were reckless in not knowing, that revenue cannot be recognized on services and upgrades on a bill-and-hold basis.

*"Pulling in" F-Term orders*

41.     At certain times during the period 2004 through 2006, in connection with Diebold's efforts to meet its earnings forecasts, Geswein and Krakora resorted to recognizing revenue even earlier on some F-term orders by directing the manufacturing and shipment of products to the warehouse before the shipment dates contained in the MOAs.  Diebold would then record revenue on the products it shipped to its warehouse early.  This practice was known as "pulling in" F-terms.

42.     The amount of F-term orders "pulled in" varied by quarter, but in many instances was done purposely to inflate earnings in order to meet forecasts.  In these instances, Geswein and Krakora instructed Diebold's manufacturing personnel to manufacture products early, without customer notice or approval, for the purpose of recognizing revenue in an earlier reporting period.  For example, in June 2004 (the last month of the second quarter), Diebold "pulled in" about $3.4 million of F-term orders that were scheduled to be shipped to the warehouse in July 2004, and in December 2004 (the last month of the fourth quarter), Diebold "pulled in" about $3.8 million of F-term orders that were scheduled to ship to the warehouse in January 2005.  These "pull ins" inflated Diebold's earnings in these quarters by about $1.1 million and $1.3 million, respectively.  This false financial reporting was republished in August 2005, when the Company restated its 2004 earnings without removing these items from earnings.

43.     Geswein and Krakora knew, or were reckless in not knowing, that "pulling in" F-term orders was not in accordance with GAAP, and that Diebold was prematurely recognizing revenue on these transactions and, therefore, falsely reporting its revenues and earnings.

*The $7.5 Million Revenue Reserve*

44.     In January 2004, as part of its 2003 year-end audit, Diebold's auditor tested a sample of Diebold's 2003 bill-and-hold transactions.  This testing found that Diebold had prematurely recognized revenue on certain transactions, and that in certain instances Diebold had recognized revenue on transactions inconsistent with Company policy.  In response, Diebold established a reserve representing $7.5 million of profit margin in the reporting for fourth quarter of 2003 ("4Q03").  This reserve was derived by extrapolating from the errors found in the auditor's sample.

45.     In February 2004, Krakora and Miller learned that Diebold had prematurely recognized revenue in 4Q03 results for a $5.2 million order from PNC Bank.  This had not been discovered by the Company's auditor during its testing.  Krakora and Miller did not correct this error or adjust the $7.5 million profit margin reserve that the Company had established to account for errors the auditor had found during its audit, even though this error demonstrated that the reserve was inadequate.

46.     Krakora and Miller knew or were reckless in not knowing that GAAP required Diebold to correct the applicable 2003 financial statements to reflect the effect of this known error of $5.2 million.  Yet, Krakora and Miller failed to do so.  In addition, when in August 2005 the Company's 2003 earnings were restated, this error was repeated and republished.

*Improper "Smoothing" of Earnings Impact*

47.    In 2004, when Defendants began using the revised MOA, Geswein and Krakora knew that this would result in fewer F-term orders and less revenue in 2004, as it was envisioned that many customers would not agree to the new terms.

48.    One factor analysts consider in valuing a Company's stock is the consistency in earnings results from period to period.  To improperly "smooth" the negative impact to earnings from these changes, Geswein and Krakora decided to stagger the implementation of the new practices.  Starting in April 2004, Diebold started applying the new practices to orders from its larger national bank customers.  Diebold decided to wait until July 2004 to apply the practices to orders from its smaller regional bank customers.

49.    However, certain Diebold personnel began applying the new revenue recognition practices to some regional bank orders earlier than Geswein and Krakora had planned, resulting in fewer orders being designated as F-term, and thus less revenue being recognized early. Geswein and Krakora discovered this and realized that the Company would not meet its earnings forecast for the third quarter of 2004.  In or about August and September 2004, Geswein and Krakora instructed Diebold financial personnel to make a significant "top line" journal entry that would prematurely and artificially pull revenue into the third quarter of 2004 ("3Q04") with regard to sales that, based upon the new bill-and-hold procedures, actually would not generate revenue until later.  In accordance with Geswein's and Krakora's direction, Diebold financial personnel made an $18.8 million top line journal entry that prematurely recognized revenue that otherwise would not, and should not, have been recognized until later quarters.

50.    As a result of this improper $18.8 million top line entry, Diebold met its revised earnings forecast for 3Q04.  When, in August 2005, the Company restated its 2004 results, this item was not removed and the falsely inflated 2004 earnings were republished.  Geswein and

Krakora knew, or were reckless in not knowing, that the making of such a top line entry had no legitimate accounting basis, violated GAAP, and was solely used to manipulate and "smooth" out the financial effects of Diebold's changed 2004 revenue recognition practices.  In doing so, Defendants also successfully hid, for years, their accounting manipulations.

## THE FALSE STATEMENTS AND OMISSIONS

*False and Misleading Statements and Omissions of Material Fact*
*Involving Bill-and-Hold Accounting*

51.     Diebold's premature recognition of revenue on certain F-term orders, based upon the many improper actions of Defendants Geswein, Krakora and Miller, described above, resulted in revenue and earnings misstatements in each of Diebold's quarterly and annual financial statements from 2003 through 1Q07, as described and quantified in the Restatement, Exhibit C.  In 2003 alone, Diebold overstated its earnings before taxes by $29.5 million (or over 11%) due to premature recognition of revenue on supposed bill-and-hold transactions.

52.     Diebold announced that, going forward, Diebold would recognize revenue upon customer acceptance of goods or services (*i.e.*, not on an F-term basis).  In its Restatement, Diebold retroactively applied this new revenue recognition policy which alone resulted in a decrease of the Company's total earnings before taxes of $56.2 million.

53.     As a result of the misuse of bill-and-hold accounting and the resulting premature recognition of revenue, as described above, Geswein and Krakora signed and caused Diebold to file materially false and misleading Forms 10-K, 10-Q, and 8-K with the SEC during the periods from 2003 through 1Q07, and made (and republished) materially false and misleading statements and omissions of material fact in those reports, in statements in press releases issued to the public and in statements by Geswein and Krakora during conference calls with stock analysts.

54.     As a result of the foregoing, Geswein and Krakora knowingly or recklessly made misrepresentations or omissions of material fact when they signed SOX certificates and Diebold's Forms 10-K for the years 2003 and 2004 (signed by Geswein, and restated and republished by Geswein and Krakora), the SOX certificates and Forms 10-K for the years 2005 and 2006 (signed by Krakora), and each of Diebold's Form 10-Q reports covering the quarterly periods within those years and 1Q07.  Geswein and Krakora also made materially false and misleading statements and omissions of material fact in statements in press releases issued to the public and in statements by Geswein and Krakora during conference calls with stock analysts with regard to those same periods of time.

55.     As Geswein and Krakora knew or were reckless in not knowing, those reports and statements contained false and misleading statements and omissions of material fact about Diebold's revenues and earnings, and failed to disclose the material facts surrounding Diebold's use of bill-and-hold accounting, including but not necessarily limited to, the fact that Diebold was improperly using bill-and-hold accounting, that Diebold had prematurely recognized material amounts of revenue and was not complying with GAAP requirements, that Diebold changed its procedures and documentation for bill-and-hold transactions in 2004 and anticipated a significant drop in revenue as a result, and that in 2004 Diebold was staggering its implementation of its revised policies regarding revenue recognition in order to smooth earnings and hide the impact of its changed policies.

56.     As examples of the foregoing, on or about February 27, 2004, Geswein signed Diebold's Form 10-K for 2003; on or about August 12, 2005, Geswein and Krakora signed a restatement of Diebold's income for 2003, and on or about March 13, 2006, Krakora signed Diebold's Form 10-K for 2005, all of which stated Diebold's revenues and earnings for years

including 2003.  Each of those reports – which were filed with the SEC – materially overstated Diebold's revenues and earnings figures for 2003 because they included material amounts of revenue and earnings from bill-and-hold transactions that did not meet the applicable criteria. For example, according to the Restatement, Diebold's net income for 2003 had been overstated by $29.5 million attributable to improper bill-and-hold accounting.

57.     Miller, as Director of Corporate Accounting, was responsible along with Geswein and Krakora for ensuring that Diebold's revenue recognition policies, including its policies regarding bill-and-hold, complied with GAAP, and for overseeing Diebold's filings with the SEC.  Miller, acting knowingly or recklessly, through actions including but not necessarily limited to those described above, caused, in part, the reporting of misstatements of revenue and earnings attributable to its bill-and-hold accounting practices.

Recognition of Revenue on a Lease Agreement Subject to a Side Buy-back Agreement

58.     Under GAAP, the full amount of revenue from a transaction cannot be recognized if the transaction is subject to significant future obligations or contingencies, such as a buy-back agreement.

59.     As detailed below, Geswein and Krakora participated in a scheme to prematurely recognize revenue from a transaction that was subject to a buy-back agreement.

60.     In the first quarter of 2005 ("1Q05"), Diebold entered into an agreement to lease a portfolio of ATMs located in WalMart stores to a private company, Cash Depot, for $5 million. In this transaction, Diebold entered into a side agreement with Cash Depot, giving Cash Depot the right to "sell" the ATMs back to Diebold at a later date.

61.     Geswein agreed to the buy-back provision when he met with Cash Depot's CEO to negotiate the transaction in 1Q05.  Geswein told the Diebold sales representative working on

the transaction to speak with Krakora about how to draft the agreement with Cash Depot with a buy-back provision, so that the Company ostensibly could still recognize all the revenue from the transaction in 1Q05.

62.  In 1Q05, Krakora advised the Diebold sales representative that two agreements would be needed: an agreement for the sale of the ATMs to Cash Depot and a separate side agreement regarding the buy-back provision.  After meeting with Krakora, the sales representative told Geswein that Krakora said that a separate side agreement regarding the buy-back provision was needed for 1Q05 revenue recognition.

63.  Because the Cash Depot transaction was subject to significant future obligations or contingencies (*i.e.*, the buy-back agreement), it was improper under GAAP for Diebold to recognize the entire $5 million in revenue on this transaction in the first quarter of 2005.

64.  Geswein and Krakora failed to inform Diebold's auditors of the existence of the side agreement with Cash Depot.

65.  Notwithstanding the foregoing, Diebold improperly recognized all $5 million in revenue on this transaction in its 1Q05 Form 10-Q.  Approximately $3.3 million of that amount represented earnings, which accounted for approximately 8% of Diebold's total pretax earnings that quarter.

66.  At all relevant times, Geswein and Krakora knew, or were reckless in not knowing, that Diebold was recognizing the $5 million in revenue from the Cash Depot transaction, that the sale was subject to a buy-back agreement, and that therefore the Company's recognition of the full amount of revenue and earnings on the transaction was improper.

67.  As a result of the foregoing, Diebold's 1Q05 revenue and earnings figures, as well as its 2005 annual results, were materially false and misleading.

<u>Manipulating Reserves and Accruals</u>

68.     Under GAAP, an issuer is required to immediately recognize expense and set up reserves for expected losses under circumstances where the expected losses can be estimated and reach a certain level of certainty.  The reserves should only be "released" (so that an operating expense is not then reported in earnings) in appropriate circumstances such as the occurrence of a specified event or when the estimate that resulted in the reserve should be revised in response to new information.  Moreover, maintaining general or excess reserves (*i.e.*, cookie jar reserves) is prohibited under GAAP, because it skews the true on-going trends in operating earnings which are often used by analysts and investors to value a company's stock.

69.     From 2002 to 2006, as discussed below, Geswein, Krakora and Miller routinely manipulated Diebold's reserves and accruals in order to manage earnings in violation of GAAP requirements, as detailed below.

*Under-accrued Liabilities*

70.     During the Class Period, Geswein, Krakora and Miller inflated Diebold's earnings by failing to accrue for known liabilities, in violation of GAAP.  As detailed below, this caused Diebold's financial results to be materially inflated.

71.     For example, Geswein and Krakora knew, or were reckless in not knowing, the liability account for the Company's Long Term Incentive Plan ("LTIP") – an employee benefit plan intended to reward long term Company performance – was under-accrued for much of 2002 and 2003.  For example, in a May 9, 2003 e-mail from Krakora to Geswein, Krakora explained that "GAAP requires variable accounting for the LTIP, so technically each quarter we should be adjusting the accrual to reflect expected shares to be earned on a pro-rata basis times the price of the stock at quarter-end."  In fact, as Krakora knew, Diebold was not making the required

adjustments each quarter.  Moreover, at the time of this e-mail, Krakora's calculations indicated that the LTIP accrual was under-accrued by at least $5 million.

72.     In order to accrue for the LTIP in 2003 without negatively impacting earnings, Diebold, through the actions of Defendants, offset the liability by improperly reducing other accounts, including an unreconciled accounts payable account and an unreconciled deferred revenue account.

73.     For example, in May 2003, Miller, acting in concert with Geswein and Krakora, made a manual journal entry in which she funded the LTIP accrual by reducing an inventory account even though, contrary to the requirements of GAAP, she had no accounting basis to justify reducing the inventory account.

74.     Miller made another improper entry by reducing the deferred revenue account (internally named "Account 270") to fund the LTIP reserve.  One of Miller's staff members raised questions concerning the proposed entry.  Notwithstanding these questions, Miller made the inappropriate entry.

75.     Geswein, Krakora and Miller knew or were reckless in not knowing that making improper journal entries regarding such accrual accounts was in violation of GAAP and would cause Diebold's reported earnings to be overstated and false.

76.     In 2003 alone, Geswein, Krakora and Miller's manipulation of various accrual accounts had the effect of improperly under-accruing Diebold's liabilities, and overstating Diebold's reported pre-tax earnings by at least $16 million.

77.     By reason of the foregoing, as a result of the actions of Geswein, Krakora and Miller, Diebold's statements of its earnings for 2003 were materially false and misleading. Such statements were included in Diebold's Form 10-K for 2003, which Geswein and Krakora signed

on or about February 27, 2004, and were included in a restatement of Diebold's income for 2003, which Geswein and Krakora signed on or about August 12, 2005, and in the Form 10-K for 2005, which Krakora signed on or about March 13, 2006.

78.    From at least 2002 through 2005, Geswein knew, or was reckless in not knowing, that Diebold, in violation of GAAP, failed to properly accrue for other liabilities, including its North American sales commission accrual (commissions to be paid to sales personnel) and its team incentive accrual (incentive pay to be paid to service personnel).  In 2005, Diebold restated its financial statements to correct errors in certain accounts for the years 2002 to 2004 and 1Q05, including the North American sales commission accrual account (which in 2005 had been materially under-accrued by $11.4 million).

79.    Prior to the 2005 Restatement, a Diebold vice president had informed Geswein that the commission accrual account was materially under-accrued.  Geswein took no action to correct the under-accrual.

80.    In 2005 and thereafter, as detailed below, Geswein and Krakora made statements to the public that were materially false and misleading in that they misrepresented and failed to disclose the truth about the commission accrual account and its impact on Diebold's finances.  These false statements and omissions include but are not necessary limited to the following instances:

(a)    On June 30, 2005, Geswein signed a Form 8-K stating that "the company has identified a reconciliation issue in its North American sales commission accrual account."  Geswein further stated on a conference call with analysts that same day that "during management's review of the second quarter, we noted an error in the reconciliation process of the North American commission accrual."  He also said "it's

something that, certainly, the process is in place and documentation is in place, but mechanically, the reconciliations weren't doing the job."  Geswein knew, or was reckless in not knowing, that his representations in the June 30, 2005 Form 8-K and conference call were materially misleading because the sales commission accrual account was under-accrued due to his desire to meet forecasted targets, not due to an "error" or "reconciliations [that] weren't doing the job."

(b)     On August 15, 2005, Krakora signed Diebold's Form 10-Q for the second quarter of 2005 ("2Q05"), stating that the Company needed to restate its financial statements due to a "reconciliation issue in its North America sales commission accrual account."  On November 4, 2005, Krakora signed Diebold's Form 10-Q for the third quarter of 2005 ("3Q05"), which repeated the misleading information that the need to restate Diebold's financial statements was due to a "reconciliation issue."  Krakora knew, or was reckless in not knowing, that his representations were materially false and misleading because the sales commission accrual account was under-accrued due to a desire to meet forecasted targets, not due to a "reconciliation issue."

*Cookie Jar Reserves*

81.     Geswein, Krakora and Miller used "cookie jar" reserves to manage earnings, in violation of GAAP.  As described above, Diebold established a reserve of profit margin of $7.5 million in the last quarter of 2003.  Over the course of 2004, acting in concert with Geswein and Krakora, Miller released the reserve, to avoid recognizing operating expense, and thus fill shortfalls in operating results.  By this manipulation, Defendants skewed the true trends in the Company's revenues and operating earnings that investors use to value a Company's stock. Geswein, Krakora and Miller knew or were reckless in not knowing that releasing the reserve in

order to cover shortfalls in operating results, rather than presenting the Company's true trends in operating earnings, violated GAAP and misled investors about the Company's on-going performance.

82.     Miller, acting in concert with Geswein and Krakora, released $1 million of the $7.5 million reserve in the first quarter 2004, $1.25 million in the second quarter of 2004, and the remaining $5.25 million in the third quarter of 2004.  As a result, Diebold exactly met analyst earnings consensus for the first two quarters and the revised analyst earnings consensus in the third quarter, thereby presenting a false impression of consistent operating earnings growth.

83.     Geswein, Krakora and Miller knew, or were reckless in not knowing, that these entries had no legitimate accounting basis, and that they were recorded to fraudulently manage Diebold's reported earnings.

84.     Geswein, Krakora and Miller knew or were reckless in not knowing that making improper journal entries regarding such accrual accounts would cause the trends in operating earnings that Diebold reported to the public to be skewed.

85.     In another example, in or about January 2004, Miller, acting in concert with Krakora and Geswein, established a $4.5 million corporate obsolescence and excess inventory account effective December 31, 2003.  This corporate inventory account was used as a cookie jar reserve that Geswein, Krakora and Miller knew, or were reckless in not knowing, had no legitimate accounting basis and violated GAAP.

<u>Improperly Delaying and Capitalizing Expenses</u>

*Division 35 and CAP 250*

86.     As detailed below, Diebold failed to recognize certain expenses as incurred, and instead improperly deferred these expenses or spread the expenses over several reporting

periods, which artificially increased net income in several fiscal years.  With regard to recording expenses, Geswein had a saying he used with subordinates: "take it by the drink."  The expression meant that instead of recording the whole expense, Diebold would recognize its expenses a little at a time, dilute its impact on current earnings.  Diebold engaged in improper expense deferrals in at least two accounts: the "Division 35" and "CAP 250" accounts.

87.     Division 35 was a finished goods inventory account.  From 2003 through 2005, Geswein and Krakora knew, or were reckless in not knowing, that the value of the account was overstated.  Various meetings had taken place in which Geswein and Krakora discussed that the Division 35 account had a large unexplained balance, and that the account needed to be reconciled.

88.     Nevertheless, Diebold improperly failed to reconcile the account until 2005.  Then, in 2005, instead of restating its prior financial statements to correct the material errors in the account and record expenses in the proper reporting periods as required under GAAP, Diebold spread $15 million of expenses over two quarters in 2005.

89.     Geswein and Krakora knew, or were reckless in not knowing, that the overstatement of the Division 35 account inflated Diebold's earnings by $4.3 million in 2003, and more than $6.2 million in periods prior to 2003.

90.     CAP 250 was an installation accounting system, primarily consisting of two accounts accruing for the cost of installation.  Geswein and Krakora knew, or were reckless in not knowing, that the overstatement of this CAP 250 account inflated Diebold's earnings by $2.1 million in 2004, $2.2 million in 2003, and $4.4 million in periods prior to 2003.

*The Oracle Project*

91.    In 2002, Diebold began a project to replace many of its older internal software systems with Oracle software.  Under GAAP, capitalization of a software asset requires companies to properly capture internal and external costs involved with the various stages of software development.  Consequently, Diebold was permitted to capitalize certain costs associated with the Oracle project.  However, from 2003 through 2006, Diebold improperly capitalized costs that should have been expensed in the periods they were incurred.

92.    In certain quarters when Diebold's earnings were short of forecast, Miller, acting in concert with Geswein and Krakora, made top-level entries to fraudulently capitalize additional expenses to the Oracle project.  These improper "additions," which often were round numbers such as $1 million, had the effect of materially reducing reported expenses, and thus increasing reported earnings.  Geswein, Krakora and Miller knew, or were reckless in not knowing, that Diebold had been improperly capitalizing expenses related to the Oracle project since at least 2004.  For example, Miller made top-level entries to increase capitalization of Oracle expenses in the amounts of $1 million effective September 30, 2004, and $1.6 million effective March 31, 2005.

93.    Diebold's improper capitalization of expenses to the Oracle project increased Diebold's pre-tax earnings in 2003, 2004 and 2005, by at least $0.5 million, $3 million, and $6.8 million, respectively.

94.    Geswein, Krakora and Miller knew, or were reckless in not knowing, that making such improper journal entries would cause the revenue and/or earnings figures reported by Diebold to the public to be overstated and false.

<u>Used Equipment Write-Ups</u>

95.    Under GAAP, used equipment inventory should be valued at the lower of cost or market value.  From 2003 to 2005, Diebold often improperly "wrote-up" the value of certain

used inventory, such as used ATMs.  These "write-ups" had the effect of reducing cost of goods sold and thus inflating earnings, and were used by Geswein and Krakora in order to meet earnings forecasts.

96.     For example, in the second quarter of 2004, Geswein and Krakora directed the write-up of value of used equipment inventory by $1 million (and thus increased net income by $1 million) to inflate earnings to meet forecasts.

97.     Miller improperly booked this $1 million entry without any legitimate accounting basis.

98.     Furthermore, Diebold improperly wrote up the value of other used equipment inventory (and inflated earnings) by $750,000 in the fourth quarter of 2004, $1.2 million in 1Q05, and $1 million in 2Q05.  These improper accounting entries were republished in later financial reports, including in the restated 2004 results reported in August 2005, and the 2005 annual report.

99.     Geswein, Krakora and Miller knew, or were reckless in not knowing, that these used equipment "write-ups," which were listed on several "opportunity lists," had no legitimate accounting basis, violated GAAP and were used improperly to inflate Diebold's earnings.

100.     Geswein, Krakora and Miller knew, or were reckless in not knowing, that the making of such improper journal entries would cause the revenue and/or earnings figures reported by Diebold to the public to be overstated and false.

<u>Diebold's 2008 Restatement</u>

101.     As result of Diebold management's improper accounting manipulations from at least 2002 to 2007, the financial statements that Diebold incorporated into its periodic filings and other materials disseminated to the investing public were materially false and misleading. Diebold's improper accounting practices significantly inflated the Company's reported earnings,

28

skewed Diebold's revenue and earnings trends and created a false impression of Diebold's value that artificially inflated the price of its stock.  To correct the more recent misstatements, on September 30, 2008, Defendants belatedly filed Diebold's Form 10-K for 2007 and included in that report a restatement for the years 2003 through 2006, and 1Q07, the "Restatement."

Diebold's Materially
Misleading Financial Reports and Statements

102.    By virtue of the Restatement (Exhibit C), Defendants particularly described and quantified the financial reporting false statements, and, pursuant to GAAP, admitted that the financial statements were inaccurate as of the time they were initially issued and at the time they were republished in later reports; and that the accounting misstatements were material to users of the financial statements, including investors.  Diebold's materially false financial statements were included in Diebold's Forms 8-K, and originally issued and restated 10-K's, and 10-Q's filed with the SEC and available to the public, appeared in other presentations of Diebold's finances in press releases distributed to the public, and were incorporated and discussed in conference calls with stock analysts during the Class Period.

103.    The false statements about Diebold's revenues, expenses and/or earnings, as well as about its financial condition, which resulted from the conduct of Geswein, Krakora and Miller, as described above, included, but are not limited to, the false reports and statements described above, and the following additional examples, which, even when they were made outside the Class Period, further demonstrate Defendants' intent to mislead investors:

(a)     After Diebold announced its fourth quarter 2003 ("4Q03") earnings results, on January 28, 2004, Geswein stated on a conference call with investment analysts, "let me echo Wally's sentiments of how pleased we are to report record revenue and profits with EPS of 81 cents per share, which is near the high end of our previous

guidance of 78 cents to 83 cents per share."  Diebold's Form 10-K for 2003 (signed by Geswein and Krakora on or about February 27, 2004), repeated the EPS figure of $0.81 for the fourth quarter of 2003.  However, Diebold's earnings would not have met the Company's previous guidance without Miller's improper manual journal entries made in concert with Geswein and Krakora. Miller made a $14.8 million entry to an unreconciled deferred revenue account and an $8.5 million entry to an unreconciled accounts payable account, increasing Diebold's pre-tax income by over $23 million.  Without these journal entries, Diebold's reported fourth quarter 2003 EPS would have been about 25% lower, which would have been well outside its previous guidance range.

(b)      After Diebold announced its 4Q04 earnings results, on January 26, 2005, Geswein stated on a conference call with investment analysts, "We are pleased to report record revenue, earnings, and free cash flow for the quarter.  Reported revenue was $717 million, up 10.6 percent while reported EPS was 87 cents, an increase of 7.4 percent and within previous guidance of 87 to 92 cents a share."  However, Diebold's earnings would not have been within Diebold's previous guidance but for several of the Defendants' fraudulent schemes described above.  For example, Diebold's pre-tax income was increased by over $8 million by "pulling-in" $1.3 million of earnings from F-term transactions, switching orders from F-terms to I-terms resulting in an increase in $5.6 million of earnings, writing-up inventory by $750,000, and improperly capitalizing $1 million of expenses related to the Oracle project.  Without these entries, Diebold's 4Q04 EPS would have been over 10% lower, and would have been well outside its previous guidance range.

(c)     In Diebold's Form 10-Q for 1Q05 (signed by Geswein on or about May 5, 2005), the Company reported EPS of $.37, which met its earnings forecast for that quarter of $.35 to $.40.  Diebold's reported EPS was inflated by improper transactions and accounting entries described above, including but not necessarily limited to, the premature recognition of revenue from the Cash Depot transaction, improper capitalization of expenses on the Oracle project, and improper reversal of a portion of the "cookie jar" excess and obsolescence reserve.  Without this fraudulent accounting, Diebold's reported EPS would have been well below the quarterly earnings forecast.

<u>The KPMG Auditors Knowingly or Recklessly Approved Materially<br>False and Misleading Annual Reports</u>

104.    Under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, an auditor may be primarily liable for securities fraud when it provides an audit report containing an unqualified audit opinion certifying financial statements that were false or misleading at the time the audit report was issued.  Even if the auditor lacked knowledge and was not reckless in issuing its audit report, an auditor may become primarily liable for securities fraud if it subsequently learns or was reckless in not learning that its earlier issued audit report erroneously certified financial statements that, in fact, were materially false and misleading, and that potential investors are relying on its earlier issued audit report, yet fails to take reasonable steps to correct or withdraw it and/or to cause the audit client to correct the underlying financial statements.

105.    Here, for annual audits of Diebold for 2003-2006, KPMG issued unqualified audit reports that incorrectly certified Diebold's materially false and misleading financial statements. The audit reports were published with the respective annual reports for Diebold.  For each annual audit KPMG stated in its report that, in its opinion, Diebold's statement of financial position for

31

the year under audit and the previous year, and its statement of the results of operations for the year under audit and the two previous years, were presented "fairly" . . . "in conformity with accounting principles generally accepted in the United States of America."

106.    KPMG's unqualified audit reports were materially false and misleading because, as set forth with particularity above, Diebold's financial statements included in its annual reports for years 2003-2006 did not present fairly, in all material respects, Diebold's results of operation or its financial condition in accordance with GAAP.

107.    Furthermore, as early as May 9, 2006 if not earlier, KPMG learned, or was reckless in not learning, that Diebold had been materially misstating its earnings so that KPMG's audit reports containing unqualified audit opinions would also be false and misleading.  On May 9, 2006 Diebold publicly announced that the SEC had begun an informal inquiry relating to the Company's revenue recognition policy.  With this information, KPMG was on notice that it had to investigate the accuracy of its earlier issued audit opinions.  In light of the nature and pervasiveness of the revenue recognition and other accounting errors admitted in the Restatement, and with information of the SEC's inquiry, any auditor which was not acting recklessly would have discovered that the earlier issued financial statements were materially misstated.

108.    That KPMG was on notice that it had to investigate the accuracy of its earlier issued audit opinions, and was at least reckless in failing to do so and/or in failing to correct its reports, became progressively more obvious with the following public information:

- on August 7, 2006 Diebold reported that the SEC had upgraded its review from an informal inquiry to a formal fraud investigation;

- on July 25, 2007 Diebold reported that it was delaying the release of its 2Q07 financial results;

- on October 2, 2007 Diebold announced that its prior year financial results may need to be restated;

- on November 9, 2007 Diebold reported that it was delaying the release of its 3Q07 financial results; and

- on December 21, 2007 Diebold reported that it was under investigation by the DOJ.

109.    Each of these announcements was enough to require KPMG to investigate the accuracy and correct its prior unqualified audit reports upon which Diebold's investors were continuing to rely.  With full access to Diebold's internal financial documents and financial officers, and armed with the knowledge that first the SEC and then the DOJ were investigating the Company for securities fraud and that the Company was unable to timely file its required Forms 10-Q, KPMG either knew or was reckless in not learning that the Company's past financial statements were materially misstated and that KPMG's past audit opinions were false and needed to be corrected, yet were not.

110.    Investors were relying upon KPMG's unqualified audit opinions for years 2003-2006.  Had KPMG withdrawn its unqualified audit opinions and/or required the Company to withdraw the underlying financial statements for those years, investors would not have continued to purchase Diebold shares at artificially inflated prices.  Not until filing a Form 8-K on January 15, 2008 did Diebold advise potential investors that its earlier financial statements should no longer be relied on.  Specifically, Diebold's Form 8-K stated:

> Based upon further discussions with the OCA, the company has decided to change its revenue recognition policy.  For revenue previously recognized on a

bill and hold basis, the Company will now recognize revenue upon customer acceptance of products at a customer location.  Within the North America business segment, when the Company is contractually responsible for installation, customer acceptance will be upon completion of installation of all of the items at a job site and Diebold's demonstration that the items are in operable condition.  In those instances when the Company is not contractually responsible for the installation, the Company will continue to recognize revenue upon shipment of the products to a customer location.

*The Company's revised method of recognizing revenue will be adopted immediately and comes after an in-depth analysis and review with its independent registered public accounting firm, KPMG LLP*, the Audit Committee of the Company's Board of Directors and the OCA.  *On January 9, 2008, management of the Company concluded that the Company's financial statements for the fiscal years ended December 31, 2006, 2005, 2004 and 2003; the quarterly data in each of the quarters for the years ended December 31, 2006 and 2005; and the quarter ended March 31, 2007, must be restated to reflect the Company's revised accounting method and should no longer be relied upon.*  On January 14, 2008, the Company discussed this conclusion with the Audit Committee.  In addition, management's report on internal control over financial reporting contained in Form 10-K for the fiscal year ended December 31, 2006 should no longer be relied upon.

On December 21, 2007, it was announced that as a result of the SEC's ongoing investigation, the Company and the Audit Committee, in consultation with their outside advisors, have been reviewing other accounting items.  While the review is not complete, any adjustments identified will be included in amendments to the Company's financial statements.

*Management and the Audit Committee have discussed the matter disclosed in this current report on Form 8-K with KPMG LLP.*

[Emphasis added.]

111.   Beginning in 2006 and throughout 2007, KPMG knew and/or recklessly disregarded the facts which demonstrated that the 2003-2006 year-end financial statements of the Company which it had audited, and which it had publicly approved, were materially misstated as of the dates they were issued as described herein.  As a result, KPMG also knew or recklessly disregarded that its own audit reports on these financial statements had been false and misleading and needed to be corrected to prevent continuing harm to investors.

112.    KPMG falsely stated that the Company's fiscal 2003-2006 financial statements "present fairly, in all material respects," and "in conformity with generally accepted accounting principles," the financial position and results (*i.e.*, earnings) of the Company.    These representations were materially false and misleading because, *inter alia*:

      a.  Diebold improperly engaged in "bill-and-hold" revenue recognition in violation of the requirements of GAAP;

      b.  Diebold improperly recognized revenue on a lease agreement subject to an undisclosed side buy-back agreement;

      c.  Diebold had manipulated its reserves and accruals to manage its revenue and earnings trends;

      d.  Diebold had improperly delayed and capitalized expenses; and

      e.  Diebold had improperly written up the value of used inventory.

### LOSS CAUSATION/THE TRUTH EMERGES

113.    The truth about Defendants' earnings management fraud slowly leaked into the market and first began to emerge on May 9, 2006.  That is when Diebold disclosed that the SEC had taken an interest in the Company's revenue recognition practices.    Specifically, the Company stated:

> ***The company was recently informed that the staff of the SEC has begun an informal inquiry relating to the company's revenue recognition policy***.  The SEC indicated in its letter to the company that the inquiry should not be construed as an indication by the SEC that there has been any violation of the federal securities laws.  The Company is cooperating with the SEC in connection with the inquiry.  ***The company cannot predict the length, scope or results of the informal inquiry, or the impact, if any, on its results of operations***.

[Emphasis added.]

114.    In describing the "SEC Probe," Diebold's spokesman, Mike Jacobson, revealed that Diebold had been prematurely recognizing its service revenues on its voting systems, and that the SEC's examination of Diebold revenue recognition practices extended beyond this business segment.

115.    Nothing more was said about the SEC investigation until August 7, 2006, when Diebold announced in its 2Q06 financial report that the SEC had upgraded the investigation from an informal inquiry into a ***formal fraud investigation***.  Specifically, the Company stated:

> ***The company was previously informed that the staff of the SEC had begun an informal inquiry relating to the company's revenue recognition policy. . . . The company was recently informed that the SEC's inquiry now has been converted to a formal, non-public investigation.  The company is continuing to cooperate with the SEC in connection with the investigation.  The company cannot predict the length, scope or results of the investigation, or the impact, if any, on its results of operations***.

[Emphasis added.]

116.    Former Diebold employees confirmed that the SEC's formal fraud investigation into the Company's revenue recognition practices was ongoing.  For instance, Diebold's Former Director of Accounting, who held this position throughout the Class Period, has stated that the SEC has deposed several of the Company's top executives, including current and former officers in Diebold's accounting and finance departments.  This former Diebold officer further confirmed that the SEC was scrutinizing Diebold's revenue recognition practices.

117.    Investors learned more bad news about Defendants' premature revenue recognition on July 25, 2007.  That is the date when Diebold announced that it was delaying the release of the Company's 2Q07 financial results and first described the nature of its conduct that was under investigation by the SEC, particularly its "bill-and-hold" revenue recognition practices.  By this announcement, Diebold also sought to minimize its accounting transgressions by presenting its reporting violations as "long-standing" and technical.  The Company announced in a press release entitled "Diebold Announces Delay of Second Quarter Financial Results":

NORTH CANTON, Ohio – *Diebold, Incorporated (NYSE: DBD) today announced that it will delay the release of its second quarter 2007 earnings results and related conference call, both originally scheduled for July 31.*

*The delay relates to Diebold's long-standing practice of recognizing certain revenue on a "bill and hold" basis within its North America business segment. In connection with questions that have arisen during the ongoing formal investigation by the Securities and Exchange Commission (SEC), Diebold has decided to proactively seek guidance from the Office of the Chief Accountant (OCA) of the SEC as to the company's revenue recognition policy.* While the percentage of this bill and hold revenue may vary from period to period, it represented less than 10 percent of the company's total consolidated revenue in 2006.

*Diebold believes that the OCA's response would only potentially affect the timing of the recognition of certain revenue.* As a consequence, the company does not anticipate any impact to cash provided by operating activities or the company's net cash position, due to any potential change in the timing of revenue recognition.

"We regret the delay in our ability to report results for the second quarter. We take our responsibility to provide complete and accurate financial information seriously and are taking proactive steps that we believe are appropriate under these circumstances," said Thomas W. Swidarski, Diebold president and chief executive officer.

The company will issue its second quarter 2007 earnings results as soon as possible following a response from the OCA. Diebold may also have to delay the filing of its Quarterly Report on Form 10-Q for the quarter ended June 30, 2007 depending on the timing of the receipt of the response. The regular deadline for the filing of the company's Form 10-Q for the quarter ended June 30, 2007 is August 9.

[Emphasis added.]

118.     Between July 25 and July 27, 2007, as a result of this partial disclosure of the truth, Diebold's stock price dropped 4.5%.

119.     Defendants issued another press release on October 2, 2007 entitled "Diebold Provides Update On Revenue Recognition Practice." In this release, the Company informed investors for the first time that Diebold's prior year financial results may need to be restated as a result of its premature revenue recognition. It also announced that the amount of improperly

recognized ATM revenue was significant – *i.e.*, 11% of total 2006 revenues, or $320 million.

Specifically, the Company stated:

> NORTH CANTON, Ohio – ***Diebold, Incorporated (NYSE: DBD) has been engaged in an ongoing discussion with the Office of the Chief Accountant (OCA) of the Securities and Exchange Commission (SEC) regarding the company's practice of recognizing certain revenue on a "bill and hold" basis within its North America business segment.  As a result of these discussions, Diebold will discontinue the use of bill and hold as a method of revenue recognition in both its North America and international businesses.  Diebold is currently working to determine the most appropriate revenue recognition method to replace its prior bill and hold practice, and believes that an amendment of its prior financial statements may be required.***
>
> The change in the company's revenue recognition practice, and the potential amendment of prior financial statements, would only affect the timing of recognition of certain revenue.  **While the percentage of the company's global bill and hold revenue varied from period to period, it represented 11 percent of Diebold's total consolidated revenue in 2006.**  The company does not anticipate that the change in the timing of revenue recognition would impact previously reported cash provided by operating activities or the company's net cash position.
>
> Diebold will provide further information once it has completed an in-depth analysis of the most appropriate revenue recognition method and has reviewed it with its independent auditors and its audit committee.  While the company cannot predict with certainty the length of time it will take to complete this analysis and review, it anticipates the process will take at least 30 days.  Upon completing this process, Diebold will be in a position to provide updated revenue and earnings guidance for the full-year 2007.
>
> ***Additionally, if the company determines it is necessary, it will begin the process of filing amended financial statements, including amending its annual report on Form 10-K/A for the year ended December 31, 2006 and its quarterly report on Form 10-Q/A for the quarter ended March 31, 2007.  After filing these amendments, the company can then file its Form 10-Q for the quarters ended June 30, 2007, and September 30, 2007, and resume its regular financial reporting schedule.***

[Emphasis added.]

120.    On October 3, 2007, as a result of this partial disclosure of the truth, Diebold's

stock price dropped 2.5%.

121.    By a news release dated December 21, 2007, Diebold announced that it was also under investigation by the DOJ – which means that the government was now investigating Diebold's financial reporting for violations of federal criminal laws:

**SEC investigation in process; U.S. Department of Justice also investigating related matters.**

NORTH CANTON, Ohio – As announced on October 2, 2007, Diebold, Incorporated (NYSE: DBD) has been engaged in an ongoing discussion with the Office of the Chief Accountant (OCA) of the Securities and Exchange Commission (SEC) regarding the company's prior, discontinued practice of recognizing certain revenue on a "bill and hold" basis.  Bill and hold is when ownership of a product contractually passes to the customer and revenue is recognized by the supplier prior to delivery of the products to the customer.

\*      \*      \*

*Also, as previously disclosed, the SEC's formal, non-public investigation is still in process.  Additionally, the company recently learned that the U.S. Department of Justice is conducting a parallel investigation.  Diebold continues to cooperate with the SEC, and will cooperate with the Department of Justice if requested, in connection with these investigations and cannot predict the length, scope or results of the investigations, or the impact they may have on the results of the company's operations.*

[Emphasis added.]

122.    Diebold issued another press release relating to its false revenue recognition scheme on January 15, 2008.  In this release, the Company stated that it had concluded its discussions with the SEC's Office of the Chief Accounting regarding its premature revenue recognition, and, as a result, it would be restating its year end financial results for fiscal years 2006, 2005, 2004 and 2003.  The Company also admitted that the SEC's investigation was not limited to the so-called "bill-and-hold" practices at the Company, but also included certain unspecified "other accounting items."  Specifically, the release stated that:

NORTH CANTON, Ohio – Diebold, Incorporated (NYSE: DBD) announced today that it has concluded its discussions with the Office of the Chief Accountant (OCA) of the Securities and Exchange Commission (SEC) regarding the

company's prior practice of recognizing certain revenue on a "bill and hold" basis and has established a revised revenue recognition method.

## Revised revenue recognition

On October 2, 2007, the company announced it was discontinuing the use of bill and hold as a method of revenue recognition in both its North America and International businesses. Based upon further discussions with the OCA, Diebold has decided to change its revenue recognition policy. For revenue previously recognized on a bill and hold basis, the company will now recognize revenue upon customer acceptance of products at a customer location. Within the North America business segment, when the company is contractually responsible for installation, acceptance will be upon completion of the installation of all of the items at a job site and Diebold's demonstration that the items are in operable condition. In those instances when Diebold is not contractually responsible for the installation, the company will continue to recognize revenue upon shipment of the products to a customer location.

The company's revised method of recognizing revenue will be adopted immediately and comes after an in-depth analysis and review with its external auditors, the audit committee of the company's Board of Directors and the OCA. *Following this in-depth analysis and review, the company has also concluded that its financial statements for the fiscal years ended December 31, 2006, 2005, 2004 and 2003; the quarterly data in each of the quarters for the years ended December 31, 2006 and 2005; and the quarter ended March 31, 2007 must be restated to reflect the company's revised accounting method and should no longer be relied upon. On January 14, the company discussed this conclusion with its audit committee. In addition, management's report on internal control over financial reporting contained in Form 10-K for the fiscal year ended December 31, 2006 should no longer be relied upon.*

As noted above, revenue previously recognized under the company's prior bill and hold practice will be deferred until customer acceptance of the products at a customer location. This change should not, however, impact the timing of related billing and collection activity, and therefore is not expected to impact total cash flow from operating activities.

Once Diebold has reviewed the impact of this accounting change on its 2006 and 2007 revenue with its external auditors, it will provide updated revenue estimates for these periods. The company anticipates that the review of the impact of the accounting change will be completed by the end of January 2008.

*On December 21, 2007, it was announced that as a result of the SEC's ongoing investigation, the company and its audit committee, in consultation with their outside advisors, have been reviewing other accounting items. While this review is not complete, any adjustments identified will be included in amendments to the company's financial statements. The company anticipates the review of other accounting items will be completed in the first quarter of 2008.* After this review has been completed, Diebold will file, as soon as possible, the necessary amended financial statements. After filing these amendments, the company will then file its quarterly reports on Form 10-Q for the quarters ended June 30, 2007 and September 30, 2007 and its annual report on Form 10-K for the year ended December 31, 2007. While any amended financial statements will address all the issues identified in the review, the government

investigations remain ongoing and there can be no assurance that the results of these investigations will not impact previously reported financial statements.

Prior to filing its amended financial statements, and as soon as is feasible following the completion of the review of the other accounting items, Diebold will also provide preliminary financial results for the second, third and fourth quarters of 2007.

[Emphasis added.]

123.    On January 16, 2008, as a result of this partial disclosure of the truth, Diebold's stock price dropped 4.23%.

124.    Diebold, by its press release dated February 6, 2008, announced that its restatements for its admittedly wrongful revenue recognition practices were still coming, and that even greater financial reporting violations included in its prior financial statements continued to be reviewed internally and remained under government investigation.  It also announced that Diebold had over-stated its pre-2006 reported revenues by $190 million as a result of its wrongful "bill-and-hold" revenue recognition practices.

125.    By its Form 8-K filed February 19, 2008, Diebold reported that its Board of Directors had decided to deny compensation in the form of performance shares of Diebold stock to Defendant Krakora, "[I]n light of and in connection with the pending restatements of the Company's financial statements."

**THE STATUTE OF LIMITATIONS
HAS NOT EXPIRED**

126.    The five year statute of repose under the Exchange Act has not expired for any of the accounting misstatements incorporated into Diebold's financial statements contained in the 10-Ks filed in 2003 and 2004 because Defendants republished all of its financial statements from 2003 and 2004 when it filed an amended 10-K for 2003 and 2004 on August 12, 2005.

127.     Furthermore, the two-year discovery rule under the Exchange Act has not expired because Plaintiff did not have access to particularized facts showing the amounts, by year, and details of the accounting misstatements until the Company filed its Restatement in September 2008 (Exhibit C), and did not have access to the particularized facts available to the SEC (and KPMG) showing that Defendants Geswein, Krakora and/or Miller made the false and misleading statements and/or omissions described in the Restatement with scienter until the SEC concluded its in depth investigation of Diebold's internal documents and witnesses, and publicly disclosed this detailed investigative information in the complaints charging Diebold and the other Defendants with civil securities fraud on June 2, 2010.

## CLASS ACTION ALLEGATIONS

128.     Plaintiff brings this action as a federal class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all those who purchased the securities of Diebold between June 30, 2005 and January 15, 2008 inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

129.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Diebold securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.

130.    Plaintiff's claims are typical of the claims of the members of the Class, because they and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

131.    Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel who are experienced and competent in class actions and securities litigation.

132.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

133.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendants' acts as alleged herein;

- Whether the Company's publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

- Whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

- Whether the Defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts; and

- Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

134.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things;

- Defendants made public misrepresentations or failed to disclose facts during the Class Period;

- The omissions and misrepresentations were material;

- Diebold securities traded in an efficient market;

- The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and other members of the Class purchased Diebold securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

135.    At all relevant times, the market for Diebold securities was an efficient market for the following reasons, among others:

- Diebold securities were listed and actively traded during the Class Period on the NYSE, an open, highly efficient and automated market.  The average daily volume of the Diebold common stock during the Class Period was approximately 595,000 shares traded per day;

- As a regulated issuer, Diebold regularly made public filings, including its Forms 10-K, Forms 10-Q and related press releases, with the SEC;

- Diebold was followed by analysts from major brokerages including Goldman Sachs, Merrill Lynch, Robert W. Baird Analysts, Midwest Research, KeyBanc Capital Markets, Brookside Capital, Jefferies & Company, and Bramwell Capital Management, among others. The reports of these analysts were redistributed to the brokerages' sales force, their customers, and the public at large; and

- Diebold regularly communicated with public investors via established market communication mechanisms, including the Company's website, regular disseminations of press releases on the major news wire services, and other wide-ranging public disclosure, such as communications with the financial press and other similar reporting services.

136.  As a result, the market for Diebold securities digested current information regarding the Company from the publicly available sources described above and reflected such information in the prices of Diebold securities.  As would be expected where a security is traded in an efficient market, material news concerning Diebold's business had an immediate effect on the market price of Diebold's securities, as evidenced by the rapid decline in the market price in the immediate aftermath of Diebold's corrective disclosures as described herein.  Under these circumstances, all purchasers of Diebold's securities during the Class Period suffered similar injury due to the fact that the price of Diebold securities was artificially inflated through the Class Period, and they incurred losses when the truth about the fraud was revealed or otherwise leaked into the market.  At the times they purchased or otherwise acquired Diebold's securities, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.  As a

result, the presumption of reliance applies.  Plaintiff will also rely, in part, upon the presumption of reliance established by a material omission.

## COUNT I

**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
PROMULGATED THEREUNDER
(AGAINST DIEBOLD AND THE INDIVIDUAL DEFENDANTS)**

137.    Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein.  This claim is asserted against Defendants Geswein, Krakora and Miller (the "Individual Defendants") and Diebold.

138.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period did:  (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Diebold's publicly traded securities; (c) cause Plaintiff and other members of the Class to purchase Diebold's publicly traded securities at artificially inflated prices; and (d) proximately cause Plaintiff's losses when the truth leaked into the market and was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

139.    In addition to the duty of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01 *et seq*.), S-K (17 C.F.R. §229.10 *et seq*.) and other SEC regulations, including accurate and truthful

information with respect to Diebold's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

140.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Diebold as specified herein.

141.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Diebold's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Diebold and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchaser of Diebold's securities during the Class Period.

142.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Diebold's securities were artificially inflated during the Class Period, and then fell as Defendants made corrective disclosures that were revealed or otherwise leaked into the market.  In ignorance of the fact that market prices of Diebold's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the

integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Diebold securities during the Class Period at artificially high prices and, as the truth was revealed or otherwise leaked into the market about the artificial inflation in Diebold's stock price was removed, Plaintiff and other members of the Class were damaged thereby.

143.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff, the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Diebold stock, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Diebold publicly traded securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

144.    By virtue of the foregoing, Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

145.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other member of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

<u>**COUNT II**</u>

**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
PROMULGATED THEREUNDER
(AGAINST DEFENDANT KPMG)**

146.     Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein.  This claim is asserted against Defendant KPMG.

147.     During the Class Period, KPMG issued several unqualified audit opinions that were materially false and misleading because, as set forth with particularity above, Diebold Form 10-Ks for years 2003-2006 did not present fairly, in all material respects, the financial information set therein and were not prepared in accordance with GAAP.

148.     KPMG knew or was reckless in not learning that its unqualified audit opinions were false and misleading at least as early as May 9, 2006 – if not earlier.  That is the date when Diebold announced that the SEC had begun an informal inquiry relating to the Company's revenue recognition policy.

149.     KPMG was also reckless in failing to withdraw its unqualified audit opinion when it learned:

- on August 7, 2006 Diebold reported that the SEC had upgraded its review from an informal inquiry to a formal fraud investigation,

- on July 25, 2007 Diebold reported that it delaying the release of its 2Q07 financial results,

- on October 2, 2007 Diebold announced that its prior year financial results may need to be restated;

- on November 9, 2007 Diebold reported that it was delaying the release of its 3Q07 financial results; and

- on December 21, 2007 Diebold reported that it was under investigation by the DOJ.

150.     As a result of the failure to withdraw its unqualified audit opinions upon learning that Diebold's financial statements were materially false, the market price of Diebold's securities were artificially inflated during the Class Period, and then fell as Diebold made corrective disclosures that were revealed or otherwise leaked into the market.  In ignorance of the fact that market prices of Diebold's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by KPMG, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by KPMG but not disclosed in public statements by KPMG or Diebold during the Class Period, Plaintiff and the other members of the Class acquired Diebold securities during the Class Period at artificially high prices and, as the truth was revealed or otherwise leaked into the market about the artificial inflation in Diebold's stock price was removed, Plaintiff and other members of the Class were damaged thereby.

151.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff, the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Diebold stock, which were not disclosed by KPMG, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Diebold publicly traded securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

152.     By virtue of the foregoing, KPMG has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

153.     As a direct and proximate result of KPMG's wrongful conduct, Plaintiff and the other member of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT III

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### (AGAINST ALL INDIVIDUAL DEFENDANTS)

154.     Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

155.     Defendants Geswein, Krakora and Miller each acted as a controlling person of Diebold within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.  Each of these Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

156.     In addition, each of these Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

157.     As set forth above, Diebold and these Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of their controlling positions, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests a judgment, as follows:

A.     Determining that this action is a proper class action, and certifying proposed class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 30, 2010                               /s/ Geoffrey M. Johnson
Cleveland, Ohio                                    **SCOTT+SCOTT LLP**
                                                   Geoffrey M. Johnson (Bar No. 0073084)
                                                   12434 Cedar Road, Suite 12
                                                   Cleveland Heights, OH  44106
                                                   (216) 229-6088 (phone)
                                                   (216) 229-6092 (fax)
                                                   gjohnson@scott-scott.com

**SCOTT+SCOTT LLP**
David R. Scott
156 South Main Street
P.O. Box 192
Colchester, CT  06415
(860) 537-5537 (phone)
(860) 537-4432 (fax)
drscott@scott-scott.com

**SCOTT+SCOTT LLP**
Beth A. Kaswan
500 Fifth Avenue, 40th Floor
New York, NY  10110
(212) 223-6444 (phone)
(212) 223-6334 (fax)
bkaswan@scott-scott.com

**Counsel for Plaintiff**