UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | No. 1:10-cv-01461-CAB<br><br>CLASS ACTION<br><br>Judge Christopher A. Boyko |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| KPMG, LLP, et al., | ) ) | |
| Defendants. | ) ) ) | DEMAND FOR JURY TRIAL |

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES
EXCHANGE ACT OF 1934

LANDSKRONER • GRIECO • MADDEN, LLC
JACK LANDSKRONER (0059227)
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
   & DOWD LLP
DARREN J. ROBBINS
DEBRA J. WYMAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................1

JURISDICTION AND VENUE .................................................................................2

RELEVANT PARTIES .............................................................................................3

DIEBOLD DEFENDANTS' FINANCIAL MANIPULATION OF DIEBOLD'S
    REPORTED RESULTS........................................................................................6

FALSE AND MISLEADING STATEMENTS AND OMISSIONS...........................19

THE AFTERMATH OF DEFENDANTS' FRAUD ...................................................50

DIEBOLD'S CLASS PERIOD FINANCIAL STATEMENTS WERE  MATERIALLY
    MISSTATED IN VIOLATION OF GAAP..........................................................56

DISCLOSURE OF DEFENDANTS' INVOLVEMENT IN THE FALSIFICATION OF
    DIEBOLD'S FINANCIAL STATEMENTS ........................................................86

LOSS CAUSATION/ECONOMIC LOSS .................................................................87

NO SAFE HARBOR .................................................................................................88

APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD-ON-THE-MARKET
    DOCTRINE .........................................................................................................89

CLASS ACTION ALLEGATIONS ...........................................................................90

CLAIMS FOR RELIEF ............................................................................................91

PRAYER....................................................................................................................94

JURY DEMAND .......................................................................................................95

## INTRODUCTION

1.      This securities fraud class action is brought on behalf of persons who purchased the publicly traded securities of Diebold, Inc. ("Diebold" or the "Company") between June 30, 2005 and January 14, 2008 (the "Class Period").  This case is brought against Diebold, Gregory T. Geswein ("Geswein"), Kevin J. Krakora ("Krakora"), Sandra Miller ("Miller") and KPMG, LLP ("KPMG") (collectively "defendants").  This action arises out of a fraudulent scheme and wrongful course of business whereby defendants caused Diebold to issue false financial statements for fiscal year 2003-2006 and the first quarter of 2007.

2.      Beginning in at least 2002 and continuing through the end of the Class Period, defendants Diebold, Geswein, Krakora and Miller fraudulently manipulated Diebold's reported earnings and financial performance, which conduct was designed to and did cause Diebold to issue false releases and file false reports with the Securities and Exchange Commission ("SEC").

3.      These defendants caused Diebold to falsify its financial results during the Class Period by, among other things, improperly recognizing revenue and manipulating the Company's recording of expenses.  Defendants' actions caused Diebold to materially misstate the Company's reported revenues and earnings by as much $127 million.

4.      Defendants Diebold, Geswein, Krakora and Miller's conduct to manipulate and manage Diebold's earnings stretched back to at least 2002.  However, during the Class Period, when these defendants announced that the Company was restating its financial statements to correct an "error" in a commission account, defendants remained silent about their wrongful conduct that they knew resulted in a material misstatement in the Company's revenues and earnings that was not addressed by the announced restatement.  Those materially misstated "restatement" results were reiterated throughout the Class Period.

- 1 -

5.      Defendant KPMG also remained silent concerning the violations of Generally Accepted Accounting Principles ("GAAP") occurring internally at Diebold.  In January 2004, KPMG discovered evidence of improper revenue recognition relating to the application of GAAP's "bill and hold" provisions but did no further investigation to determine how widespread the discovered conduct was, what amount of revenue was improperly reported, and if other violations of GAAP were occurring.  KPMG remained silent on this discovery even after the Company announced its limited restatement in the summer of 2005.

6.      On May 9, 2006, the Company announced that the SEC had opened an informal investigation into Diebold's revenue recognition practices.  More than four years later, on June 2, 2010, the SEC filed a complaint against Diebold outlining various violations of GAAP by the Company.  That same day, the Company announced that the SEC had filed settlement materials to finalize Diebold's agreement to pay $25 million to resolve the SEC's action.  On June 30, 2010, the SEC also filed a civil action against defendants Geswein, Krakora and Miller for violations of the federal securities laws associated with their falsification of Diebold's reported financial results.  This action remains pending against these defendants.

7.      Plaintiff and the Class have suffered hundreds of millions of dollars in damages as they purchased Diebold securities at inflated prices and the price of Diebold's common stock – which traded as high as $54.50 during the Class Period – fell to $24.71 per share on January 15, 2010.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act" or the "1934 Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

- 2 -

9.      This Court has jurisdiction over the subject matter of this action pursuant to 27 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78aa].

10.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Diebold maintained its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

11.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## RELEVANT PARTIES

**Lead Plaintiff**

12.     Lead Plaintiff The Building Trades United Pension Trust Fund (the "Fund") is operated for the benefit of its participants and their families.  The Fund purchased Diebold's publicly traded securities during the Class Period and was damaged thereby as set forth in the Certification attached hereto.

**Defendants**

13.     Diebold is engaged primarily in the sale, manufacture, installation and service of ATMs, bank security systems and electronic voting machines.  Diebold's business segments correspond with its primary sales channels: Diebold North America, Diebold International and Election Systems.  Diebold North America sells financial and retail systems in the United States and Canada.  Diebold International sells financial and retail systems throughout the remainder of the world.  Diebold's Election Systems includes the operating results of Diebold Election Systems and its voting and lottery related business.  Diebold is an Ohio corporation headquartered in North Canton, Ohio.

585867_1

14.     Defendant Gregory T. Geswein is a certified public accountant and was Diebold's Senior Vice President and Chief Financial Officer  ("CFO") from 2000 until his resignation on August 8, 2005.  As part of his duties, Geswein was responsible for and oversaw all aspects of the Company's finance and accounting functions, including the improper revenue recognition and other wrongful accounting practices described herein.  During the Class Period, Geswein participated in the issuance of and caused to be disseminated false and misleading statements and/or failed to disclose material facts about Diebold's accounting practices as detailed in ¶¶21-152.

15.     Defendant Kevin Krakora was Diebold's Executive Vice President and Corporate Controller from 2001 until August 12, 2005 and then CFO during the remainder of the Class Period. As part of his duties as Controller, Krakora reported directly to defendant Geswein.  Defendant Krakora was a certified public accountant.  Defendant Krakora signed false and misleading Sarbanes-Oxley ("SOX") certifications included in the Form 10-K the Company filed for FY05-FY06, and Forms 10-Q for 2Q05, 3Q05, 1Q06-1Q07.  Defendant Krakora also signed the Forms 10-K for FY05-FY06, and each Form 10-Q  filed during the Class Period, which included and republished false and misleading financial results for FY03-FY04.  During the Class Period, Krakora participated in the issuance of and caused to be disseminated false and misleading statements and/or failed to disclose material facts about Diebold's accounting practices as detailed in ¶¶21-132.

16.     Defendant Sandra Miller was Diebold's Director of Corporate Accounting between 2002-2006.  As part of her duties, Miller reported directly to defendant Krakora.  During the Class Period, Miller participated in the issuance of and caused to be disseminated false and misleading statements and/or failed to disclose material facts about Diebold's accounting practices as detailed in ¶¶21-132.

17.     Diebold, Geswein, Krakora and Miller are collectively referred to as "Diebold Defendants."

- 4 -

18.     Defendant KPMG, LLP was Diebold's outsider auditor before and during the Class Period.  Diebold's audits were performed by accountants out of KPMG's Cleveland, Ohio office. For its 2003 through 2006 annual audits, KPMG issued unqualified audit opinions that certified Diebold's false and misleading financial statements included in the Forms 10-K Diebold filed with the SEC.

19.     Defendants were obligated to refrain from falsifying Diebold's books, records and accounts and were prohibited from using the instrumentalities of interstate commerce or the mails to (a) employ devices, schemes or artifices to defraud; (b) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading; or (c) engage in any act, practice or cause of conduct that operates as a fraud.  Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of Diebold securities.

20.     Each of the defendants is liable as a participant in a fraudulent course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of Diebold securities by disseminating materially false and misleading statements and/or concealing material adverse facts about Diebold's operations.  Defendants' conduct deceived the investing public regarding Diebold's operations, finances and financial statements and the intrinsic value of the Company's securities and caused Lead Plaintiff and other members of the Class to be damaged as a result of their purchases of Diebold securities at inflated prices.

21.     During the Class Period, defendants misled the investing public by causing the Company to include Diebold's false and misleading FY03-FY06 and 1Q07 financial statements in public press releases and filings made with the SEC on Forms 10-K and 10-Q.  Diebold's Forms 10-K and 10-Q filed with the SEC each represented that the Company's financial statements were fairly stated in conformity with GAAP, which consists of those principles recognized by the

- 5 -

accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.

22.     As Diebold has now admitted, the Company's FY03-FY06 and 1Q07 financial results were materially false and misleading as the Company's financial reporting violated GAAP and SEC rules in numerous respects.  Regulation S-X [17 C.F.R. §210.4-01(a)(1)], to which the Company is subject as a registrant under the Exchange Act, provides that financial statements filed with the SEC not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

### DIEBOLD DEFENDANTS' FINANCIAL MANIPULATION OF DIEBOLD'S REPORTED RESULTS

23.     Throughout the Class Period, the Diebold Defendants orchestrated financial manipulations that were designed to, and did, misstate Diebold's financial results.  As alleged in the following paragraphs, the Diebold Defendants had actual knowledge of the falsity of the statements they made, or acted in reckless disregard of the truth or falsity of those statements.  In doing so, the Diebold Defendants committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Diebold's stock during the Class Period.

24.     Defendants Geswein, Krakora and Miller were Diebold's top finance and accounting executive officers and certified public accountants charged with ensuring the Company's financial results were fairly stated and complied with GAAP, and Diebold's disclosed accounting policies. Due to the circumstances described in this Complaint, these defendants knew, based on their conduct and accounting expertise, that their alleged Class Period misrepresentations were false or misleading and omitted material information.

25.     Between 2003-2007, the Diebold Defendants regularly manipulated earnings to meet earnings forecasts.  During this time, Diebold management conducted meeting known as monthly business reviews ("MBRs"), in which each Diebold business unit would review the past month's financial performance and that quarter's projected results.  Defendants Geswein, and later Krakora,

- 6 -

would then compare the Company's projection to stock analysts' consensus earnings projections for Diebold.  Typically, Diebold's internally projected earnings were lower than the analyst consensus earnings projected.

26.  Toward the end of most quarters, defendant Krakora compiled "opportunity lists" of ways to close the gap between the Company's actual financial results and analysts' forecasts. Defendant Krakora reviewed such lists with defendant Geswein.  While some items on the "opportunity lists" represented legitimate business opportunities, others were fraudulent accounting transactions designed to improperly recognize revenue or otherwise inflate Diebold's financial performance.

27.  As a quarter came to a close, defendants Geswein and Krakora received "flash reports," sometimes on a daily basis, comparing Diebold's actual earnings to analyst consensus earnings forecasts, which were often referred to as "required" or "necessary" earnings.  Defendants Geswein and Krakora used the often improper "opportunities" from the "opportunity lists" that they devised to reach analysts' earnings target.  Defendant Miller made various manual accounting entries corresponding to these "opportunities" to Diebold's books.  Defendant Miller knew, or was reckless in not knowing, that these "opportunities" and the corresponding manual journal entries were improper.  The Diebold Defendants knew or were reckless in not knowing that their actions were causing Diebold to report materially false financial results to the public.

**Fraudulent Revenue Recognition**

28.  From at least 2003 through 2007, the Diebold Defendants prematurely recognized revenue on numerous transactions they called Factory or "F-term" orders.  The Diebold Defendants recognized revenue on F-term orders when the Company shipped products from its factory to its warehouse.

- 7 -

29.     Under GAAP, a product generally must be shipped to the customer, or services must be rendered, before revenue can be recognized.  GAAP does, however, allow revenue to be recognized before product shipment on so called "bill and hold" transactions, provided very specific criteria are met.  The criteria that allow for a bill and hold transaction to be recognized as revenue prior to product shipment includes: (i) the buyer, not the seller, requests that the transaction be on a bill and hold basis; (ii) the buyer has a substantial business purpose for ordering on a bill and hold basis; (iii) there is a fixed delivery schedule that is reasonable and consistent with the buyer's business purpose; (iv) the seller does not retain any specific performance obligations such that the earnings process is incomplete; and (v) the products are ready for shipment.

30.     Prior to and during the Class Period, the Diebold Defendants fraudulently recognized revenue on all of Diebold's F-term orders by deceptively abusing GAAP's revenue recognition standards by treating ordinary business transactions as bill and hold sales.

31.     In January 2004, as part of its 2003 year-end audit, KPMG tested a sample of Diebold's 2003 bill and hold transactions.  This testing found that Diebold had prematurely recognized revenue on certain transactions, and that in certain instances, Diebold had recognized revenue on transactions inconsistent with Company policy.  In response, Diebold established a reserve representing $7.5 million of profit margin in 4Q03.  This reserve was derived by extrapolating the errors found in KPMG's sample.  The creation of an accounting reserve in this manner violated GAAP as the improperly recognized revenue identified in the audit was required to have been reversed.

32.     In February 2004, defendants Krakora and Miller learned that Diebold had prematurely recognized revenue in 4Q03, on a $5.2 million order from PNC Bank.  Since this transaction had not been identified by KPMG during its testing, defendants Krakora and Miller did not correct the accounting for this transaction or adjust the $7.5 million profit margin reserve that the

585867_1

Company established to account for such errors, even though the transaction demonstrated that the $7.5 million profit margin reserve was inadequate.

33.     After the SEC reiterated the criteria for bill-and-hold accounting in Staff Accounting Bulletin ("SAB") 104 in December 2003, the Diebold Defendants became concerned that their revenue recognition practices would not withstand scrutiny.

34.     Thus, beginning in 2004, the Diebold Defendants created form documents that purported to show that many of Diebold's sales supposedly met the criteria for bill-and-hold revenue recognition under GAAP, even though they knew or were reckless in not knowing that the documents were untrue in many transactions, and those transactions did not legitimately qualify for bill-and-hold treatment.

35.     For example, in early 2004, defendant Krakora, with defendant Miller's assistance, redrafted the Company's form sales contract, known as a Memorandum of Agreement ("MOA") in an effort to make it appear that Diebold customers using the MOA were requesting a product on a bill-and-hold basis for the customer's business purposes even if the customers had not actually requested this and/or did not have a purpose for bill-and-hold.

36.     The Diebold Defendants knew, or were reckless in not knowing, that notwithstanding the revisions to the MOA, the transactions did not meet the criteria for bill-and-hold treatment to recognize review under GAAP because, for example, customers were not generally requesting products on a bill-and-hold basis, and bill-and-hold treatment was not being used for the customers' own business purposes.  Thus, defendants Geswein, Krakora and Miller, as certified public accountants, knew or were reckless in not knowing that Diebold could not properly recognize revenue before delivery of the products to the customer.

37.     In early 2004, under Diebold's revised revenue recognition practices, North American orders could only be designated as being F-term if the customer signed the new standard MOA

- 9 -

drafted by defendants Krakora and Miller, which required a larger percentage of payment from the customer before delivery and installation.  The revised MOA also contained a new boilerplate clause stating that "Customer requests that Diebold hold Items purchased for the Customer's convenience until shipment to the Customer's destination."

38.     Defendants Geswein and Krakora knew that these changes would result in fewer F-term orders, as they envisioned that many customers would not be willing to agree to the new terms. In fact, Diebold's internal financial analysts informed management that the proposed changes to the Company's revenue recognition practices – with the predicted sharp drop-off of F-term contracts – would significantly reduce 2004 revenues.

39.     To offset the negative impact to earnings from these changes, defendants Geswein and Krakora decided to stagger the implementation of the new revenue recognition policy.  For example, beginning in April 2004, Diebold applied the new practices to orders from its larger national bank customers.  Diebold decided to wait until July 2004 to apply the practices to orders from its smaller regional bank customers.

40.     When defendants Geswein and Krakora discovered, however, that certain Diebold personnel began applying the new revenue recognition practices to some regional bank orders earlier than planned, it reduced the Company's earnings and caused Diebold not to meet earnings forecasts for 3Q04.  In or about August and September 2004, defendants Geswein and Krakora instructed Diebold financial personnel to make a significant "top line" journal entry that would prematurely and artificially pull revenue into 3Q04 with regard to sales that, based upon the new bill-and-hold procedures, actually would not generate revenue until later.  In accordance with defendants Geswein and Krakora's direction, Diebold financial personnel made an $18.8 million top line journal entry that prematurely recognized revenue that otherwise would not and should not have been recognized until later quarters.

- 10 -

41.    As a result of this improper $18.8 million top line entry, Diebold met its revised earnings forecast in 3Q04.  Defendants Geswein and Krakora knew, or were reckless in not knowing, that the making of such a top line entry had no accounting basis, violated GAAP, and was solely used to "smooth" or mitigate the impact of Diebold's 2004 revenue recognition changes.

42.    During the period 2004 through 2006, in connection with the Diebold Defendants' efforts to meet earnings forecasts, defendants Geswein and Krakora also directed F-term orders be shipped to warehouses before the shipment dates specified in the MOAs.  The Diebold Defendants would then record revenue on the products the Company shipped to its warehouse prematurely.  This practice was internally referred to as "pulling in" F-terms.

43.    The amount of orders "pulled in" varied by quarter, but in many instances was done purposely to inflate earnings in order to meet analyst earnings forecasts as described in ¶¶149-150. In these instances, defendants Geswein and Krakora instructed employees to manufacture products early, without customer notice or approval, for the purpose of recognizing revenue in an earlier reporting period.

44.    Diebold finance and manufacturing personnel raised concerns about this practice on several occasions.  In fact, in a March 2005 e-mail to Company management, a Diebold manufacturing manager stated that "my employees in scheduling believe that manufacturing these orders without customer approval to pull the order in is a violation of Sarbanes-Oxley." Notwithstanding these challenges, no action was taken by management at the time to end this practice.

45.    In 2004, defendants Krakora and Miller also drafted a standard form contract to convert "I-term" orders – orders for which Diebold recognized revenue upon installation at the customer site – to purported bill-and-hold transactions.  With regard to customers who agreed to sign this form at Diebold's request, rather than at the customer's request and for the customer's business

585867_1

purposes, the Diebold Defendants improperly recognized revenue on the transaction when the product was shipped from Diebold's factory to its warehouse.

46.     Contrary to the requirements for bill-and-hold accounting, defendants Geswein, Krakora and other Diebold management encouraged Diebold's sales force to request that customers execute the forms to convert "I-term" order to bill-and-hold transactions.  Defendants Geswein and Krakora often did this on "make the quarter" calls, notwithstanding concerns raised by sales personnel.  For example, in 4Q04, a Diebold sales representative had Charter One Bank ("Charter One") sign a bill-and-hold form to convert a $4 million I-term order into a purported bill-and-hold transaction.  The sales representatives was carrying out instructions from his superiors to get a bill-and-hold treatment.

47.     In late 2004, Diebold personnel informed defendant Geswein that Charter One would sign a bill-and-hold form, but that Charter One was unwilling to actually pay for the equipment until it was installed.  Defendant Geswein nevertheless instructed his subordinates to have Charter One sign the bill-and-hold form, even though he knew that Charter One had not requested bill-and-hold and would not pay until installation.

48.     In a later conference call among defendant Geswein and other Diebold personnel in early 2005, defendant Geswein was again told that Charter One had signed the bill-and-hold form, but that Charter One would not pay for the ATMs before they were installed.  Defendant Geswein's response was that the Company should take the revenue, and "we'll worry about the receivables later."  Even though Charter One was invoiced in 4Q04, it did not pay for this transaction until 2Q05 after Diebold delivered and installed the product.  Defendant Geswein thus caused Diebold to improperly recognize revenue on the transaction in 4Q04.  This transaction inflated Diebold's earnings in 4Q04 by about $2 million, and permitted Diebold to report that it met the low end of its

- 12 -

projected earnings for 4Q04. Without the revenue from the Charter One transaction in that quarter, Diebold would have missed its projected earnings.

49.     Additionally, in June 2005, a Diebold sales manager wrote an email that was forwarded to defendant Krakora stating that the sales staff was "trying to help Diebold's revenue recognition drive," but raised concerns about asking customers to sign bill-and-hold forms in instances when Diebold was at fault for installation delays. Defendant Krakora took no action at the time to correct this improper practice. However, another employee responded to the sales manager's original email stating: "This is like the crazy aunt in the cellar no one wants to talk about."

50.     The Diebold Defendants never disclosed these changes to the Company's revenue recognition practices, or the impact such changes had on the Company's reported revenues. During at least one management meeting, when the issue of publicly disclosing these revenue recognition changes was surfaced, the Diebold Defendants determined against such disclosure out of fear it would create an "investor relations issue."

51.     Defendants Geswein and Krakora also participated in conduct to prematurely recognize revenue from a transaction that was subject to a buy-back agreement. Under GAAP, the full amount of revenue from a transaction cannot be recognized if the transaction is subject to significant future obligations or contingencies, such as a buy-back agreement.

52.     In 1Q05, Diebold entered into an agreement to lease a portfolio of ATMs located in WalMart stores to a private company, Cash Depot, for $5 million. In this transaction, Diebold entered into a side agreement with Cash Depot, giving Cash Depot the right to "sell" the ATMs back to Diebold at a later date.

53.     Defendant Geswein agreed to the buy-back provision when he met with Cash Depot's CEO to negotiate the transaction in 1Q05. Defendant Geswein told the Diebold sales representative working on the transaction to speak with defendant Krakora about how to draft the agreement with

- 13 -

Cash Depot with a buy-back provision, so that the Company ostensibly could still recognize all the revenue from the transaction in 1Q05.

54.    In 1Q05, defendant Krakora advised the Diebold sales representative that two agreements would be needed: an agreement for the sale of the ATMs to Cash Depot and a separate side agreement regarding the buy-back provision.  After meeting with defendant Krakora, the sales representatives told defendant Geswein that defendant Krakora said that a separate side agreement regarding the buy-back provision was needed for revenue recognition in 1Q05.

55.    Because the Cash Depot transaction was subject to significant future obligations or contingencies (*i.e.*, the buy-back agreement), the Diebold Defendants knew it was improper under GAAP for Diebold to recognize the entire $5 million in revenue on this transaction in 1Q05.  Notwithstanding, the Diebold Defendants improperly recognized all $5 million in revenue on this transaction in 1Q05.  Approximately $3.3 million of that amount represented earnings, which accounted for approximately 8% of Diebold's total pretax earnings that quarter.

**The Manipulation of Accounting Reserves**

56.    As noted above, Diebold established an accounting  reserve of $7.5 million in 4Q03.  Under GAAP, the appropriate accounting required that the improperly recorded transactions be accounted for as a deferred revenue liability and recognize the revenue associated with these transactions as it were earned.  However, over the course of 2004, the Diebold Defendants released the reserve, without any legitimate accounting basis, to fill shortfalls in the Company's operating results.

57.    For example, the Diebold Defendants released $1 million of the reserve in 1Q04, $1.25 million in 2Q04, and the remaining $5.25 million in 3Q04.  This permitted Diebold to meet analysts' exact earnings consensus for 1Q04-2Q04 and revised analysts' earnings consensus in 3Q04.  The Diebold Defendants knew, or were reckless in not knowing, that these entries had no

- 14 -

legitimate accounting basis, and they were recorded to fraudulently manage Diebold's reported earnings.

**The Understatement of Liabilities**

58.    Pursuant to GAAP, companies are required to account for anticipated liabilities. During the Class Period, the financial statements issued by Diebold were materially misstated by failing to accrue for known liabilities.  For example, defendants Geswein and Krakora knew that the liability account for the Company's Long Term Incentive Plan ("LTIP") – an employee benefit plan intended to reward long term company performance – was under-accrued for much of 2002 and 2003.  In a May 9, 2003 email between defendants Krakora and Geswein, defendant Krakora explained that "GAAP requires variable accounting for the LTIP, so technically each quarter we should be adjusting the accrual to reflect expected shares to be earned on a pro-rata basis times the price of the stock at quarter-end."  At the time of this email, defendant Krakora's calculations indicated that the LTIP accrual was under-accrued by at least $5 million, and he knew that Diebold was not making the required adjustments.

59.    In order to accrue for the LTIP liability in 2003 without negatively impacting earnings, the Diebold Defendants offset the liability by improperly reducing other accounts, including an un-reconciled accounts payable account and an un-reconciled deferred revenue account. Indeed, when defendant Miller made one such $1.2 million off-setting journal entry in May 2003, the description in the notes to that journal entry was: "to fund a LTIP reserve."  During 2003, defendant Miller made a $14.8 million entry to an unreconciled deferred revenue account and an $8.5 million entry to an unreconciled accounts payable account.  In 2003 alone, the Diebold Defendants' manipulation of these accounts had the effect of improperly under-accruing Diebold's liabilities, and overstating Diebold's reported pre-tax earnings by at over $23 million.

- 15 -

60.     From at least 2002 through 2005, the Diebold Defendants also knew, or were reckless in not knowing, that Diebold failed to properly accrue for other liabilities, including its North American sales commission liabilities (commissions to be paid to sales personnel) and its team incentive liabilities (incentive pay to be paid to service personnel).  In 2005, Diebold restated its financial statements to correct errors in certain accounts for the years 2002 to 2004 and the first quarter of 2005, including the North American sales commission liability account (which in 2005 had been materially understated by $11.4 million).  Prior to the 2005 restatement, defendant Geswein was informed by one of Diebold's vice presidents that the commission account was materially over accrued.  Defendant Geswein took no action to correct this accounting issue.  In a letter to the Company's Audit Committee relating to the 2005 restatement, a Diebold officer acknowledged that this account was understated because "[an accounting manager] felt that given the need to meet [earnings] forecast, these [commission accrual] adjustments should be deferred until a later date."

**Delaying the Recognition of Expenses**

61.     During the Class Period, the Diebold Defendants also knew or recklessly ignored that Diebold issued financial statements that failed to recognize certain expenses as incurred.  These expenses were improperly deferred and spread over several reporting periods to manage reported earnings, which artificially increased net income in several fiscal years.  The Diebold Defendants engaged in improper expense deferrals in at least two accounts: the "Division 35" and "CAP 250" accounts.

62.     Division 35 was a finished goods inventory account.  From 2003 through 2005, defendants Geswein and Krakora knew, or were reckless in not knowing, that the value of this account was overstated.  Various meetings had occurred where defendants Geswein and Krakora discussed that the Division 35 account had a large unexplained balance that needed to be reconciled.  Nevertheless, Diebold improperly failed to reconcile the account until 2005.  Then, in 2005, instead

- 16 -

585867_1

of restating its prior financial statements to correct this material error and record expenses in the proper reporting periods as required under GAAP, defendants Geswein and Krakora fraudulently spread $15 million of expenses over two quarters in 2005. The overstatement of the Division 35 account inflated Diebold's earnings by $4.3 million in 2003, and more than $6.2 million in periods prior to 2003.

63.     In addition, CAP 250 was an installation accounting system, primarily consisting of two accounts accruing for the cost of installation. By at least 2004, defendants Geswein and Krakora knew or recklessly ignored that one of the CAP 250 accounts had been un-reconciled since at least 2002. As with Division 35, defendants Geswein and Krakora did not reconcile the account until 2005. Then, similar to Division 35, the Diebold Defendants did not restate Diebold's financial statements to correct the material error in conformity with GAAP, but instead improperly recorded a series of entries totaling approximately $9 million during 2005. The overstatement of this CAP 250 account inflated Diebold's earnings by $2.1 million in 2004, $2.2 million in 2003, and $4.4 million in periods prior to 2003.

64.     During 2002, Diebold began a project to replace many of its older internal software systems with updated Oracle software. Under GAAP, companies that intend to capitalize the cost of the software as an asset are required to maintain detailed records of the internal and external costs incurred during the various stages of software development.

65.     From 2003 through 2006, the Diebold Defendants improperly capitalized information technology costs that should have been expensed. For example, in certain quarters when Diebold's earnings were short of forecast, the Diebold Defendants made "top-level" entries to fraudulently capitalize additional expenses to the Oracle project. These improper entries were made by defendant Miller at defendants Geswein and Krakora's direction and were often round numbers such as $1 million. These entries had the effect of materially reducing reported expenses, and increasing

- 17 -

Diebold's reported earnings.   The Diebold Defendants improper capitalization of expenses associated with Diebold's Oracle project increased the Company's pre-tax earnings in 2003, 2004, and 2005, by $.5 million, $3 million, and $6.8 million, respectively.

**Overstating Equipment Costs**

66.    Pursuant to GAAP, used equipment inventory should be valued at the lower of cost or market.  From 2003 to 2005, defendants Geswein and Krakora improperly "wrote-up" the value of certain used inventory, such as used ATMs.  These "write-ups" had the effect of reducing Diebold's cost of sales, which improperly inflated the Company's reported earnings to meet analysts' earnings forecasts.

67.    For example, in 2Q04, defendants Geswein and Krakora wrote up the value of used equipment inventory by $1 million (and thus increased net income by $1 million) to inflate earnings to meet earnings forecasts.  Defendant Miller booked this entry without any legitimate accounting basis.  A July 13, 2004 e-mail issued by a Diebold accounting manager stated, in part:

> I followed up with [a company officer] this morning, the primary reason we needed to book the used equipment re-valuation was due to two issues:
>
> 1 – TFE [a recent Diebold acquisition] missing their OP forecast by 300k;
>
> 2 – The overall corp tax rate was a little higher than forecast causing an approx $500K problem at Net Income (as a result we need a little more NIBT to deliver the required Net Income. [sic]

68.    In addition, in 4Q03, defendants Geswein and Krakora improperly wrote up the value of parts contained in used ATMs by $650,000.  Tellingly, these parts were never removed from the ATMs, and the ATMs were later scrapped.  Further, the Diebold Defendants improperly wrote up the value of other used equipment inventory (and inflated earnings) by $750,000 in 4Q04 and $1.2 million in 1Q05.

- 18 -

69.    The Diebold Defendants knew, or were as reckless in not knowing, that these used equipment "write-ups," which were included in several "opportunity lists," had no legitimate accounting basis and were used improperly to inflate Diebold's earnings.

70.    Notwithstanding their conduct, as described above, the Diebold Defendants repeatedly issued false and misleading financial results to investors throughout the Class Period.

## FALSE AND MISLEADING STATEMENTS AND OMISSIONS

71.    The Class Period begins on June 30, 2005.  On that day, Diebold issued a press release announcing that it was lowering its earnings guidance for the second quarter and full year 2005, and that it had "identified" that an account on its balance sheet was "under accrued."  The release stated in relevant part:

> Diebold, Incorporated today announced it has lowered its second quarter and full-year earnings per share guidance for 2005, as its North America growth outlook has been revised downward and is now in line with current expectations of customer demand.
>
> Additionally, the company has identified a reconciliation issue in its North America sales commission accrual account, as of December 31, 2004, with the impact on specific prior years yet to be determined.  As a result of this reconciliation, the company has determined the commission account was under accrued by approximately $13 million at the end of 2004.  This is a preliminary estimate and the final amount could vary.  A thorough review is currently underway and is expected to be completed shortly.  This amount is excluded from earnings estimates provided throughout the remainder of this outlook.

72.    The June 30, 2005 press release was false and misleading when made and failed to disclose material facts concerning Diebold's financial results, business and business practices.  As described in ¶¶21-67, the Diebold Defendants had engaged, and continued to engage, in conduct to manage Diebold's earnings which falsified Diebold's financial results reported to the SEC and investors.  The Diebold Defendants therefore knew that the revised earnings estimates that the June 30, 2005 press release announced were not based upon reasonable expectations, but were skewed due to the continued earnings management conduct that they were undertaking.  Additionally, the

- 19 -

Diebold Defendants also knew that Diebold's financial statements were materially misstated due to the conduct described in ¶¶21-67, and thus did not disclose the full truth concerning the extent of the misstatement of the Company's financial results.  The Diebold Defendants knew that the revised earnings estimates and representations concerning the Company's reported financial results would be relied upon by investors and the market in their valuation of Diebold's stock.

73.     While Diebold's stock price dropped on June 30, 2005 $4.50 from the prior day's close, by July 8, 2005 it regained $2.57 of this drop.

74.     On July 27, 2005, Diebold issued a press release announcing its earnings for the second quarter 2005 ("2Q05").  The press release stated in relevant part:

> Diebold, Incorporated today reported second quarter 2005 revenue from continuing operations of $629.2 million, up 15.3 percent from the second quarter of 2004.  The company reported second quarter net income of $33.3 million, compared to net income of $43.6 million in the second quarter of 2004.  Diluted earnings per share were $.47, a decline of 21.7 percent from $.60 per share in the second quarter of 2004 and within the most recent guidance of $.47 to $.50 per share.

> Included in the second quarter 2005 reported results are restructuring charges of approximately $.03 per share and European Opteva manufacturing startup costs and related issues of $.04 per share.  Excluding the impact of the restructuring charges and the European startup costs and related issues, diluted earnings per share in the second quarter would have been $.54 per share, consistent with previous guidance.

> *       *       *

> As previously announced, the company identified a reconciliation issue in its North America sales commission accrual account.  A detailed analysis of this reconciliation has been performed and the company has determined the commission account was under-accrued by $13.2 million at December 31, 2004 and $11.4 million at March 31, 2005.  First quarter 2005 commission expense was overstated by $1.8 million.  Commission expense in 2004 was understated by $0.3 million, with the first and second quarters of 2004 each understated by less than $0.1 million.  Commission expense was understated by $2.7 million and $1.5 million in 2003 and 2002, respectively.  The remaining $8.7 million understatement of commission expense was related to periods prior to fiscal year 2002.  As a result, the company intends to file an amendment to its first quarter 2005 Form 10-Q and an amendment to its 2004 Form 10-K.  All prior financial information presented in this release reflects the changes from the correction of the North America sales commission accrual account.

- 20 -

(Footnote omitted.)

75.    On August 8, 2005, defendant Geswein resigned from Diebold.  Defendant Krakora

was named as the Chief Financial Officer.

76.    On August 15, 2005, Diebold filed with the SEC its Form 10-Q for the quarter ended

June 30, 2005 ("2Q05 Form 10-Q") which was signed by defendant Krakora.  The 2Q05 Form 10-Q

included Diebold's financial results for 2Q05 and 2Q04, which were falsely represented to have been

presented in conformity with GAAP, and included the following information concerning the

restatement of the FY03-FY04 and 1Q05 financial statements:

> The company has filed amendments, on August 12, 2005, to its Annual
> Report on Form 10-K for the year ended December 31, 2004 and its quarterly report
> on Form 10-Q for the quarter ended March 31, 2005, to amend and restate financial
> statements and other financial information for the years 2004, 2003 and 2002 and
> financial information for the years 2001 and 2000, for the quarter ended March 31,
> 2005, and for each of the quarters in the year 2004 and 2003 with respect to a
> reconciliation issue in its North America sales commission accrual account. All
> amounts are before tax unless otherwise noted.  A detailed analysis of this
> reconciliation has been performed and the company has determined that the
> commission account was under-accrued by approximately $13,200 at December 31,
> 2004 and approximately $11,400 at March 31, 2005. First quarter 2005 commission
> expense was overstated by approximately $1,800.  Commission expense was
> understated by approximately $300, $2,700 and $1,500 in 2004, 2003 and 2002,
> respectively.  The remaining approximately $8,700 understatement of commission
> expense was related to periods prior to fiscal year 2002.  The results of the analysis
> were reported to KPMG LLP and to the Audit Committee of the Board of Directors
> by management.  During the discussions with the Audit Committee, management
> recommended to the Audit Committee that previously reported results for the
> company be restated to reflect the correction of the error.  On July 26, 2005, the
> Audit Committee agreed with this recommendation.  The Audit Committee of the
> Board of Directors has discussed the matter with KPMG LLP.

77.    The July 27, 2005 press release and 2Q05 Form 10-Q were false and misleading when

made and failed to disclose material facts concerning Diebold's financial results, business and

business practices.  As described in ¶¶21-67, the Diebold Defendants had engaged, and continued to

engage, in conduct to manage Diebold's earnings which falsified Diebold's financial results reported

to the SEC and investors.  The Diebold Defendants therefore knew that the earnings results disclosed

- 21 -

in the July 27, 2005 press release and 2Q05 Form 10-Q were materially misstated due to the continued earnings management conduct they were undertaking.  Additionally, the Diebold Defendants also knew that the restated financials contained in the 2Q05 Form 10-Q did not disclose the full truth concerning Diebold's financial performance and the Diebold Defendants' conduct to manage the Company's reported results.  As described in ¶¶141-187, these results did not comply with GAAP.  Defendants made sure that these manipulated results were incorporated into Diebold's public filings to be reported to Diebold's investors as part of the Company's quarterly and year-end reporting requirements, and would be relied upon by investors and the market in their valuation of Diebold's stock.

78.    The 2Q05 Form 10-Q also contained a certification from defendant Krakora concerning the truthfulness of the information contained in the Form 10-Q, as well as the effectiveness of the Company's internal controls:

I, Kevin J. Krakora, Vice President and Chief Financial Officer, certify that:

1)    I have reviewed this quarterly report on Form 10-Q of Diebold, Incorporated;

2)    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3)    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4)    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5)      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors:

a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

79.      This certification by defendant Krakora was repeated in all material respects in the Forms 10-Q and 10-K that Diebold filed with the SEC during the Class Period.  Each SOX certification signed by defendant Krakora and included in the Forms 10-K and Forms 10-Q filed during the Class Period were false and misleading, and failed to disclose the earnings management conduct described in ¶¶21-67 that defendant Krakora was engaged in, and continued to engage in. That conduct resulted in the material misstatement of Diebold's FY03-FY06 and 1Q07 financial statements, and was not prevented by the internal controls defendant Krakora certified were in place and functioning to prevent the material misstatement of the Company's financial results.

- 23 -

80.    On August 12, 2005, Diebold filed with the SEC a Form 10-K/A for FY04 ("amended FY04 Form 10-K") which was signed by defendant Geswein.  The amended FY04 Form 10-K contained the restated financial results described in the July 27, 2005 press release for FY03-FY04. The amended FY04 Form 10-K also stated:

(a) Evaluation of Disclosure Controls and Procedures

Management, under the supervision and with the participation of the chief executive officer and the chief financial officer, has evaluated the company's disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report.

During the review of the North America sales commission accrual, it was noted that the reconciliation was not performed properly and the North America sales commission accrual appeared to be understated. A detailed analysis of this reconciliation has been performed and the company has determined that the sales commission accrual was under-accrued by approximately $13,200 at December 31, 2004 and approximately $11,400 at March 31, 2005. First quarter 2005 sales commission expense was overstated by approximately $1,800. Sales commission expense was understated by approximately $300, $2,700 and $1,500 in 2004, 2003 and 2002, respectively. The remaining approximately $8,700 understatement of sales commission expense was related to periods prior to fiscal year 2002.

The results of the analysis were reported to KPMG LLP and to the Audit Committee of the Board of Directors by management. During the discussions with the Audit Committee, management recommended to the Audit Committee that previously reported results for the company be restated to reflect the correction of the error. On July 26, 2005, the Audit Committee agreed with this recommendation. The Audit Committee of the Board of Directors has discussed the matter with KPMG LLP.

In connection with the restatement, under the direction of the chief executive officer and the chief financial officer, the company reevaluated its disclosure controls and procedures and identified the material weakness noted in Management's Report on Internal Control over Financial Reporting (as restated) in its internal control over financial reporting. As a result of this material weakness, management has concluded that the company's disclosure controls and procedures were not effective as of December 31, 2004.

As previously reported, management has not identified any change in internal controls over financial reporting occurring during the fourth quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting. However, subsequent to March 31, 2005, the company has taken the remedial actions described below.

- 24 -

(b) Management's Report on Internal Control over Financial Reporting (as restated)

The management of Diebold, Incorporated is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of management, including the principal executive officer and principal financial officer, the company conducted an evaluation of the effectiveness of the company's internal control over financial reporting based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

In the company's Annual Report on Form 10-K for the year ended December 31, 2004, filed on March 8, 2005, management concluded that the company's internal control over financial reporting was effective as of December 31, 2004. Subsequently, management determined that its controls did not exist to provide for a proper reconciliation of its North American sales commission accrual account. As a result of this deficiency, the Company has determined that the sales commission accrual account and related commission expense were understated. This material weakness has caused the company to amend its Annual Report on Form 10-K for the year ended December 31, 2004 in order to restate the financial statements for the years ended December 31, 2004, 2003 and 2002 and to restate financial information for the year ended December 31, 2001 and 2000 and each of the quarters in 2003 and 2004.

As a result of this material weakness, management has revised its earlier assessment and has now concluded that the company's internal control over financial reporting was not effective as of December 31, 2004.

Management's revised assessment of the effectiveness of the company's internal control over financial reporting as of December 31, 2004 has been audited by KPMG LLP, an independent registered public accounting firm, as stated in their report which accompanies the Consolidated Financial Statements.

(c) Remediation of Material Weakness in Internal Controls

Management is confident that, as of the date of this filing, the company has taken appropriate measures to fully remediate the material weakness in the company's internal control over financial reporting with respect to the North America sales commission accrual reconciliation. The remedial actions included:

• revised the reconciliation procedures to focus on the balance sheet position of the accrual account for North America sales commissions as well as the sales commission expense reported each period, including more senior management review of the reconciliation; and

• implemented corporate monitoring procedures to ensure timely completion of the reconciliation of accrual accounts.

In connection with this amended Form 10-K, under the direction of the chief executive officer and the chief financial officer, the company has evaluated its disclosure controls and procedures as currently in effect, including the remedial actions discussed above, and we have concluded that, as of this date, our disclosure controls and procedures are effective.

81.     On August 12, 2005, Diebold also filed with the SEC a Form 10-Q/A for 1Q05 ("amended 1Q05 Form 10-Q") which was signed by defendant Geswein.  The amended 1Q05 Form 10-Q contained the restated financial results described in the July 27, 2005 press release for 1Q05. The amended 1Q05 Form 10-Q also repeated the representations concerning the evaluation of the Company's disclosure controls contained in the amended FY04 Form 10-K.

82.     The restated financial results and internal control disclosures contained in the amended FY04 Form 10-K and amended 1Q05 Form 10-Q were false and misleading when made and failed to disclose the conduct described in ¶¶21-67 that the Diebold Defendants had engaged, and continued to engage, in conduct to manage Diebold's earnings.  The Diebold Defendants therefore knew that the restated financials contained in the amended FY04 Form 10-K and amended 1Q05 Form 10-Q did not disclose the full truth concerning Diebold's financial performance and their conduct to manage the Company's reported results.  As described in ¶¶141-187, these results did not comply with GAAP.  The Diebold Defendants made sure that these manipulated results were incorporated into Diebold's public filings to be reported to Diebold's investors as part of the Company's quarterly and year-end reporting requirements, and would be relied upon by investors and the market in their valuation of Diebold's stock.

83.     The amended FY04 Form 10-K and amended 1Q05 Form 10-Q also contained a SOX certification signed by defendant Geswein which stated:

1)      I have reviewed this Amendment No. 2 to the annual report on Form 10-K of Diebold, Incorporated;

2)      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made,

- 26 -

in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3)    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4)    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5)    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors:

    a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

- 27 -

This certification by defendant Geswein was false and misleading, and failed to disclose the earnings management conduct described in ¶¶21-67 that defendant Geswein had engaged in and which caused the material misstatement of the FY03-FY04 and 1Q05 financial statements.  Therefore, defendant Geswein knew that the restated results for FY03-FY04 and 1Q05 did not correct the manipulations he had undertaken and therefore remained materially misstated.

84.     In response to this information, Diebold's stock price increased $1.45 on July 27, 2005 and continued to trade at inflated levels through August 2005.

85.     On September 21, 2005, Diebold issued a press release announcing that it was again lowering its earnings guidance, this time for the third quarter and full year 2005.  The release stated in relevant part:

> Diebold, Incorporated today announced it is lowering its third quarter and full-year earnings per share guidance for 2005.
>
> The company now anticipates third quarter EPS in the range of $.32 to $.37, which includes restructuring changes of approximately $.07 per share related to the continued realignment of its operations, manufacturing start-up and other one-time costs of approximately $.04 per share, and the one-time gain of approximately $.18 per share on the sale of the campus car systems business.  Excluding these items, EPS is expected to be in the range of $.25 to $.30.
>
> Full-year EPS is now expected to be $1.90 to $2.00.  This range excludes restructuring charges of approximately $.30 per share, manufacturing start-up costs and other one-time costs of approximately $.08 per share, and the one-time gain of approximately $.18 per share on the sale of the campus card systems business.  This revised earnings guidance compares to 2004 full-year earnings per share of $2.53.

(Footnote omitted.)

86.     The September 21, 2005 press release falsely blamed the earnings revisions on the following factors:

– Overall North America financial self-service revenue outlook is lower than previously expected, resulting in lower profit expectations.

– Certain revenue anticipated from the company's North America business for the third quarter is being pushed out to future periods, partially impacted by the effect of Hurricane Katrina.

– Operational inefficiencies, rising fuel costs and pricing pressures are continuing to negatively impact gross margins.

– Higher effective tax rate of approximately 34 percent for the year.

87. The September 21, 2005 press release was false and misleading when made and failed to disclose material facts concerning Diebold's financial results, business and business practices. As described in ¶¶21-67, the Diebold Defendants had engaged, and continued to engage, in conduct to manage Diebold's earnings which falsified Diebold's financial results reported to the SEC and investors. The Diebold Defendants therefore knew that the revised earnings estimates that the September 21, 2005 press release announced were not based upon reasonable expectations but were skewed due to the continued earnings management conduct they were undertaking. The Diebold Defendants knew that the revised earnings estimates would be relied upon by investors and the market in their valuation of Diebold's stock.

88. In response to this information, Diebold's stock price dropped on September 21, 2005, $6.90 from the prior day's close, and continued to drop in the following days eventually losing another $2.96 by September 28, 2005.

89. On October 26, 2005, Diebold issued a press release announcing its earnings for the third quarter 2005 ("3Q05"), which stated, in relevant part:

> Diebold, Incorporated today reported third quarter 2005 revenue from continuing operations of $622.3 million, up 2.7 percent from the third quarter of 2004. The company reported third quarter net income of $26.4 million, compared to net income of $48.3 million in the third quarter of 2004. Diluted earnings per share were $.37, compared to $.67 per share in the third quarter of 2004.

90. On November 7, 2005, Diebold filed with the SEC its Form 10-Q for the quarter ended September 30, 2005 (the "3Q05 Form 10-Q"), which was signed by defendant Krakora. The 3Q05 Form 10-Q included Diebold's financial statements for the quarters ended September 30, 2005 and 2004, which were falsely represented to have been presented in conformity with GAAP. In addition, the 3Q05 Form 10-Q represented that:

- 29 -

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and therefore do not include all information and footnotes necessary for a fair presentation of financial position, results of operations and cash flows in conformity with United States generally accepted accounting principles; however, such information reflects all adjustments (consisting solely of normal recurring adjustments), which are, in the opinion of management, necessary for a fair statement of the results for the interim periods.

91.     The October 26, 2005 press release and 3Q05 Form 10-Q were false and misleading when made and failed to disclose material facts concerning Diebold's financial results, business and business practices.  As described in ¶¶21-67, the Diebold Defendants had engaged, and continued to engage, in conduct to manage Diebold's earnings which falsified Diebold's financial results reported to the SEC and investors.  The Diebold Defendants therefore knew that the earnings results disclosed in the October 26, 2005 press release and 3Q05 Form 10-Q were materially misstated due to the continued earnings management conduct they were undertaking.  Additionally, the Diebold Defendants also knew that the restated financials contained in the 3Q05 Form 10-Q did not disclose the full truth concerning Diebold's financial performance and their conduct to manage the Company's reported results.  As described in ¶¶141-187, these results did not comply with GAAP. The Diebold Defendants made sure that these manipulated results were incorporated into Diebold's public filings to be reported to Diebold's investors as part of the Company's quarterly and year-end reporting requirements, and would be relied upon by investors and the market in their valuation of Diebold's stock.

92.     The 3Q05 Form 10-Q also included the following representations about the Company's disclosure and internal controls:

Management, under the supervision and with the participation of the chief executive officer and the chief financial officer, has evaluated the company's disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report.

- 30 -

As reported in the company's quarterly report for the quarter ended June 30, 2005, it was determined that revenues as previously announced in the company's earnings release for the quarter ended June 30, 2005 for the company's voting subsidiary, Diebold Election Systems Incorporated (DESI), were incorrectly recorded. Management corrected the error in the company's quarterly report for the quarter ended June 30, 2005, which resulted in a decrease in revenue by $10,273, a decrease in cost of sales by $8,020 and a decrease in operating expense by $288.  The effect of the correction on the balance sheet at June 30, 2005 resulted in an increase in inventories by $7,264 and a decrease in accounts receivable by $10,273 and other current liabilities by $1,691, respectively.  As a result of the aforementioned error and due to the fact that the error was not detected by management in a timely manner, management had determined that a control deficiency related to revenue recognition on contracts entered into with customers by DESI constituted a material weakness in the company's internal control over financial reporting as of June 30, 2005.

In response to the control weaknesses mentioned above, management designed and implemented the following remedial actions at DESI:

•      Realignment of the finance organization; which includes formal review procedures of new contracts as well as current financial statements.

•      Standardization of revenue recognition policies.

•      Training and implementation of revenue recognition policies and literature.

Management is confident that the company has designed internal controls to fully remediate the material weakness in the company's internal control over financial reporting with respect to revenue recognition at DESI; however, in the opinion of management the above remedial actions were not in place for a sufficient amount of time in the current quarter to conclude that the new control procedures were operating effectively as of September 30, 2005.  Management expects the new controls to be operating effectively by December 31, 2005.

Also reported in the company's quarterly report for the quarter ended June 30, 2005, during the review of the reconciliation over the North American sales commission accrual account, it was noted that the reconciliation was not performed properly and the North American sales commission accrual appeared to be understated. Accordingly, management determined that a control deficiency related to the reconciliation of the North American sales commission accrual account constituted a material weakness in the company's internal control over financial reporting as of December 31, 2004 and March 31, 2005, which was corrected in July and August. The remedial actions and additional internal controls remain in place and operating effectively as of September 30, 2005.

Under the direction of the chief executive officer and the chief financial officer, the company has evaluated its disclosure controls and procedures as currently in effect as of the end of the period covered by this report, including the remedial

- 31 -

actions discussed above, and we have concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are not effective.

Unrelated to the issues noted above, the company has implemented the Oracle technology platform in several significant subsidiaries in Europe as well as in Mexico and Australia as of September 30, 2005. Although the company is experiencing certain implementation challenges related to these subsidiaries' internal control over financial reporting, management is confident that there are sufficient compensating controls in place to mitigate the increase in risk caused by the implementations.

Other than the remedial actions taken with respect to the material weakness described above and the Oracle technology platform implementations, management has not identified any change in internal control over financial reporting that occurred during the third quarter of 2005 that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.

These representations were false and misleading, and failed to disclose the earnings management conduct described in ¶¶21-67.

93.     In response to this information, Diebold's stock price continued to trade at inflated levels.

94.     On December 16, 2005, Diebold issued a press release announcing that Thomas Swidarski, Diebold's President and Chief Operating Officer, assumed the position of CEO of the Company with the retirement of Walden O'Dell.

95.     On January 31, 2006, Diebold issued a press release announcing its earnings for the fourth quarter and year ended December 31, 2005 ("4Q05" and "FY05"), which stated, in pertinent part:

Diebold, Incorporated today reported fourth quarter 2005 revenue from continuing operations of $817.6 million, up 14.9 percent from the fourth quarter of 2004. Net income for the fourth quarter was $14.6 million, compared to net income of $62.8 million in the fourth quarter of 2004. Diluted earnings per share were $.21 compared to $.87 per share in the fourth quarter of 2004.

Included in the fourth quarter 2005 reported results were restructuring charges of $.20 per share resulting from plant restructuring, associate voluntary early retirement and other severance costs. In addition, the company has established a $.10 per share reserve against deferred tax assets primarily associated with its European

- 32 -

operations and has reserved $.14 per share related to approximately $32 million in Diebold Election Systems trade receivables from two counties.

96.     Defendant Krakora commented on the 4Q05 and FY05 results, stating in pertinent part as follows:

"While 2005 was very challenging, during the fourth quarter we began taking the steps necessary to bring more stability to the business.  We've improved our forecasting processes and have made changes to our finance organization to further strengthen the financial controls and processes we have in place.  Despite the progress we've made in addressing our operational issues, significant work remains.  Therefore, 2006 will be a transitional year requiring focus and investment in key areas of our operations, as we take the steps necessary to return Diebold to acceptable levels of profitability in 2007 and beyond."

97.     On March 7, 2006, Diebold issued a press release regarding the filing of its Form 8-K on that same date.  The Form 8-K stated in pertinent part:

On January 31, 2006, just prior to the announcement of its fourth quarter and year-end 2005 results, the company became aware of a possible adjustment related to the recognition of certain election systems revenue in the fourth quarter of 2005.  At the time of the announcement, the company indicated the need for additional time to adequately review the matter, but management had preliminarily estimated that between $2 million to $10 million in election systems revenue might need to be deferred until future periods.

The company has since determined that $7.0 million in fourth quarter 2005 election systems revenue and $4.2 million in net income would need to be recognized in future periods.  This adjustment reduced previously announced fourth quarter and full-year 2005 earnings per share by $0.06.  Because of this revision, the company will recognize this deferred revenue and associated net income between 2007 and 2010.  This change will have no effect on the company's 2006 full-year revenue and earnings per share expectations.

98.     On March 14, 2006, Diebold filed with the SEC its Form 10-K for the year ended December 31, 2005, (the "FY05 10-K"), which was signed by defendant Krakora.  The FY05 Form 10-K incorporated by reference Diebold's false and misleading financial statements for the years ended December 31, 2005, December 31, 2004 and December 31, 2003 from the Company's 2005 Annual Report to Shareholders.  Such financial statements represented, in part:

The preparation of the Consolidated Financial Statements in conformity with accounting principles generally accepted in the United States of America requires

- 33 -

management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the Consolidated Financial Statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

*       *       *

The company's revenue recognition policy is consistent with the requirements of Statement of Position (SOP) 97-2, Software Revenue Recognition and Staff Accounting Bulletin 104 (SAB 104).  In general, the company records revenue when it is realized, or realizable and earned.  The company considers revenue to be realized or realizable and earned when the following revenue recognition requirements are met: persuasive evidence of an arrangement exists, which is a customer contract; the products or services have been provided to the customer; the sales price is fixed or determinable within the contract; and collectability is probable.  The sales of the company's products do not require significant production, modification or customization of the hardware or software after it is shipped.

99.    The January 31, 2006 press release, March 7, 2006 press release and Form 8-K, and FY05 Form 10-K were false and misleading when made and failed to disclosed material facts concerning Diebold's financial results, business and business practices.  As described in ¶¶21-67, the Diebold Defendants had engaged, and continued to engage, in conduct to manage Diebold's earnings which falsified Diebold's financial results reported to the SEC and investors.  The Diebold Defendants therefore knew that the earnings results disclosed in the January 31, 2006 press release, March 7, 2006 press release and Form 8-K, and FY05 Form 10-K were materially misstated due to the continued earnings management conduct that they were undertaking.  Additionally, the Diebold Defendants also knew that the restated financial results contained in the FY05 Form 10-K did not disclose the full truth concerning Diebold's financial performance and their conduct to manage the Company's reported results.  As described in ¶¶141-187, these results did not comply with GAAP. The Diebold Defendants made sure that these manipulated results were incorporated into Diebold's public filings to be reported to Diebold's investors as part of the Company's quarterly and year-end reporting requirements, and would be relied upon by investors and the market in their valuation of Diebold's stock.

- 34 -

100.    In response to this information, on January 31, 2006 Diebold's stock price increased $3.00 per share and continued to trade at inflated levels thereafter.

101.    On April 25, 2006, Diebold issued a press release announcing its earnings for the first quarter 2006 ("1Q06"), which stated, in relevant part:

> Diebold, Incorporated today reported first quarter 2006 revenue from continuing operations of $623.7 million, up 16.5 percent from the first quarter of 2005.  Net income for the first quarter was $12.7 million, compared to net income of $27.9 million in the first quarter of 2005.  Diluted earnings per share were $.18 compared to $.38 in the first quarter of 2005.
>
> Included in the first quarter 2006 reported results were restructuring charges of $.04 per share resulting primarily from the realignment of global research and development efforts.  Excluding the impact of these restructuring charges, diluted earnings per share in the first quarter would have been $.22.
>
> Net cash provided by operating activities was $54.4 million, down $24.1 million, or 30.7 percent, from the prior year; while free cash flow decreased by $15.9 million, moving from free cash flow of $58.4 million in the first quarter 2005 to $42.5 million in the first quarter 2006.

(Footnote omitted.)

102.    On May 9, 2006, Diebold filed with the SEC its Form 10-Q for the quarter ended March 31, 2006 (the "1Q06 Form 10-Q"), which was signed by defendant Krakora.  The 1Q06 Form 10-Q included Diebold's financial statements for the quarters ended March 31, 2006 and 2005, which were falsely represented to have been presented in conformity with GAAP.  In addition, the 1Q06 Form 10-Q represented that:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and therefore do not include all information and footnotes necessary for a fair presentation of financial position, results of operations and cash flows in conformity with United States generally accepted accounting principles; however, such information reflects all adjustments (consisting solely of normal recurring adjustments), which are, in the opinion of management, necessary for a fair statement of the results for the interim periods.

103.    The April 25, 2006 press release and 1Q06 Form 10-Q were false and misleading when made and/or filed with the SEC and failed to disclose material facts concerning Diebold's

- 35 -

financial results, business and business practices.  As described in ¶¶21-67, the Diebold Defendants had engaged, and continued to engage, in conduct to manage Diebold's earnings which falsified Diebold's financial results reported to the SEC and investors.  The Diebold Defendants therefore knew that the earnings results disclosed in the April 25, 2006 press release and 1Q06 Form 10-Q were materially misstated due to the continued earnings management conduct that they were undertaking.  Additionally, the Diebold Defendants also knew that the restated financials contained in the 1Q06 Form 10-Q did not disclose the full truth concerning Diebold's financial performance and their conduct to manage the Company's reported results.  As described in ¶¶141-187, these results did not comply with GAAP.  The Diebold Defendants made sure that these manipulated results were incorporated into Diebold's public filings to be reported to Diebold's investors as part of the Company's quarterly and year-end reporting requirements, and would be relied upon by investors and the market in their valuation of Diebold's stock.

104.    In response to this information, Diebold's stock price continued to trade at inflated levels.

105.    On July 25, 2006, Diebold issued a press release announcing its earnings for the second quarter 2006 ("2Q06"), which stated, in relevant part:

> Diebold, Incorporated today reported second quarter 2006 revenue from continuing operations of $726.4 million, up 17.4 percent from the second quarter of 2005.  Net income for the second quarter was $17.2 million, compared to net income of $32.0 million in the second quarter of 2005.  Diluted earnings per share were $.26 compared to $.45 in the second quarter of 2005.
>
> Included in the second quarter 2006 reported results were restructuring charges of $.10 per share resulting primarily from the termination of the information technology (IT) outsourcing agreement and product development rationalization. Excluding the impact of these items, diluted earnings per share in the second quarter would have been $.36.
>
> Net cash provided by operating activities was $23.0 million, a $30.0 million improvement from the comparable period in the prior year. Free cash flow increased by $25.4 million, moving from free cash use of $24.2 million in the second quarter 2005 to $1.2 million in the second quarter 2006.

- 36 -

585867_1

(Footnote omitted.)

106.    On August 7, 2006, Diebold filed with the SEC its Form 10-Q for the quarter ended

June 30, 2006, (the "2Q06 Form 10-Q"), which was signed by defendant Krakora.  The 2Q06 Form

10-Q included Diebold's financial statements for the quarters ended June 30, 2006 and 2005, which

were falsely represented to have been presented in conformity with GAAP.  In addition, the 2Q06

Form 10-Q represented, in part:

> The accompanying unaudited condensed consolidated financial statements
> have been prepared in accordance with the instructions to Form 10-Q and therefore
> do not include all information and footnotes necessary for a fair presentation of
> financial position, results of operations and cash flows in conformity with United
> States generally accepted accounting principles; however, such information reflects
> all adjustments (consisting solely of normal recurring adjustments), which are, in the
> opinion of management, necessary for a fair statement of the results for the interim
> periods.

107.    The July 26, 2006 press release and 2Q06 Form 10-Q were false and misleading when

made and/or filed with the SEC and failed to disclose material facts concerning Diebold's financial

results, business and business practices.  As described in ¶¶21-67, the Diebold Defendants had

engaged, and continued to engage, in conduct to manage Diebold's earnings which falsified

Diebold's financial results reported to the SEC and investors.  The Diebold Defendants therefore

knew that the earnings results disclosed in the July 26, 2006 press release and 2Q06 Form 10-Q were

materially misstated due to the continued earnings management conduct that they were undertaking.

As described in ¶¶141-187, these results did not comply with GAAP.  The Diebold Defendants made

sure that these manipulated results were incorporated into Diebold's public filings to be reported to

Diebold's investors as part of the Company's quarterly and year-end reporting requirements, and

would be relied upon by investors and the market in their valuation of Diebold's stock.

108.    In addition, the 2Q06 Form 10-Q disclosed:

> Management, under the supervision and with the participation of the
> company's chief executive officer and the chief financial officer, has evaluated the
> company's disclosure controls and procedures, as defined in Rules 13a-15(e) and

- 37 -

15d-15(e) under the Securities Exchange Act of 1934, as amended, as of June 30, 2006.

As reported in the company's Annual Report on Form 10-K for the year ended December 31, 2005, it was determined that, as of December 31, 2005, the following material weakness existed:

The company did not have personnel with sufficient technical knowledge to analyze complex revenue contracts to ensure that such transactions were accounted for in accordance with generally accepted accounting principles at its voting subsidiary, Diebold Election Systems, Inc. (DESI). Specifically, the review of these contracts did not provide for effective identification of, and consideration of, terms of certain arrangements within the contracts that impact the accounting required for the related revenue for such arrangements. This material weakness resulted in a material overstatement of revenue and a material understatement of deferred revenue balances in the company's preliminary interim and annual financial statements for the year ended December 31, 2005. The revenue and deferred revenue balances were corrected by management prior to the issuance of the company's consolidated financial statements.

The company had previously disclosed in its prior SEC filings on-going remediation efforts related to DESI, which included the following:

• realignment of the finance organization; which includes formal review procedures of new contracts as well as current financial statements;

• standardization of revenue recognition policies; and

• training and implementation of revenue recognition policies and literature.

In addition to the above remediation efforts, the company had invested in additional accounting management at DESI during the first quarter of 2006. During the second quarter of 2006, the company was able to fully implement the above remediation efforts including testing of the additional internal controls related to analyzing and reviewing complex revenue contracts. The testing was performed by the company's internal audit department.

Under the direction of the chief executive officer and the chief financial officer, the company has evaluated its disclosure controls and procedures as of June 30, 2006, including the remedial actions discussed above, and has concluded that, as of June 30, 2006, the company's disclosure controls and procedures are effective.

Unrelated to the issues noted above, the company implemented the global enterprise resource planning (ERP) system in several significant subsidiaries in Europe as well as in Mexico and Australia during 2005. Although the company is experiencing certain implementation challenges related to these subsidiaries' internal control over financial reporting, management is confident that there are sufficient compensating controls in place to mitigate the increase in risk caused by the implementations. On June 1, 2006, the company reorganized its global IT operation

- 38 -

and assumed implementation and support responsibilities for its global ERP system and other IT-related functions, which were previously outsourced.  The company has made significant progress in stabilizing the ERP system to date and is on track to achieve system stabilization by the end of 2006.

Other than the remedial actions taken with respect to the material weakness described above and the information technology reorganization, management has not identified any change in internal control over financial reporting that occurred during the second quarter of 2006 that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.

These representations were false and misleading, and failed to disclose the earnings management conduct described in ¶¶21-67.

109.    In response to this information, Diebold's stock price continued to trade at inflated levels.

110.    On October 30, 2006, Diebold issued a press release announcing its earnings for the third quarter ("3Q06"), which stated, in pertinent part, as follows:

Diebold, Incorporated today reported third quarter 2006 revenue from continuing operations of $730.7 million, up 17.4 percent from the third quarter of 2005.  Income from continuing operations in the third quarter was $29.5 million, compared with $13.5 million in the third quarter of 2005.  Diluted earnings per share from continuing operations were $.45 compared to $.19 in the third quarter of 2005.

Included in the third quarter 2006 reported results were restructuring charges of $.02 per share resulting primarily from costs associated with the realignment of the European service and research and development operations.

111.    On November 6, 2006, Diebold filed with the SEC its Form 10-Q for the quarter ended September 30, 2006, (the "3Q06 Form 10-Q"), which was signed by defendant Krakora.  The 3Q06 Form 10-Q included Diebold's financial statements for the quarter ended September 30, 2006 and 2005, which were falsely represented to have been presented in conformity with GAAP.  In addition, the 3Q06 Form 10-Q represented, in part:

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and therefore do not include all information and footnotes necessary for a fair presentation of financial position, results of operations and cash flows in conformity with United States generally accepted accounting principles; however, such information reflects

- 39 -

all adjustments (consisting solely of normal recurring adjustments), which are, in the opinion of management, necessary for a fair statement of the results for the interim periods.

112.    The October 30, 2006 press release and 3Q06 Form 10-Q were false and misleading when made and/or filed with the SEC and failed to disclose material facts concerning Diebold's financial results, business and business practices.  As described in ¶¶21-67, the Diebold Defendants had engaged, and continued to engage, in conduct to manage Diebold's earnings which falsified Diebold's financial results reported to the SEC and investors.  The Diebold Defendants therefore knew that the earnings results disclosed in the October 30, 2006 press release and 3Q06 Form 10-Q were materially misstated due to the continued earnings management conduct that they were undertaking.  As described in ¶¶141-187, these results did not comply with GAAP.  The Diebold Defendants made sure that these manipulated results were incorporated into Diebold's public filings to be reported to Diebold's investors as part of the Company's quarterly and year-end reporting requirements, and would be relied upon by investors and the market in their valuation of Diebold's stock.

113.    The 3Q06 Form 10-Q also falsely represented:

Under the direction of the chief executive officer and the chief financial officer, the company has evaluated its disclosure controls and procedures as of September 30, 2006, including the remedial actions discussed above, and has concluded that, as of September 30, 2006, the company's disclosure controls and procedures are effective.

Unrelated to the issues noted above, the company implemented the global enterprise resource planning (ERP) system in several significant subsidiaries in Europe as well as in Mexico and Australia during 2005.  Although the company is experiencing certain implementation challenges related to these subsidiaries' internal control over financial reporting, management is confident that there are sufficient compensating controls in place to mitigate the increase in risk caused by the implementations.  On June 1, 2006, the company reorganized its global IT operation and assumed implementation and support responsibilities for its global ERP system and other IT-related functions, which were previously outsourced. The company has made some progress in stabilizing the ERP system to date.  While the company remains committed to the new ERP Platform, it has begun a thorough evaluation of its implementation plan, with the assistance of a third-party provider, including

- 40 -

organization, processes, and software and hardware architecture.  A substantial portion of this evaluation is expected to be completed in the fourth quarter.

Other than the remedial actions taken with respect to the material weakness described above and the information technology reorganization, management has not identified any change in internal control over financial reporting that occurred during the third quarter of 2006 that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.

These representations were false and misleading, and failed to disclose the earnings management conduct described in ¶¶21-67.

114.    In response to this information, Diebold's stock price increased $2.22 per share and continued to trade at inflated levels.

115.    On January 30, 2007, Diebold issued a press release announcing its earnings for the fourth quarter and year ended December 31, 2006 ("4Q06" and "FY06"), which stated, in pertinent part, as follows:

Diebold, Incorporated today reported fourth quarter 2006 income from continuing operations of $27.1 million or $.41 per share.  This compares to $10.4 million or $.15 per share from the fourth quarter of 2005, representing an increase of 160.3 percent and 173.3 percent, respectively.  Fourth quarter revenue from continuing operations was $825.4 million, an increase of 1.8 percent from the fourth quarter of 2005.

Included in the fourth quarter was a non-cash charge of $.25 per share related to the impairment of a portion of the costs previously capitalized relative to the company's enterprise resource planning (ERP) implementation.  Also included in the quarter were restructuring charges of $.11 per share resulting primarily from costs associated with the continued realignment of the European service and research and development operations as well as the relocation of the company's Europe, Middle East and Africa (EMEA) headquarters.

116.    On March 1, 2007, Diebold filed with the SEC its Form 10-K for the year ended December 31, 2006 (the "FY06 Form 10-K"), which was signed by defendant Krakora.  The FY06 Form 10-K incorporated by reference Diebold's false and misleading financial statements for the years ended December 31, 2006, December 31, 2005 and December 31, 2004, from the Company's 2006 Annual Report to Shareholders.

117.    The FY06 Form 10-K also represented:

- 41 -

(a)      . . . Under the direction of the Company's chief executive officer and chief financial officer, management has evaluated the company's disclosure controls and procedures, as such term is defined in Exchange Act Rule 13a-15(f), as in effect as of the end of the period covered by this annual report. Based on that evaluation, the chief executive officer and the chief financial officer have concluded that, as of the end of the period covered by this annual report, our disclosure controls and procedures are effective.

(b)      . . . Management of the company is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f).  Management, under the supervision and with the participation of the company's chief executive officer and chief financial officer, conducted an evaluation of the effectiveness of the company's internal control over financial reporting as of December 31, 2006, based on the framework in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.  The company concluded that its internal control over financial reporting was effective as of December 31, 2006.

(c)      . . . There have been no changes in the company's internal control over financial reporting during the fourth quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the company's internal controls over financial reporting.

118.    The January 30, 2007 press release and FY06 Form 10-K were false and misleading when made and/or filed with the SEC and failed to disclose material facts concerning Diebold's financial results, business and business practices.  As described in ¶¶21-67, the Diebold Defendants had engaged, and continued to engage, in conduct to manage Diebold's earnings which falsified Diebold's financial results reported to the SEC and investors.  The Diebold Defendants therefore knew that the earnings results disclosed in the January 30, 2007 press release and FY06 Form 10-K were materially misstated due to the continued earnings management conduct that they were undertaking.  Additionally, the Diebold Defendants also knew that the restated financials contained in the FY06 Form 10-K did not disclose the full truth concerning Diebold's financial performance and their conduct to manage the Company's reported results.  As described in ¶¶141-187, these results did not comply with GAAP.  The Diebold Defendants made sure that these manipulated results were incorporated into Diebold's public filings to be reported to Diebold's investors as part of

- 42 -

the Company's quarterly and year-end reporting requirements, and would be relied upon by investors and the market in their valuation of Diebold's stock.

119.    In response to this information, Diebold's stock price increased $1.75 per share and continued to trade at inflated levels.

120.    On April 25, 2007, Diebold issued a press release announcing its earnings for the first quarter ended ("1Q07"), which stated, in pertinent part, as follows:

> Diebold, Incorporated today reported 2007 first quarter revenue of $628.4 million, an increase of 0.8 percent from the first quarter of 2006.  The company reported a first quarter net loss of $5.9 million, or $.09 per share.  This compares to net income of $12.7 million, or $.18 per share from the first quarter of 2006.
>
> Included in the first quarter 2007 results was a restructuring charge of $.32 per share related to the closing of the manufacturing facility in Cassis, France.

121.    On May 10, 2007, Diebold filed with the SEC its Form 10-Q for the quarter ended March 31, 2007 (the "1Q07 Form 10-Q"),which was signed by defendant Krakora.  The 1Q07 Form 10-Q included Diebold's financial statements for the quarters ended March 31, 2007 and 2006, which were falsely represented to have been presented in conformity with GAAP.  In addition, the 1Q07 Form 10-Q represented that:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and therefore do not include all information and footnotes necessary for a fair presentation of financial position, results of operations and cash flows in conformity with United States generally accepted accounting principles; however, such information reflects all adjustments (consisting solely of normal recurring adjustments), which are, in the opinion of management, necessary for a fair statement of the results for the interim periods.

122.    In addition, the 1Q07 Form 10-Q disclosed:

> Management of the company is responsible for establishing and maintaining adequate disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934.  Under the supervision and with the participation of the company's Chief Executive Officer and the Chief Financial Officer, management has evaluated the company's disclosure controls and procedures as of March 31, 2007.  Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer have concluded that, as of the end of the

- 43 -

period covered by this quarterly report, our disclosure controls and procedures were effective.  Additionally, there have been no changes in the company's internal control over financial reporting during the first quarter of 2007 that have materially affected, or are reasonably likely to materially affect, the company's internal control over financial reporting.

123.    The April 25, 2007 press release and 1Q07 Form 10-Q were false and misleading when made and/or filed with the SEC and failed to disclose material facts concerning Diebold's financial results, business and business practices.  As described in ¶¶21-67, the Diebold Defendants had engaged, and continued to engage, in conduct to manage Diebold's earnings which falsified Diebold's financial results reported to the SEC and investors.  The Diebold Defendants therefore knew that the earnings results disclosed in the April 25, 2007 press release and 1Q07 Form 10-Q were materially misstated due to the continued earnings management conduct that they were undertaking.  As described in ¶¶141-187, these results did not comply with GAAP.  The Diebold Defendants made sure that these manipulated results were incorporated into Diebold's public filings to be reported to Diebold's investors as part of the Company's quarterly and year-end reporting requirements, and would be relied upon by investors and the market in their valuation of Diebold's stock.

124.    In response to this information, Diebold's stock price continued to trade at inflated levels.

125.    On May 30, 2007, Diebold announced that Michael Moore had stepped down as the Company's Principal Accounting Officer and assumed a new role as Vice President, Corporate Finance, and Leslie Pierce assumed the role of the Company's Principal Accounting Officer, Vice President and Corporate Controller.

- 44 -

**The Diebold Defendants' Fraud Begins to Unravel**

126.    On July 25, 2007, Diebold announced that it was delaying the release of its second

quarter 2007 ("2Q07") earnings results and related conference call, both originally scheduled for

July 31, 2007.  The Company stated:

> The delay relates to Diebold's long-standing practice of recognizing certain
> revenue on a "bill and hold" basis within its North America business segment.  In
> connection with questions that have arisen during the ongoing formal investigation
> by the Securities and Exchange Commission (SEC), Diebold has decided to
> proactively seek guidance from the Office of the Chief Accountant (OCA) of the
> SEC as to the company's revenue recognition policy.  While the percentage of this
> bill and hold revenue may vary from period to period, it represented less than 10
> percent of the company's total consolidated revenue in 2006.

> Diebold believes that the OCA's response would only potentially affect the
> timing of the recognition of certain revenue.  As a consequence, the company does
> not anticipate any impact to cash provided by operating activities or the company's
> net cash position, due to any potential change in the timing of revenue recognition.

> "We regret the delay in our ability to report results for the second quarter.
> We take our responsibility to provide complete and accurate financial information
> seriously and are taking proactive steps that we believe are appropriate under these
> circumstances," said Thomas W. Swidarski, Diebold president and chief executive
> officer.

> The company will issue its second quarter 2007 earnings results as soon as
> possible following a response from the OCA.  Diebold may also have to delay the
> filing of its Quarterly Report on Form 10-Q for the quarter ended June 30, 2007
> depending on the timing of the receipt of the response.  The regular deadline for the
> filing of the company's Form 10-Q for the quarter ended June 30, 2007 is August 9.

127.    The July 25, 2007 press release was false and misleading at the time it was made.  As

described in ¶¶21-67, the Diebold Defendants had engaged in conduct to manage Diebold's earnings

which falsified Diebold's financial results reported to the SEC and investors.  The Diebold

Defendants therefore knew that the "bill and hold" conduct the July 25, 2007 release mentioned was

occurring not only in FY06 but also in FY03-FY05 and 1Q07, and that those financial results were

materially misstated as a result.  The Diebold Defendants also failed to disclose the other wrongful

conduct described in ¶¶158-184, that resulted in the manipulation and falsification of Diebold's FY03-FY06 and 1Q07 financial results.

128.    In response to this information, Diebold's stock price fell $1.37 per share on July 25, 2007 and continued to fall, eventually losing $3.58 per share by the close of trading on July 30, 2007.  However, since the full extent of the Diebold Defendants' earnings management conduct had not yet been disclosed, Diebold's stock price continued to trade at inflated levels.

129.    On October 2, 2007, Diebold announced that it was discontinuing the use of its bill-and-hold revenue recognition practice:

> Diebold, Incorporated has been engaged in an ongoing discussion with the Office of the Chief Accountant (OCA) of the Securities and Exchange Commission (SEC) regarding the company's practice of recognizing certain revenue on a "bill and hold" basis within its North America business segment.  As a result of these discussions, Diebold will discontinue the use of bill and hold as a method of revenue recognition in both its North America and international businesses.  Diebold is currently working to determine the most appropriate revenue recognition method to replace its prior bill and hold practice, and believes that an amendment of its prior financial statements may be required.
>
> The change in the company's revenue recognition practice, and the potential amendment of prior financial statements, would only affect the timing of recognition of certain revenue.  While the percentage of the company's global bill and hold revenue varied from period to period, it represented 11 percent of Diebold's total consolidated revenue in 2006.  The company does not anticipate that the change in the timing of revenue recognition would impact previously reported cash provided by operating activities or the company's net cash position.
>
> Diebold will provide further information once it has completed an in-depth analysis of the most appropriate revenue recognition method and has reviewed it with its independent auditors and its audit committee.  While the company cannot predict with certainty the length of time it will take to complete this analysis and review, it anticipates the process will take at least 30 days.  Upon completing this process, Diebold will be in a position to provide updated revenue and earnings guidance for the full-year 2007.
>
> Additionally, if the company determines it is necessary, it will begin the process of filing amended financial statements, including amending its annual report on Form 10-K/A for the year ended December 31, 2006 and its quarterly report on Form 10-Q/A for the quarter ended March 31, 2007.  After filing these amendments, the company can then file its Form 10-Q for the quarters ended June 30, 2007, and September 30, 2007, and resume its regular financial reporting schedule.

- 46 -

130.    The October 2, 2007 press release was false and misleading at the time it was made. As described in ¶¶21-67, the Diebold Defendants had engaged in conduct to manage Diebold's earnings which falsified Diebold's financial results reported to the SEC and investors.  The Diebold Defendants therefore knew that the "bill and hold" conduct was occurring not only in FY06 but also in FY03-FY05 and 1Q07, and that those financial results were materially misstated as a result.  The Diebold Defendants also failed to disclose the other wrongful conduct described in ¶¶158-184, that resulted in the manipulation and falsification of Diebold's FY03-FY06 and 1Q07 financial results.

131.    In response to this information, Diebold's stock price fell $1.57 per share by the close of trading on October 3, 2007.  However, since the full extent of the Diebold Defendants' earnings management conduct had not yet been disclosed, Diebold's stock price continued to trade at inflated levels.

132.    On December 21, 2007, Diebold announced that the SEC's formal investigation was still in process and that the U.S. Department of Justice ("DOJ") was also conducting an investigation into Diebold's financial reporting:

> As announced on October 2, 2007, Diebold, Incorporated has been engaged in an ongoing discussion with the Office of the Chief Accountant (OCA) of the Securities and Exchange Commission (SEC) regarding the company's prior, discontinued practice of recognizing certain revenue on a "bill and hold" basis.  Bill and hold is when ownership of a product contractually passes to the customer and revenue is recognized by the supplier prior to delivery of the products to the customer.
>
> Diebold is continuing its dialogue with the OCA so that it can determine the most appropriate revenue recognition method to replace its bill and hold practice, and will provide further information once it has received sufficient guidance.  Upon receiving this guidance, Diebold will be in a position to communicate a new method of revenue recognition.  The company will also then provide revenue estimates for the full-year 2007.
>
> This change in the company's bill and hold revenue recognition practice would only affect the timing of recognition of certain revenue.  Diebold does not anticipate that the change in the timing of revenue recognition would impact previously reported cash provided by operating activities or the company's net cash position.

- 47 -

Also, as previously disclosed, the SEC's formal, non-public investigation is still in process. Additionally, the company recently learned that the U.S. Department of Justice is conducting a parallel investigation. Diebold continues to cooperate with the SEC, and will cooperate with the Department of Justice if requested, in connection with these investigations and cannot predict the length, scope or results of the investigations, or the impact they may have on the results of the company's operations.

As a result of the SEC's ongoing investigation, the company and its audit committee, with the assistance of their outside advisors, are reviewing these issues. The company anticipates this review will be completed in the first quarter of 2008. Any material adjustments identified as a result of this review will be included in amendments to the company's financial statements. While any amended financial statements would address all the issues identified in the review, the government investigations remain ongoing and there can be no assurance that the results of these investigations will not impact previously reported financial statements.

133.    Diebold's stock price fell $3.06 on very heavy trading volumes between December 19, 2007 and December 21, 2007 as this information leaked into the market. Diebold's stock price continued to fall throughout the remainder of the Class Period.

134.    On January 15, 2008, Diebold issued a press release, which disclosed, in part, that its previously issued financial statements should no longer be relied upon:

Diebold, Incorporated announced today that it has concluded its discussions with the Office of the Chief Accountant (OCA) of the Securities and Exchange Commission (SEC) regarding the company's prior practice of recognizing certain revenue on a "bill and hold" basis and has established a revised revenue recognition method.

**Revised revenue recognition**

On October 2, 2007, the company announced it was discontinuing the use of bill and hold as a method of revenue recognition in both its North America and International businesses. Based upon further discussions with the OCA, Diebold has decided to change its revenue recognition policy. For revenue previously recognized on a bill and hold basis, the company will now recognize revenue upon customer acceptance of products at a customer location. Within the North America business segment, when the company is contractually responsible for installation, acceptance will be upon completion of the installation of all of the items at a job site and Diebold's demonstration that the items are in operable condition. In those instances when Diebold is not contractually responsible for the installation, the company will continue to recognize revenue upon shipment of the products to a customer location.

The company's revised method of recognizing revenue will be adopted immediately and comes after an in-depth analysis and review with its external

- 48 -

auditors, the audit committee of the company's Board of Directors and the OCA. Following this in-depth analysis and review, the company has also concluded that its financial statements for the fiscal years ended December 31, 2006, 2005, 2004 and 2003; the quarterly data in each of the quarters for the years ended December 31, 2006 and 2005; and the quarter ended march 31, 2007 much be restated to reflect the company's revised accounting method and should no longer be relied upon. On January 14, the company discussed this conclusion with its audit committee. In addition, management's report on internal control over financial reporting contained in Form 10-K for the fiscal years ended December 31, 2006 and should no longer be relied upon.

As noted above, revenue previously recognized under the company's prior bill and hold practice will be deferred until customer acceptance of the products at a customer location. This change should not, however, impact the timing of related billing and collection activity, and therefore is not expected to impact total cash flow from operating activities.

Once Diebold has reviewed the impact of this accounting change on its 2006 and 2007 revenue with its external auditors, it will provide updated revenue estimates for these periods. The company anticipates that the review of the impact of the accounting change will be completed by the end of January 2008.

On December 21, 2007, it was announced that as a result of the SEC's ongoing investigation, the company and its audit committee, in consultation with their outside advisors, have been reviewing other accounting items. While this review is not complete, any adjustments identified will be included in amendments to the company's financial statements. The company anticipates the review of other accounting items will be completed in the first quarter of 2008. After this review has been completed, Diebold will file, as soon as possible, the necessary amended financial statements. After filing these amendments, the company will then file its quarterly reports on Form 10-Q for the quarters ended June 30, 2007 and September 30, 2007 and its annual report on Form 10-K for the year ended December 31, 2007. while any amended financial statements will address all the issues identified in the review, the government investigations remain ongoing and there can be no assurance that the results of these investigations will not impact previously reported financial statements.

Prior to filing its amended financial statements, and as soon as is feasible following the completion of the review of the other accounting items, Diebold will also provide preliminary financial results for the second, third and fourth quarters of 2007.

135.    Diebold's stock closed at $24.71 on January 15, 2008, down $20.40 per share from its

closing price on June 30, 2005, the first day of the Class Period.

- 49 -

## THE AFTERMATH OF DEFENDANTS' FRAUD

136.    On February 6, 2008, Diebold announced its revenue estimate for 2007 and 2008

revenue outlook:

> Diebold, Incorporated announced today that it has concluded its review of the impact on revenue from its change in revenue recognition method for 2006 and 2007.  As a result, the company can now provide updated revenue estimates and net debt for these periods as well as an updated market outlook.  In addition, the company is announcing related cost-reduction initiatives for 2008.

> Change in accounting method impact on revenue

> As previously announced on January 15, Diebold has been in discussions with the Office of the Chief Accountant (OCA) of the Securities and Exchange Commission (SEC) with regard to its practice of recognizing certain revenue on a "bill and hold" basis in its North America business segment.  Bill and hold is when ownership of a product contractually passes to the customer and revenue is recognized by the supplier prior to delivery of the products to the customer.  As a result of those discussions the company determined that its previous, long-standing method of accounting for bill and hold transactions was in error, representing a misapplication of generally accepted accounting principles.  To correct for this error, Diebold announced it would discontinue the use of bill and hold as a method of revenue recognition in its North America and international businesses.

> For revenue previously recognized on a bill and hold basis, the company will now recognize this revenue only upon customer acceptance of products at a customer location.  Within the North America business segment, when the company is contractually responsible for installation, acceptance will be upon completion of the installation of all of the items at a job site and Diebold's demonstration that the items are in operable condition.  In those instances when the company is not contractually responsible for the installation, the company will continue to recognize revenue upon shipment of the products to a customer location.

> The company estimates that the impact of this change in its revenue recognition method will result in a net revenue increase for the full years 2007 and 2006 of approximately $31 million and $27 million, respectively.  These net increases in revenue generally reflect higher installation levels versus bill and hold transactions for those years.  The cumulative net revenue impact from the change in Diebold's revenue recognition method will result in a decrease of $190 million to previously reported revenue in years prior to 2006.

> *       *       *

**Financial review update**

> As previously announced, the company and its audit committee, in consultation with their outside advisors, have been reviewing other accounting items.

- 50 -

After this review is completed, as soon as is practical, the company will provide financial information beyond revenue. The company now anticipates this review will be completed by the end of the first quarter or during the second quarter of 2008.

As soon as practical after the review of the other accounting items has been completed, but prior to filing its restated financial statements, Diebold will provide preliminary financial results for the second, third and fourth quarters of 2007. The company will then file the necessary restated financial statements as soon as practical. While the restated financial statements will address the issues identified in the review, the previously disclosed investigations by the SEC and U.S. Department of Justice remain ongoing and there can be no assurance that the results of these investigations will not impact previously reported financial statements.

137.     On March 3, 2008, Diebold announced that it would not timely file its 2007 Annual Report and that its Forms 10-Q for the periods ended June 30, 2007 and September 30, 2007 would be filed as soon as possible after completion of the previously disclosed accounting review, which the Company then anticipated to be completed by the end of the second quarter of 2008.

138.     On May 12, 2008, Diebold filed with the SEC a Form NT 10-Q for the quarter ended March 31, 2008, which disclosed, in relevant part, that the Company would not be able to timely file its Form 10-Q for the first quarter 2008 due to the continuing restatement work.

139.     On August 12, 2008, Diebold filed with the SEC a Form NT 10-Q for the quarter ended June 30, 2008, again announcing it would be unable to timely file its Form 10-Q for the current quarter due to the continuing restatement work.

140.     Then, on September 30, 2008, Diebold filed its Form 10-K for the year ended December 31, 2007 (the "2007 Form 10-K"). With regard to the Company's financial restatement, the 2007 disclosed, in relevant part:

**Revenue**

Bill and Hold - The largest of the revenue recognition adjustments relates to the Company's previous long-standing method of accounting for bill and hold transactions under Staff Accounting Bulletin 104, *Revenue Recognition in Financial Statements* (SAB 104), in its North America and International businesses. On January 15, 2008, the Company announced that it had concluded its discussions with the OCA with regard to its practice of recognizing certain revenue on a bill and hold basis in its North America business segment. As a result of those discussions, the

- 51 -

Company determined that its previous, long-standing method of accounting for bill and hold transactions was in error, representing a misapplication of GAAP. To correct for this error, the Company announced it would discontinue the use of bill and hold as a method of revenue recognition in its North America and International businesses and restate its financial statements for this change.

The Company completed an analysis of transactions and recorded adjusting journal entries related to revenue and costs recognized previously under a bill and hold basis that is now recognized upon customer acceptance of products at a customer location. Within the North America business segment, when the Company is contractually responsible for installation, customer acceptance will be upon completion of the installation of all of the items at a job site and the Company's demonstration that the items are in operable condition. Where items are contractually only delivered to a customer, revenue recognition of these items will continue upon shipment or delivery to a customer location depending on the terms in the contract. Within the International business segment, customer acceptance is upon either delivery or completion of the installation depending on the terms in the contract with the customer. The Company restated for transactions affecting both product revenue for hardware sales and service revenue for installation and other services that had been previously recognized on a bill and hold basis.

Other Revenue Adjustments - The Company also adjusted for other specific revenue transactions in both its North America and International businesses related to transactions largely where the Company recognized revenue in incorrect periods. The majority of these adjustments were related to misapplication of GAAP related to revenue recognition requirements as defined within SAB 104. Generally, the Company recorded adjustments for transactions when the Company previously recognized revenue prior to title and/or risk of loss transferring to the customer.

**Account Reconciliations**

Many of the restatement adjustments relate to inaccurate account balances not identified timely due to lack of account reconciliations or inaccurate reconciliations of various accrued liabilities, reserves, prepaid expenses, and select other balance sheet accounts. During the course of the internal review, the Company reviewed certain accruals, reserves, prepaids and select other balance sheet accounts, including the underlying supporting documentation and estimates to evaluate and determine if the account balances required adjustment. The Company determined that a number of accounts required adjustments related to either inaccurate or incomplete data extracted from systems, misinterpretations of data from systems, faulty analysis, and/or known differences not previously recorded. These adjustments were made across various accounts and accounting periods. The largest of these adjustments related to the following areas:

Service Contract Revenue - The Company records deferred service revenue upon billing to customers and recognizes the related revenue ratably over the life of the service contract. Within the North America business segment, the sub ledger that tracks the service contract activity is the National Service Contract Administration

(NSCA) system.  During 2007, the Company determined that the deferred service revenue reconciliations since 2003 were in error as there was a misinterpretation of system data and exclusion of certain leasing transactions within the prior reconciliations, which created a difference between the NSCA sub ledger system and the general ledger.  The Company subsequently initiated and completed a project to reconstruct the sub ledger balance and reconcile differences between the deferred service revenue accounts in the general ledger and the NSCA sub ledger system.  The Company determined that the above errors largely originated in 2003 creating a carry forward out of balance condition in the deferred service revenue general ledger account balance into 2007.  The Company corrected the deferred service revenue balance in the general ledger for these errors.

Accounts Payable Float and Related Reserve - Within the North America business segment, the Accounts Payable Float account is used to record liabilities for goods received that were ordered via purchase order, but not yet invoiced from a supplier, as well as invoices that have been received and matched to a purchase order for goods received, but not yet approved for payment due to differences between the invoice and the purchase order.  At times, and in error, these same invoices could be processed via direct payment and expensed a second time.  This resulted in the Accounts Payable Float account accruing for items that ultimately were paid via direct payment of invoices, which resulted in an overstatement of the Accounts Payable Float account.  To adjust for this overstatement, the Company recorded a reserve to the Accounts Payable Float account representing the Company's estimate of the overstatement of the Accounts Payable Float balances based on historical aging trends and final disposition of purchases with suppliers which indicated that a percentage of these vendors had previously been paid via the direct payment process.

In the 2003 reconciliation between the Accounts Payable Float aged sub ledger balance and the reserve for the Account Payables Float general ledger account balance, it was determined that the general ledger account balance was not properly stated.  The reserve balance within the general ledger was not adjusted for aged unmatched and aged receipts from vendors within the Accounts Payable Float account.  At that time, the Company adjusted the account related to the reserve for the Accounts Payable Float to reflect the balance as supported by the aged sub ledger report.

During the course of the restatement, the Company evaluated the Accounts Payable Float and related reserve general ledger account balances in conjunction with the existing reconciliation process related to the reconciliation performed in 2003 and identified an error in the Company's analysis.  The error related to improper inclusion of intercompany related transactions in the establishment of the adjustment as well as the lack of timely adjustments of the general ledger to the supported subledger data.  The Company made the necessary adjustments to reflect the proper account balances in both the Accounts Payable Float and Related Reserve for all accounting periods.

Installation Allowance - Within the North America business segment, Installation Allowance historically related to the liability for the installation work yet

- 53 -

to be performed related to uninstalled equipment for which revenue had been recognized. During 2005, the Company determined that the general ledger installation allowance liability balance and the balance per the installation sub ledger were out of balance and that the sub ledger did not include specific uninstalled sales orders thereby understating the installation allowance liability. As a result, an analysis of detailed sales orders was performed and an adjustment was recorded to the general ledger to reflect the underlying supporting detail as of November 2005. During the restatement process, the Company reconciled the year end sub ledger information to the general ledger for the restatement periods and made adjustments to record the correction originally recorded in November 2005 into the proper accounting periods.

With the Company's discontinuance of its use of bill and hold as a method of revenue recognition as discussed previously in Note 2 to the Consolidated Financial Statements, the need to record an Installation Allowance has been eliminated for these sales. As such, the restated Installation Accrual reflects only installation services performed or outsourced by the Company for which revenue has been recognized, but liabilities for the installation services have not been paid. Further, an Installation Prepaid is recognized for Company payments for installation services performed by third parties prior to revenue recognition.

A/P Wire Clearing (Prepaid Wire Account) - The A/P Wire Clearing relates to the Company's process for making payments to vendors by wire transfer rather than by check. Verification between two departments is required in order to ensure that payments via wire transfer are properly and timely recorded as an expense or asset. In 2006, the Company determined that the A/P Wire Clearing account balance had not been reconciled in recent years and that the account balance was not supported. Based on the analysis performed in 2006, the Company adjusted the account to record the unsupported difference in the account balance. During the restatement process, the Company determined the account balances for periods prior to 2006 based on detailed supporting documentation contained errors, and recorded the 2006 adjustment in the proper time periods.

Other Accruals, Reserves and Prepaids - During the restatement process, the Company identified several accrual accounts related to warranty, freight, product trade-ins and stock-based compensation, as well as reserves and prepaid accounts, that were either not adjusted to supported balances on a timely basis or not reconciled on a timely basis. The Company reviewed these accruals, reserves and prepaid expense accounts including the underlying estimates to assess whether any previously recorded balances required adjustment. During the restatement process, the Company recorded adjustments where necessary to the accrual, reserve and prepaid expense accounts.

**Inventory**

During the restatement process, the Company adjusted its inventory balances to accurately record the differences between sub ledger detail and general ledger balances, to adjust select inventory balances to lower-of-cost-or-market valuations

- 54 -

and to adjust balances for excess, slow-moving and obsolete inventory.  Several of the more significant adjustments are described below:

Finished Goods Inventory - The largest of the inventory adjustments recorded related to the Company's finished goods inventory within its North America business segment.  The Company's finished goods inventory largely includes inventory to be installed, but also includes returned goods from customers pending manufacturing rework or final disposition.  Prior to 2005, the Company did not maintain a sub ledger report that detailed the inventory account balances at an order level and thus used analyses and trends to support the recorded general ledger balance.  During 2005, the Company constructed the finished goods inventory sub ledger at an order level and reconciled the sub ledger balance to the general ledger account balance. As a result, adjustments were recorded in 2005 to the finished goods inventory account to correct for differences between the general ledger and sub ledger.

During the restatement process, the Company reconstructed the inventory sub ledger detail by order for periods prior to 2005 and evaluated the methodology and process for determining finished good account balances and inventory reserve amounts. As a result, the Company recorded the above 2005 adjustments into the proper time periods, as well, as made adjustments based on further improvements to the accuracy of the sub ledger reports created.

Refurbished Inventory - The Company's refurbished inventory within its North America business segment consists of used equipment that is acquired through purchases, lease transfers, returned goods and trade-ins.  During the restatement process, it was determined that the general ledger account balances were not properly stated as the balances were not supported by sub ledger detail and reconciliations were not consistently performed during periods prior to 2006.  In addition, the Company determined that the valuation of the inventory was not being recorded at the lower of cost or market and adjustments for excess and obsolete inventory were not being recorded.

During the restatement, the Company reconstructed the refurbished equipment sub ledger quantities and determined the appropriate inventory value for the refurbished equipment.  The Company adjusted the inventory account balances for the refurbished inventory to the calculated amounts making adjustments for both lower of cost or market valuations as well as excess and obsolete inventory.

**Capitalization**

During the restatement process, the Company recorded adjustments related to amounts recorded for fair value assigned to select assets based on a review of the underlying transactions related to the assets.  The most significant capitalization adjustment is described below:

ERP Capitalization - During 2006, the Company employed a consulting firm to analyze the future value of specific functionality designed previously within its Enterprise resource planning system (ERP).  Previous to this, the Company had outsourced its information technology function and ERP implementation to another

- 55 -

consulting firm.  As a result of additional analysis performed by the Company, in December 2006, the Company recorded an impairment charge against the gross asset value of the ERP system.

During the restatement process, the Company reviewed the history and accounting composition of the ERP asset.  As a result of this analysis, the Company determined that the ERP asset value was overstated due to a number of factors, including unsupported manual journal entries, errors related to amounts of cost capitalized to the asset, and certain capitalized costs which did not meet the criteria of capitalization under SOP 98-1.  Portions of the improperly capitalized costs identified in the restatement were included in the impairment charge originally recorded in 2006, thus an adjustment to the original 2006 impairment charge was also recorded to exclude these costs in the restated impairment charge.

**Other**

In conjunction with the restatement process, the Company also made other adjustments and reclassifications to its financial statements in various years, including, but not limited to: (1) past immaterial unrecorded audit adjustments, (2) adjustments for liabilities for contingencies and intangible assets identified at the date of acquisition in connection with certain acquisitions, (3) select intercompany and related elimination transactions, and (4) correction for previous gain calculations on sale of discontinued operations.

## DIEBOLD'S CLASS PERIOD FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP

141.    As detailed herein, Diebold's publicly issued financial statements and related earnings releases during the Class Period were materially false and misleading and in violation of GAAP[1] for the following reasons:

(a)    The Diebold Defendants improperly recognized premature, inflated, and fictitious revenue associated with bill and hold sales and other improper revenue transactions;

_____

[1]    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure that would be duplicative of disclosures accompanying annual disclosures, per 17 C.F.R. §210.10-01(a).

- 56 -

(b)     The Diebold Defendants understated expenses and engaged in earnings management by improperly accounting for various liabilities and reserves;

(c)     The Diebold Defendants understated expenses and engaged in earnings management by improperly capitalizing technology costs;

(d)     The Diebold Defendants understated expenses and engaged in earnings management by improperly accounting for inventory valuations; and

(e)     The Diebold Defendants improperly accounted for several other transactions involving various balance sheet accounts, contingent liabilities and intangible assets related to certain acquisitions, intercompany transactions, and gain calculations on the sale of discontinued operations.

142.     The Diebold Defendants engaged in the above accounting shenanigans, typically at the end of each reporting period, to boost Diebold's reported earnings in order to meet Wall Street analysts' earnings forecasts.  As a result, each of Diebold's quarterly and annual financial statements filed with the SEC during the Class Period were materially false and misleading and in violation of GAAP.  Notably, from 2002 through 2007, the Diebold Defendants' improper accounting practices inflated the Company's reported pre-tax earnings by at least $127 million.  The fact that these accounting misstatements were material is not disputed by the Company.  On January 15, 2008, the Company admitted that its "financial statements for the fiscal years ended December 31, 2006, 2005, 2004 and 2003; the quarterly data in each of the quarters for the years ended December 31, 2006 and 2005; and the quarter ended March 31, 2007, *must be restated and should no longer be relied upon*."

143.     The restatement of previously issued public financial statements is a serious and meaningful event.  The accounting rules governing correction of errors or fraud in previously issued financial statements do not allow a company any discretion or election in deciding whether or not to

- 57 -

retroactively restate its previously issued financial statements.  GAAP only permits (and requires) restatements of previously issued financial statements to correct **material** errors, resulting from either a) "mathematical mistakes, mistakes in the application of GAAP ***or oversight or misuse of facts that existed at the time the financial statements were prepared***"; or b) a change in accounting principle or a change in the reporting entity.  *See* SFAS No. 154, *Accounting Changes and Error Corrections*, ¶¶2, 4-10, 23-26.  In this case, Diebold has admitted that its restatement was done solely to correct "errors," and ***not*** to change accounting principles or the reporting entity.  Therefore, Diebold's restatement of its previous financial statements is an admission that: (i) the Company's financial results issued during the Class Period and all public statements regarding those results were ***materially false***; and (ii) the financial results reported during the Class Period were incorrect based on information available to the defendants at the time the results were reported.

**The Diebold Defendants Improperly Recognized Revenue**

**Bill and Hold Sales**

144.    One of the primary methods the Diebold Defendants utilized to inflate and "manage" Diebold's earnings was  through the employment of an accounting scheme known as the "bill and hold."  Bill and hold schemes involve improperly recording revenue under the false pretense that a ***customer has requested*** that products not be delivered at the time of sale.  As described in ¶¶25-50, from 2002 through 2007 in order to improperly boost the Company's revenue and earnings, the Diebold Defendants recorded revenue on purported sales at the end of quarterly periods despite the fact that the Diebold Defendants knew that Diebold's customer had not actually purchased the products and/or requested that Diebold "hold" the products for future delivery.  In some cases, the purported sales involved products that were not even completed as of the quarter-end sales date.  As part of its restatement, Diebold admitted that its financial results included improperly and prematurely recognized revenue from bill and hold transactions in violation of GAAP.

- 58 -

145.    Under GAAP, specifically SAB 104, Revenue Recognition a product generally must be shipped to the customer, or services must be rendered, before revenue can be recognized.[2] Accordingly, for revenue to be recognized before product shipment on so called "bill and hold" transactions, very specific and stringent criteria would have to be met.  These criteria include: (i) the buyer, not the seller, requests that the transaction be on a bill and hold basis; (ii) the buyer has a substantial business purpose for ordering on a bill and hold basis; (iii) there is a fixed delivery schedule that is reasonable and consistent with the buyer's business purpose; (iv) the seller does not retain any specific performance obligations such that the earnings process is incomplete; and (v) the products are ready for shipment.  The above GAAP revenue recognition rules surrounding bill and hold sales are very straightforward.  This concept was specifically addressed by Lynn Turner, Chief Accountant of the SEC, in a May 31, 2001 speech in which he stated:

> The general framework and foundation for [revenue recognition under] SAB 101[3] could not be simpler – it is based on the common sense notion that revenue on a sale should not be recognized until the seller has fulfilled its obligations to the buyer under the sale arrangement.

> A simple example of this is bill and hold sales transactions. SAB 101 merely extracted and codified, word for word, the criteria set forth in 1986 in Accounting and Auditing Enforcement Release (AAER) No. 108 that must be met in order for a company to recognize revenue on a product sale prior to delivery of that product to the customer.  Nothing new was presented in SAB 101 with respect to bill and hold

---

[2]    FASB Statement of Financial Accounting Concepts No. 5 ("FASCON 5") clearly and concisely states that revenue should not be recognized until it is both realized (or realizable) and earned.  SAB 104 has further reiterated revenue recognition rules under GAAP by requiring that revenue can be recognized only when all of the following criteria are met:

1.    Persuasive evidence of an arrangement exists;
2.    Delivery has occurred or services have been rendered;
3.    The seller's price to the buyer is fixed or determinable; and
4.    Collectability is reasonably assured.

[3]    SAB 101 was superseded by SAB 104, however, the bill and hold revenue criteria listed in SAB 101 were unaffected.

transactions that was not previously spelled-out in various Commission enforcement cases (enforcement cases related to this issue are further described in AAER Nos. 108, 817, and 971, and Litigation Release No. 15093). SAB 101 reiterates and reinforces the staff's view that *ALL* of the bill and hold criteria must be met in order to recognize revenue prior to shipment/delivery - there is nothing new or novel in this concept.

(Emphasis in original).

146.    As more fully described in ¶¶25-50, the Diebold Defendants fraudulently recognized revenue on numerous transactions that failed to satisfy the GAAP bill and hold criteria. The Diebold Defendants referred to these sales transactions as Factory or "F-term" orders. This was Diebold's code for recognizing revenue on products that it shipped from its factory directly to its own warehouse. For example, on numerous occasions, the Diebold Defendants asked customers to sign Diebold's form contract – its standard MOA – which contained a boilerplate clause stating that the customer had requested Diebold to hold items for the customer's convenience. Notwithstanding the language in the MOA, Diebold's accounting was not in accordance with GAAP because Diebold's customers had not requested that the transaction be on a bill and hold basis. Moreover, Diebold's transferring of products from its factory to its own warehouse to give the appearance that the products had been "shipped" is further evidence of the Diebold Defendants deliberate attempt to circumvent the GAAP revenue recognition rules.

147.    In addition, certain F-term orders failed to meet other GAAP "bill and hold" criteria. Pursuant to GAAP, in order to recognize revenue on a bill and hold basis, there must be a fixed product delivery schedule, the seller must not retain any specific performance obligations such that the earnings process is incomplete, and the products must be complete and ready for shipment. As outlined in ¶¶28-44, many of Diebold's F-term contracts often failed to meet these criteria. For instance, many F-term "sales" did not have fixed delivery schedules and in certain instances the ATMs were not complete because the necessary software had not yet been installed and/or quality testing had not yet been performed. In addition, on certain occasions, the Diebold Defendants

- 60 -

caused Diebold to recognize "bill and hold" revenue on purported sales of products and services that would never qualify for a bill and hold arrangement, such as software orders and professional services.

148.    The GAAP revenue recognition criteria for bill and hold sales are well established. The Diebold Defendants knew, or were reckless in not knowing, that many F-term orders prior to and during the Class Period were improperly recognized and deceptive bill and hold practices were employed to circumvent and abuse GAAP's revenue recognition criteria.

149.    As described in ¶¶42-44, in connection with the Diebold Defendants' efforts to meet Diebold's earnings forecasts, they directed that F-term orders shipped to a Diebold warehouse before the shipment dates specified in the MOAs.  The Diebold Defendants would then prematurely record revenue on these shipments.  This practice was internally referred to as "pulling in" F-terms.

150.    The amount of orders "pulled in" varied by quarter, but typically was done to inflate earnings in order to meet analyst earnings forecasts for that reporting period.  Along these lines, the Diebold Defendants instructed employees to manufacture products early, without customer notice or approval, for the purpose of recognizing revenue in an earlier reporting period.  For example, in June 2004[4] (the last month of 2Q04), the Diebold Defendants "pulled in" about $3.4 million of F-term orders that were scheduled to ship to the warehouse in July 2004, and in December 2004 (the last month of 4Q04), the Diebold Defendants "pulled in" about $3.8 million of F-term orders that were

---

[4]    Transactions, referenced herein, occurring prior to the Class Period were presented in Class Period financial statements.  For example, the amended 2004 Form 10-K filed on August 12, 2005 contained financial results for the fiscal years ended 2002, 2003, and 2004.  The 2005 Form 10-K issued on March 14, 2006 contained financial results for the fiscal years ended 2003, 2004 and 2005. The 2006 Form 10-K issued on March 1, 2007 contained financial results for the fiscal years ended 2004, 2005 and 2006.

585867_1

scheduled to ship to the warehouse in January 2005. These "pulled in" orders inflated Diebold's earnings in such quarters by approximately $1.1 million and about $1.3 million, respectively.

151.    As described in ¶¶45-49, the Diebold Defendants created another standard form called the "I-term" form or "I-term" order. The Diebold Defendants then requested that customers execute contract modification forms to convert I-term orders to purported bill and hold transactions. Even though the Diebold customer believed that the deal was not complete until installation, the Diebold Defendants improperly recognized revenue on the transaction when it shipped the product from its factory to its warehouse but before it was installed at the customer site. However, as described above, under GAAP, the customer, not Diebold, must request that the transaction be on a bill and hold basis, and the customer must have a substantial business purpose for ordering on a bill and hold basis. The Diebold Defendants' conduct violated GAAP (which Diebold has now admitted) and was undertaken for the sole purpose of inflating Diebold's earnings.

152.    For example, as outlined in ¶¶46-48, in 4Q04, a Diebold sales representative had a customer sign a $4 million I-term order which, by its terms, required payment upon receipt of the invoice sent and when Diebold shipped the products to its warehouse. On a conference call, however, the Diebold sales representative advised defendant Geswein that although the customer signed the form, the actual agreement with the customer did ***not*** require it to pay for the ATMs before they were installed. Defendant Geswein caused Diebold, under the guise of a "bill and hold" transaction, to improperly recognize revenue upon shipment of the ATMs to its own warehouse despite the payment terms agreed to by the customer. Indeed the customer was invoiced in 4Q04, but did not pay for the product until 2Q05 – ***after*** Diebold delivered and installed the product. This transaction alone overstated Diebold's earnings in 4Q04 by approximately $2 million. By fraudulently recognizing revenue on this transaction, defendant Geswein caused Diebold to report that it met analyst's forecasted earnings for 4Q04.

- 62 -

153.    Moreover, as detailed in ¶¶46, 49, defendants Geswein and Krakora often had what was referred to as "make the quarter" calls.  During these calls, defendants Geswein and Krakora encouraged Diebold's sales force to request that customers execute I-term and F-term orders so that there was an appearance that GAAP revenue recognition criteria was met.  For example, in June 2005, a Diebold sales manager wrote an email to defendant Krakora stating that the sales staff was "trying to help Diebold's revenue recognition drive," but was apprehensive about asking customers to sign bill and hold forms in instances when Diebold was at fault for installation delays. Notwithstanding concerns raised by sales personnel, the Diebold Defendants recognized material "bill and hold" sales in violation of GAAP.

**The Diebold Defendants Failed to Disclose Material Information
Regarding Its Bill and Hold Sales**

154.    The Diebold Defendants also failed to disclose in Diebold's Class Period financial statements, that it recognized revenue on "bill and hold" sales despite the fact that these purported sales transactions constituted a material portion of Diebold's revenues.  After SAB 104 was published in December 2003 (which, among other things, reiterated the criteria for bill and hold accounting), defendants Geswein and Krakora became concerned that Diebold's revenue recognition practices would not withstand scrutiny.  As detailed in ¶¶35-41, these defendants realized that implementing and disclosing a new revenue recognition policy that complied with GAAP would cause the Company to miss analysts' earnings forecasts for 3Q04.  Thus, the Diebold Defendants, as detailed in ¶¶40-41, caused an improperly made $18.8 million top-level journal entry to be posted that pulled in revenue that would not have been recognized until subsequent quarters under the Company's new revenue recognition policy.  As a result of this improper entry, Diebold met its revised earnings forecast in 3Q04.

155.    The Diebold Defendants never disclosed Diebold's true revenue recognition practices, or the impact such changes had on the Company's reported revenues during the Class

- 63 -

Period.  During at least one management meeting, when the issue of publicly disclosing Diebold's true revenue recognition practices was raised, Diebold management decided against such disclosure out of fear it would create an "investor relations issue."

**Cash Depot Transaction**

156.    In addition to the above examples of improper revenue recognition, the Diebold Defendants also engaged in other improper revenue recognition conduct to inflate Diebold's revenues and earnings.  As described in ¶¶51-55, during 1Q05, the Diebold Defendants caused Diebold to enter into an agreement to lease a portfolio of ATMs to a private company, Cash Depot, for $5 million.  As part of this transaction, the Diebold Defendants caused Diebold to enter into a secret "side agreement" with Cash Depot, giving Cash Depot the right to sell the ATMs back to Diebold at a later date.

157.    Under GAAP, the recognition of revenue on a transaction that has significant future obligations or contingencies, such as a buy-back agreement, is expressly prohibited.  Nonetheless, the Diebold Defendants improperly recognized $5 million in revenue on this transaction in 1Q05, which accounted for approximately 8% of Diebold's total pretax earnings during that quarter.

**Other Revenue Misstatements**

158.    In addition to the above examples of improper revenue recognition, the Company also disclosed the following GAAP violations related to revenue recognition as part of its restatement:

> The Company also adjusted for other specific revenue transactions in both its North America and International businesses related to transactions largely where the Company recognized revenue in incorrect periods.  The majority of these adjustments were related to misapplication of GAAP related to revenue recognition requirements as defined within SAB 104.  Generally, the Company recorded adjustments for transactions when the Company previously recognized revenue prior to title and/or risk of loss transferring to the customer.

- 64 -

**The Diebold Defendants Manipulated Accounting
Reserves in Order to Manage Earnings**

159.    As described in ¶¶56-60, prior to and throughout the Class Period, the Diebold

Defendants regularly employed so-called "cookie jar" accounting – the practice of maintaining

reserves that can be used to improperly pad earnings during lean times.  The Diebold Defendants

"managed earnings" by maintaining various reserves and liabilities from which they would

improperly offset shortfalls in quarterly earnings targets.  Specifically, the Diebold Defendants

managed earnings through a profit margin reserve, a LTIP liability, a sales commission accrual, a

Master Purchase Agreement accrual, a corporate obsolescence and excess inventory account, and

other various reserves.

160.    GAAP prohibits the accrual of reserves for general or unspecified purposes.  *See*

Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting for Contingencies*.  The

SEC prohibits the management of earnings, including the employment of unsubstantiated accruals to

manage earnings.  *See* SEC Accounting and Auditing Enforcement Release No. 1563.

161.    Earnings management was also specifically addressed by Arthur Levitt, Chairman of

the SEC, in his well-known speech, *The Numbers Game* on September 28, 1998, in which he

expressed his concerns that the motivation to meet Wall Street earnings expectations may override

common sense business practices:

> In the zeal to satisfy consensus earnings estimates and project a smooth earnings
> path, wishful thinking may be winning the day over faithful representation.[5]
>
> As a result, I fear that we are witnessing an erosion in the quality of earnings,
> and therefore, the quality of financial reporting.  Managing may be giving way to
> manipulation; Integrity may be losing out to illusion . . . where earnings reports

---

[5]    Representational faithfulness is a basic qualitative characteristic central to accounting.
Representational faithfulness is correspondence or agreement between a measure or description and
the phenomenon it purports to represent.  *See* FASB Statement of Concepts No. 2, ¶63.

reflect the desires of management rather than the underlying financial performance of the company.

*     *     *

This is the pattern earnings management creates: companies try to meet or beat Wall Street earnings projections in order to grow market capitalization and increase the value of stock options.  Their ability to do this depends on achieving the earnings expectations of analysts.  And analysts seek constant guidance from companies to frame those expectations.

*     *     *

A[n] . . . illusion played by some companies is using unrealistic assumptions to estimate liabilities . . . .  In doing so, they stash accruals in cookie jars during the good times and reach into them when needed in the bad times.

**Profit Margin Reserve**

162.    In January 2004, as part of its 2003 year-end audit, KPMG tested a sample of Diebold's 2003 revenue transactions.  This testing revealed that Diebold had prematurely recognized revenue on certain transactions and that, in certain instances, Diebold had recognized revenue on transactions inconsistent with the Company's revenue recognition policy.  Instead of reversing these transactions, Diebold inappropriately established a reserve to back out $7.5 million of profit margin in 4Q03.  Creating accounting reserves to compensate for improperly recorded revenue was in violation of GAAP – the improperly recognized revenue identified through the audit work was required to have been deducted from the Company's recorded revenue.

163.    In addition to the $7.5 million of improperly recognized transactions referred to above, as described in ¶¶31-32, 56-57, defendants Geswein and Krakora learned of another prematurely recognized revenue transaction recorded in 4Q03 for $5.2 million.  This transaction however, was not discovered by KPMG so defendants Geswein and Krakora did not correct the accounting or even adjust the $7.5 million profit margin reserve that the Company had established (albeit improperly) to account for such errors.  Defendants Geswein and Krakora knew this $5.2 million transaction overstated Diebold's revenue and profit margin yet failed to reverse or even

- 66 -

reserve for the error.  As a result, defendants Geswein and Krakora knowingly and materially overstated revenue and earnings for FY03 by at least $5.2 million.

164.    Beyond the GAAP violations associated with establishing the reserve in the first place, as described in ¶32, the Diebold Defendants did not miss a beat – realizing they also could use the improper reserves to subsequently manage Diebold's earnings to meet analysts' forecasts.  Under GAAP, Diebold should have accounted for the profit margin reserve transactions as a deferred revenue liability and recognized the underlying revenue associated with the reserve as the revenue was earned.  However, over the course of 2004, the Diebold Defendants released this "cookie jar" profit margin reserve without any legitimate accounting analysis to fill shortfalls in the Company's operating results.  For example, the Diebold Defendants released $1 million of the reserve in 1Q04, $1.25 million in 2Q04, and the remaining $5.25 million in 3Q04.  Not coincidentally, Diebold met analysts' exact earnings forecasts during these three quarters.  The Diebold Defendants knew, or were reckless in not knowing, that the profit margin reserve had no legitimate accounting basis and was used only to fraudulently manage Diebold's reported earnings.

**The Understatement of LTIP Liabilities**

165.    Pursuant to GAAP, Diebold was required to account for liabilities as they were incurred.  During the Class Period, however, Diebold's financial statements were materially misstated because the Diebold Defendants failed to accrue (record) known liabilities that Diebold had incurred.  For example, as described in ¶¶58-60, the Diebold Defendants knew that the liability account for the Company's LTIP was under-accrued for much of 2002 and 2003.  Defendants Geswein and Krakora were notified in a May 9, 2003 email that the Company had not properly accounted for the LTIP liability.  The email stated:

> GAAP requires variable accounting for the LTIP, so technically each quarter we should be adjusting the accrual to reflect expected shares to be earned on a pro-rata basis times the price of the stock at quarter-end.

585867_1

166.    At the time of the above email, Diebold's LTIP accrual was under-accrued by at least $5 million.  Diebold could not accrue for the LTIP liability in 2003 without negatively impacting earnings, so instead the Diebold Defendants offset the liability by improperly reducing other accounts, including an un-reconciled accounts payable account and an un-reconciled deferred revenue account.  This hocus-pocus type of accounting was in direct contradiction to the most basic accounting principles.  Indeed, when the Diebold Defendants made one such $1.2 million off-setting journal entry in May 2003, the description in the notes to that journal entry was "to fund a LTIP reserve."  In 2003 alone, the Diebold Defendants' manipulation of these accounts had the effect of improperly under-accruing Diebold's liabilities, and overstating Diebold's reported pre-tax earnings by at least $23 million.

**Sales Commission Accruals**

167.    As described in ¶60, the Diebold Defendants also knew, or were reckless in not knowing, that Diebold failed to properly accrue for other liabilities, including its North American sales commission liabilities (commissions to be paid to sales personnel) and its team incentive liabilities (incentive pay to be paid to service personnel).  In 2005, Diebold restated its financial statements to correct errors in certain accounts for FY03-FY04 and 1Q05, including the North American sales commission liability account (which in 2005 had been materially understated by $11.4 million).  This type of accounting fraud is a direct result of defendants Geswein and Krakora's pressure put on financial and accounting managers to meet Wall Street expectations at all costs.  For example, in a letter to the Company's Audit Committee, a Diebold Officer acknowledged that the sales commission account was understated because "[an accounting manager] felt that given the need to meet [earnings] forecast, these [commission accrual] adjustments should be deferred until a later date."

- 68 -

**Other "Cookie Jar" Reserves**

168.    As described herein, maintaining general or excess reserves (*i.e.*, cookie jar reserves) are expressly prohibited under GAAP.  Notwithstanding this prohibition, the Diebold Defendants caused Diebold to improperly establish and manipulate certain other reserves in order to manage the Company's earnings and meet Wall Street expectations.  For example, in order to meet internal earnings forecasts, a Diebold accounting manager improperly reduced the Master Purchase Agreement accrual (a liability account established for payment of customer rebates) to inflate net income in both 4Q03 and 4Q04.  The Diebold Defendants  knew, or were reckless in not knowing that, there was no legitimate accounting basis for either of these entries.  Indeed, both entries were subsequently reversed in later quarters.

169.    The Diebold Defendants also used other cookie jar reserves to manage earnings.  For example, the Diebold Defendants established a $4.5 million corporate obsolescence and excess inventory account.  This corporate inventory account was a cookie jar reserve that the Diebold Defendants knew, or were reckless in not knowing, had no legitimate accounting basis.

**The Diebold Defendants Improperly
Capitalized Expenses in Violation of GAAP**

**"Division 35" and "CAP 250" Accounts**

170.    During the Class Period, the Diebold Defendants knew or recklessly ignored that Diebold's financial statements failed to recognize certain expenses as incurred.  These expenses were improperly deferred and spread over several reporting periods by the Diebold Defendants to manage Diebold's reported earnings.  The Diebold Defendants engaged in improper expense deferrals using two accounts: the "Division 35" and "CAP 250" accounts.

171.    Division 35 was a finished goods inventory account.  As described in ¶62, Diebold improperly failed to reconcile the account and the Diebold Defendants knew, or were reckless in not knowing, that the value of this account had become materially overstated.  In 2005, instead of

- 69 -

restating its prior financial statements to correct this material error and record the necessary expenses in the proper reporting periods as required under GAAP, the Diebold Defendants fraudulently spread $15 million of expenses over two quarters in 2005.  The overstatement of the Division 35 account inflated Diebold's earnings by $4.3 million in 2003, and more than $6.2 million in periods prior to 2003.

172.    In addition, CAP 250 primarily consisted of two accounts used to accrue the cost of installing Diebold's accounting system.  As detailed in ¶63, the Diebold Defendants knew or recklessly ignored that one of the CAP 250 accounts had been un-reconciled since at least 2002 and as with Division 35, had become materially overstated because Diebold management did not reconcile the account until 2005.  Then, similar to Division 35, the Diebold Defendants did not restate Diebold's financial statements to correct the material error in conformity with GAAP, but instead improperly recorded a series of entries totaling approximately $9 million during 2005.  The overstatement of this CAP 250 account materially inflated Diebold's earnings by $2.1 million in 2004, $2.2 million in 2003, and $4.4 million in periods prior to 2003.

**ERP Capitalization**

173.    As part of its restatement, the Company disclosed:

> During the restatement process, the Company reviewed the history and accounting composition of the ERP asset.  As a result of this analysis, the Company determined that the ***ERP asset value was overstated*** due to a number of factors, including ***unsupported manual journal entries***, errors related to amounts of cost capitalized to the asset, and ***certain capitalized costs which did not meet the criteria of capitalization*** under SOP 98-1.

174.    As described in ¶¶64-65, these improperly capitalized costs relate to a project, which began in 2002, in which Diebold replaced many of its older internal software systems with updated Oracle software.  From 2003 through 2006, the Diebold Defendants improperly capitalized information technology costs related to this project that should have been expensed as incurred.  For example, in certain quarters when Diebold's earnings were short of forecast, the Diebold Defendants

- 70 -

made "top-level" entries to fraudulently capitalize additional expenses to the Oracle project.  These improper entries, which often were round numbers such as $1 million, had the effect of materially reducing reported expenses, and thus increasing Diebold's reported earnings.  The Diebold Defendants' improper capitalization of expenses associated with Diebold's Oracle project increased the Company's pre-tax earnings in 2003, 2004, and 2005, by $.5 million, $3 million, and $6.8 million, respectively.

**The Diebold Defendants Overstated
Inventory Valuations in Violation of GAAP**

**Refurbished Inventory**

175.    The Company's refurbished inventory within its North America business segment consisted of used equipment that is acquired through purchases, lease transfers, returned goods and trade-ins.  Prior to and during the Class Period, Diebold's general ledger account balances were not properly stated because the balances were not supported by sub ledger detail and reconciliations were not consistently performed prior to 2006.  In addition, the Company determined that the valuation of the inventory was not being recorded at the lower of cost or market and adjustments for excess and obsolete inventory were not being recorded.

176.    Pursuant to GAAP, used equipment inventory should be valued at the lower of cost or market.  As described in ¶¶66-69, the Diebold Defendants improperly "wrote-up" the value of certain used inventory, such as used ATMs.  These "write-ups" had the effect of reducing Diebold's cost of sales, which improperly inflated the Company's reported earnings.  The Diebold Defendants directed these "write-ups" in order to meet its earnings forecasts.  Defendants knew, or were as reckless in not knowing, that these used equipment "write-ups," which were included in several "opportunity lists," had no legitimate accounting basis and were used improperly to inflate Diebold's earnings.

- 71 -

**Finished Goods Inventory**

177.    Similar to the above misstatements related to the over-valuation of used inventory, the

Company also admitted overstating the valuation of finished goods inventory.  As part of its

restatement, the Company disclosed:

> The largest of the inventory adjustments recorded related to the Company's finished
> goods inventory within its North America business segment.  The Company's
> finished goods inventory largely includes inventory to be installed, but also includes
> returned goods from customers pending manufacturing rework or final disposition.
> Prior to 2005, the Company did not maintain a sub ledger report that detailed the
> inventory account balances at an order level and thus used analyses and trends to
> support the recorded general ledger balance.  During 2005, the Company constructed
> the finished goods inventory sub ledger at an order level and reconciled the sub
> ledger balance to the general ledger account balance. As a result, adjustments were
> recorded in 2005 to the finished goods inventory account to correct for differences
> between the general ledger and sub ledger.

**Other Misstatements Corrected as Part of the Restatement**

178.    In addition to the above misstatements that allowed the Diebold Defendants to engage

in earnings management, the Company also disclosed additional "restatement adjustments"

involving "various accrued liabilities, reserves, prepaid expenses, and select other balance sheet

accounts."  The Company admitted that these accounting misstatements resulted from, among other

reasons, "*faulty analysis and/or known differences not previously recorded*."  These misstatements

included restatement adjustments related to deferred service contract revenue, accounting payable

reserve, installation allowance and A/P wire clearing.

**Deferred Service Contract Revenue**

179.    During the Class Period, the Company recorded deferred service revenue upon billing

customers and recognized the related revenue ratably over the life of the service contract.  During

2007, the Company determined that the deferred service revenue reconciliations since FY03 were in

error as there was a misinterpretation of system data and exclusion of certain leasing transactions

within the prior reconciliations, which created a difference between Diebold's sub ledger system and

- 72 -

the general ledger.  These errors represented material GAAP violations and required restatement of the Company's Class Period financial statements.

**Accounts Payable Reserve**

180.    In the 2003 reconciliation between the Accounts Payable Float aged sub ledger balance and the reserve for the Account Payables Float general ledger account balance, it was determined that the general ledger account balance was not properly stated.  The reserve balance within the general ledger was not adjusted for aged unmatched and aged receipts from vendors within the Accounts Payable Float account.  At that time, the Company adjusted the account related to the reserve for the Accounts Payable Float to reflect the balance as supported by the aged sub ledger report.

181.    During the course of the restatement, the Company evaluated the Accounts Payable Float and related reserve general ledger account balances in conjunction with the existing reconciliation process related to the reconciliation performed in 2003 and identified an error in the Company's analysis.  The error related to improper inclusion of intercompany related transactions in the establishment of the adjustment as well as the lack of timely adjustments of the general ledger to the supported subledger data.  The errors required the Company to restate its Class Period financial statements in order to reflect the proper account balances in both the Accounts Payable Float and Related Reserve in accordance with GAAP.

**Installation Allowance**

182.    Within the North America business segment, Diebold's Installation Allowance represented the liability for installation work yet to be performed on uninstalled equipment for which revenue had already been recognized.  During 2005, the Company determined the installation allowance liability recorded in the general ledger did not match the balance in the corresponding sub ledger.  As a result, Diebold's financial statements failed to reflect specific uninstalled sales orders

- 73 -

*thereby understating the installation allowance liability in violation of GAAP*.  An adjustments was recorded in 2005 but it was not until the restatement process during 2008 that the Company reconciled the installation allowance liability for the restatement periods and made adjustments to record the identified errors into the proper accounting periods.

## A/P Wire Clearing

183.    The A/P Wire Clearing relates to the Company's process for making payments to vendors by wire transfer rather than by check.  Verification between two departments is required in order to ensure that payments via wire transfer are properly and timely recorded as an expense or asset.  In 2006, the Company determined that the A/P Wire Clearing account balance had not been reconciled in recent years and *that the account balance was not supported*.  As a result, the Company's financial statements were not prepared in accordance with GAAP and the error was required to be corrected as part of the Company's restatement.

## Other

184.    In conjunction with the restatement process, the Company also made other adjustments and reclassifications to its financial statements in various years, including, but not limited to: (1) past immaterial unrecorded audit adjustments; (2) adjustments for liabilities for contingencies and intangible assets identified at the date of acquisition in connection with certain acquisitions; (3) select intercompany and related elimination transactions; and (4) correction for previous gain calculations on sale of discontinued operations.

## Diebold's Financial Restatement was Material

185.    Through its restatement of the various accounting misstatements described above, Diebold has admitted that its financial statements were materially misstated. The materiality of these misstatements is further demonstrated by the effect the misstatements had on Diebold's originally reported pre-tax income and net income – as shown in the table below:

- 74 -

| | 2007 | 2006 | | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|---|---|---|
| | | As Reported | As Restated | As Reported | As Restated | As Reported | As Restated | As Reported | As Restated |
| | | | | (In millions, except per share data) | | | | | |
| **Results of Operations** | | | | | | | | | |
| Net sales | $ 2,965 | $ 2,906 | $ 2,940 | $ 2,587 | $ 2,583 | $ 2,357 | $ 2,388 | $ 2,086 | $ 1,994 |
| Cost of sales | 2,281 | 2,196 | 2,202 | 1,962 | 1,929 | 1,688 | 1,715 | 1,470 | 1,432 |
| Gross profit | 684 | 710 | 738 | 625 | 654 | 669 | 673 | 616 | 562 |
| Income from continuing operations, net of tax | 40 | 87 | 105 | 83 | 92 | 182 | 177 | 171 | 133 |
| Income from discontinued operations, net of tax | — | — | — | 14 | 10 | 2 | 2 | 2 | 2 |
| Net Income | $ 40 | $ 87 | $ 105 | $ 97 | $ 102 | $ 184 | $ 179 | $ 173 | $ 135 |
| **Basic earnings per common share:** | | | | | | | | | |
| Income from continuing operations | 0.60 | 1.30 | 1.57 | 1.17 | 1.30 | 2.52 | 2.46 | 2.37 | 1.83 |
| Income from discontinued operations | — | — | — | 0.20 | 0.15 | 0.03 | 0.03 | 0.02 | 0.03 |
| Net Income | $ 0.60 | $ 1.30 | $ 1.57 | $ 1.37 | $ 1.45 | $ 2.55 | $ 2.49 | $ 2.39 | $ 1.86 |
| **Diluted earnings per common share:** | | | | | | | | | |
| Income from continuing operations | 0.59 | 1.29 | 1.55 | 1.17 | 1.29 | 2.50 | 2.43 | 2.35 | 1.82 |
| Income from discontinued operations | — | — | — | 0.20 | 0.14 | 0.03 | 0.03 | 0.02 | 0.02 |
| Net Income | $ 0.59 | $ 1.29 | $ 1.55 | $ 1.37 | $ 1.43 | $ 2.53 | $ 2.46 | $ 2.37 | $ 1.84 |
| **Number of Weighted-Average Shares Outstanding** | | | | | | | | | |
| Basic weighted-average shares outstanding | 65,841 | 66,669 | 66,669 | 70,577 | 70,577 | 72,000 | 72,000 | 72,417 | 72,417 |
| Diluted weighted-average shares outstanding | 66,673 | 66,885 | 67,253 | 70,966 | 71,340 | 72,534 | 72,823 | 72,924 | 73,087 |
| Common dividends paid | $62,442 | $57,408 | $57,964 | $57,770 | $58,196 | $53,240 | $53,506 | $49,242 | $49,330 |
| Common dividends paid per share | 0.94 | 0.86 | 0.86 | 0.82 | 0.82 | 0.74 | 0.74 | 0.68 | 0.68 |

Notably, from 2002 through 2007, Diebold's improper accounting practices inflated the Company's reported pre-tax earnings by at least $127 million of which $56.2 million related specifically to the improper revenue recognition described above.

**Diebold's Restatement Establishes Scienter**

186.    As described above, Diebold's restatement is an admission that: (i) its financial statements originally issued during the Class Period and its public statements regarding those results were materially false and misleading and (ii) the financial results reported during the Class Period were *incorrect based on information available to the defendants at the time the results were originally reported.*  Additionally, Diebold's announced restatement, as described herein, contains at least the following indicators of knowledge by defendants:

- 75 -

(a)      ***The type of restatement (misuse of the facts)*** – many of the restated items at issue were not due to simple mathematical errors or an honest misapplication of an accounting standard.  For example, the restatement of revenue was the result of several sales transactions that were directly structured to circumvent GAAP revenue recognition criteria in order to record premature and inflated revenues on sales  that otherwise would have resulted in delayed, decreased, and/or no revenue recognition at all.  In addition, the manipulation of accounting reserves and the improper capitalization of various technology and inventory costs were deliberate attempts to manage earnings;

(b)      ***The duration over which the improper accounting was perpetrated*** – as detailed herein, the restatement does not hinge on an honest accounting mistake or oversight during a single quarter or even a single year that was later corrected on a good faith basis.  Diebold was forced to restate its financial statements covering FY03-FY06, each quarterly period including each therein, and 1Q07 to correct the Diebold Defendants' accounting improprieties that could no longer be concealed;

(c)      ***The magnitude or size of the restatement*** – As described above, the restatement was material.  Overall, Diebold overstated its FY03 through FY06 net income by $20 million, including an overstatement of over 12% of  net income in FY03 and FY04.  Additionally, the misstatements were clearly material because they involved conduct used by the Diebold Defendants to manage earnings;

(d)      ***The types of accounting gimmicks employed*** – as detailed herein, the improper accounting corrected by the restatement did not occur as a result of good faith differences in accounting judgments, or interpretations of complicated, vague, or arcane accounting rules, and the Company does not claim otherwise. The misstatements include fraudulent revenue recognition and blatant earnings management; and

- 76 -

(e)     ***The effect of the misstatements on meeting analyst estimates*** – Moreover, it is more than sheer coincidence that the majority of the purported accounting "errors" restated by the Company occurred at or near the end of quarterly periods and had the effect of allowing the Company to meet analysts' estimates and forecasts that it otherwise would have missed.

187.    Finally, it is notable that in 2002 the SEC reiterated its position that, in its investigations of restated financial statements, it often finds that the persons responsible for the improper accounting acted with scienter:

> [T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, ***inter alia, to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter*** . . . .

*In re Sunbeam Sec. Litig*., No. 98-8258-Civ.-Middlebrooks, SEC Amicus Curiae Brief at 1 (S.D. Fla. Jan. 9, 2002)

**KPMG's Audit Opinions Were Materially False and Misleading**

188.    Under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, an auditor may be primarily liable for securities fraud when it provides an audit report containing an unqualified or "clean" audit opinion certifying financial statements that were false or misleading at the time the audit report was issued.  An auditor may also become primarily liable for securities fraud if it subsequently learns or is reckless in not learning that its previously issued audit reports erroneously certified financial statements that,  in fact, were materially false and misleading if the auditor fails to take reasonable steps to correct or withdraw the previously issued audit reports.

189.    During the Class Period, KPMG  issued unqualified or "clean" audit reports that incorrectly certified Diebold's Class Period financial statements as being free of material misstatements.  KPMG also failed to withdraw its previous unqualified audit reports that incorrectly certified Diebold's pre-Class Period financial statements as being free of material misstatements.

- 77 -

KPMG's Class Period audit reports were included in  Diebold's 10-K/A for FY04, Form 10-K for

FY05 and Form 10-K for FY06.  Each of the Class Period audit reports stated that Diebold's

statement of financial position for the year under audit and the previous year, and its statement of the

results of operations for the year under audit and the two previous years, presented "fairly" the

financial position of Diebold "in conformity with accounting principles generally accepted in the

United States of America."  KPMG's audit reports also stated that  KPMG "conducted [its] audits in

accordance with the standards of the Public Company Accounting Oversight Board (United

States)."[6]  KPMG's unqualified audit reports prior to and during the Class Period were materially

false and misleading because, as set forth above, Diebold's financial statements for the FY03-FY06

did not present fairly, in all material respects the Company's results of operations or its financial

condition in accordance with GAAP.

**KPMG Knew or was Reckless in Not Knowing Its Audit Reports
Were Materially False and Misleading**

190.     By performing  its audits in accordance with Public Company Accounting Oversight

Board ("PCAOB") auditing standards, which KPMG affirmatively stated it had done in each of its

audit reports, it is implausible that KPMG did not have actual knowledge that Diebold's financial

statements contained a multitude of material GAAP violations.[7]  However, even in the event they did

---

[6]     Prior to the FY04 audit, KPMG's standard audit report stated: "We conducted our audits in
accordance with auditing standards generally accepted in the United States of America."  "PCAOB
standards" as used herein incorporates ***auditing standards generally accepted in the United States
of America*** ("GAAS") and refers generally to the authoritative auditing rules in place at the time
KPMG performed a given audit.

[7]     If, on the other hand, KPMG was somehow completely unaware of the multitude of GAAP
violations in Diebold's financial statements, then the only plausible explanation is that KPMG not
only failed to perform their audits in accordance with PCAOB auditing standards, but performed
what amounted to no audit at all.  As a result, KPMG's audit reports would still be materially false
and misleading because the reports affirmatively stated "we conducted our audits in accordance with
the standards of the Public Company Accounting Oversight Board (United States)."

not have actual knowledge of the material misstatements, the combination of the scope of the work performed by KPMG between 2002-2007,[8] the red flags it was aware of (as described below), and the sheer magnitude of the fraudulent revenue recognition and earnings management conduct that eventually resulted in Diebold's massive accounting restatement demonstrate that KPMG's issuance of clean audit reports during the Class Period (including its failure to withdraw its pre-Class Period clean audit reports) rose to the level of recklessness.

191.    As early as January 2004 and certainly no later than May 2006, KPMG learned, or was reckless in not learning, that the Diebold Defendants had been engaging in fraudulent revenue transactions and blatant earnings management accounting schemes.  Specifically, in the course of its audits and reviews of the Company's financial results, processes and procedures, and internal controls, KPMG encountered at least the following "red flags" that clearly indicated that the Diebold Defendants were causing the Company to improperly recognize revenue and otherwise engage in fraudulent earnings management.

**KPMG's January 2004 Revenue Testing Alerted KPMG to the Fraud**

192.    As a result of the revenue recognition misstatements encountered by KPMG as part of its January 2004 audit testing, KPMG had actual knowledge, or was reckless in not knowing, of material GAAP violations in Diebold's financial statements.  In January 2004, as part of its 2003 year-end audit, KPMG tested a sample of Diebold's 2003 bill and hold transactions and found that Diebold had prematurely recognized revenue on certain transactions, and that in certain instances Diebold had recognized revenue on transactions inconsistent with Company policy.  With this information KPMG was required, under PCAOB auditing standards, to expand its audit testing to all

---

[8]      As evidence of the magnitude of work performed by KPMG, they received $26,896,731 in audit and other fees from Diebold between 2002 and 2007.

of Diebold's revenue transactions  and to investigate the accuracy of its previously issued audit reports.  KPMG did neither.

193.    In light of the nature and pervasiveness of the revenue recognition and other accounting errors admitted in the restatement, and with ***actual knowledge*** of revenue recognition misstatements as early as January 2004, along with the various other red flags described herein, any auditor which was not acting recklessly would have discovered that Diebold's financial statements were materially misstated.

**Diebold's Material Internal Control Weaknesses Alerted KPMG to the Fraud**

194.    As a result of the material weaknesses in Diebold's internal controls over financial reporting encountered by KPMG as part of its FY05 audit, KPMG was reckless in not knowing of material GAAP violations in Diebold's financial statements.  In or about March 2006, KPMG identified a material weakness in Diebold's internal controls with respect to the Company's revenue recognition and financial reporting practices.  The material weakness was disclosed in Diebold's Form 10-K issued on March 14, 2006, as follows:

> A material weakness in internal control over financial reporting as of December 31, 2005 existed because ***the Company did not have personnel with sufficient technical knowledge to analyze complex revenue contracts to ensure that such transactions were accounted for in accordance with generally accepted accounting principles at its voting subsidiary, Diebold Election Systems, Inc. (DESI)***. Specifically, the review of these contracts did not provide for effective identification of, and consideration of, terms of certain arrangements within the contracts that impact the accounting required for the related revenue for such arrangements. ***This material weakness resulted in a material overstatement in the Company's revenue and a material understatement in deferred revenue balances in the Company's preliminary interim and annual financial statements for the year ended December 31, 2005***. This weakness if not remediated could result in a material adjustment to revenue, cost of sales, inventory and deferred revenue.[9]

---

[9]    Although KPMG acknowledged, in the above disclosure, that certain revenue misstatements were corrected as of December 31, 2005, the material misstatements that led to Diebold's massive restatement in September 2008 were not corrected at this time.

- 80 -

By its very definition, a material weakness is a red flag of a material accounting misstatement. The PCAOB defines a material weakness as

> *a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.*

195.    In addition, Statement on Auditing Standards No. 99, which KPMG was required to follow, specifically identifies internal control deficiencies as a risk factor of accounting misstatements arising from fraudulent financial reporting.

196.    In light of the nature and pervasiveness of the revenue recognition and other accounting errors admitted in the restatement, and with actual knowledge of a material weakness in Diebold's internal controls over financial reporting (especially as they related to accounting for and reporting revenue), along with the various other red flags described herein, any auditor which was not acting recklessly would have discovered that Diebold's financial statements were materially misstated.

**Diebold's Public Announcements Regarding
Investigations Alerted KPMG to the Fraud**

197.    As a result of several public announcements made by Diebold regarding investigations into the accuracy of its financial statements, KPMG was reckless in not knowing of material GAAP violations in Diebold's financial statements. On May 9, 2006, Diebold publicly announced that the SEC had begun an informal inquiry relating to the Company's revenue recognition policy. With this information KPMG was again put on notice that it had to investigate the accuracy of its earlier issued audit opinions. That KPMG was on notice that it had to investigate the accuracy of its earlier issued audit opinions, and was at least reckless in failing to do so and/or in failing to correct its reports became progressively more obvious with the following public information:

- 81 -

- on August 7, 2006 Diebold reported that the SEC had upgraded its review from an informal inquiry to a formal investigation;

- on July 25, 2007 Diebold reported that it was delaying the release of its 2Q07 financial results;

- on October 2, 2007 Diebold announced that its prior year financial results may need to be restated;

- on November 9, 2007 Diebold reported that it was delaying the release of its 3Q07 financial results; and

- on December 21, 2007 Diebold reported that it was under investigation by the DOJ and thus faced possible criminal charges.

198.    In light of the nature and pervasiveness of the revenue recognition and other accounting errors admitted in the restatement, and with information of the SEC's and DOJ's investigations, along with the various other red flags described herein, any auditor which was not acting recklessly would have discovered that Diebold's financial statements were materially misstated.

**Specific Audit Procedures and Audit Risk Alerts Alerted KPMG to the Fraud**

199.    As a result of the audit evidence that would have resulted from the specific audit procedures and audit risk alerts that KPMG was required to consider as part of its audits of Diebold's financial statements, KPMG was reckless in not knowing of material GAAP violations in Diebold's financial statements.  These specific audit procedures and audit risk alerts included the following:

(a)    *AICPA Audit Risk Alerts* "*High-Technology Industry Developments - 2003/2004*."  This Audit Risk Alert issued by the American Institute of Certified Public Accountants ("AICPA") specifically required KPMG "*consider the inappropriate use of "bill and hold" accounting*."

(b)    *1999 AICPA publication* "*Audit Issues in Revenue Recognition*."  This AICPA publication specifically addresses bill and hold sales and also references AU 330.25 ("The

- 82 -

Confirmation Process") which states that the auditor should inquire about the existence and details of

any significant oral modifications to written agreements.  Specifically, the publication states:

> In situations in which the auditor requests confirmation of contract terms, he or she should consider confirming with the customer *all* significant contract terms, including information about payment terms, right-of-return privileges, acceptance criteria, termination arrangements, *or bill and hold transactions*.  The auditor should consider the need to confirm with the customer whether there are significant unfulfilled vendor obligations or the existence of any oral or written agreements . . . that may alter the terms of the contract.

       (c)    ***SEC SAB 104***.  SAB 104 specifically addresses bill and hold sales as

described above in ¶143.

       (d)    ***SEC Accounting and Auditing Enforcement Release No. 108 ("AAER***

***108")***.  AAER 108 specifically addresses bill and hold transactions including the following

suggested considerations for a Company and its auditors:

> The accounting department should carefully consider end-of-quarter sales to determine that all sales were recognized only after title had passed, and that the company should obtain written confirmation of all bill and hold sales on a standard form prior to recording the transactions.

       (e)    ***AICPA Practice Alert 03-1: Audit Confirmations***.  This AICPA publication

states, in relevant part:

> [T]he auditor should ordinarily presume that there is a risk of material misstatement due to fraud relating to revenue recognition.  Therefore, a careful evaluation of the appropriateness of the client's accounting for revenue transactions, and a consideration of confirmation of the terms of transactions and the absence of any side agreements, are important.  The necessity of confirming terms of transactions and the absence of side agreements increases if the auditor encounters any of the following:
>
>          *       *       *

Existence of bill-and-hold transactions.

       (f)    ***AICPA Practice Alert 98-3: Responding to the Risk of Improper Revenue***

***Recognition***:  This AICPA publication states, in relevant part:

> To reduce the risk of improper revenue recognition, the audit needs to be planned and executed with an appropriate degree of professional skepticism.  . . .

- 83 -

During the planning phase of the audit, the auditor should seek to identify conditions that increase the risk of misstatement. Those conditions may include:

> \*     \*     \*

Sales billed to customers prior to the delivery of goods and held by the seller ("bill and hold" or "ship-in-place" sales).

> \*     \*     \*

Knowledge of common frauds related to improper revenue recognition can help engagement teams conduct more effective brainstorming sessions. Typical revenue recognition frauds include:

> \*     \*     \*

Shipments are made to a warehouse or other intermediary location without the instruction of the customer.

(g)     ***Statement on Auditing Standards No. 99 ("SAS 99")***. SAS 99 specifically required KPMG to perform the following audit procedures, all of which are designed to uncover the exact types of fraud present at Diebold:

Confirming with customers certain relevant contract terms and the absence of side agreements, because the appropriate accounting often is influenced by such terms or agreements. For example, acceptance criteria, delivery and payment terms, the absence of future or continuing vendor obligations, the right to return the product, guaranteed resale amounts, and cancellation or refund provisions often are relevant in such circumstances.

Inquiring of the entity's sales and marketing personnel or in-house legal counsel regarding sales or shipments near the end of the period and their knowledge of any unusual terms or conditions associated with these transactions.

Being physically present at one or more locations at period end to observe goods being shipped or being readied for shipment (or returns awaiting processing) and performing other appropriate sales and inventory cutoff procedures.

(Footnote omitted).

(h)     In a May 31, 2001 speech, Lynn Turner, Chief Accountant of the SEC, stated the following with regards to auditors and revenue recognition:

As previously mentioned, the COSO Report notes that over half the frauds in the study involved over-stating revenues by recording revenues prematurely or fictitiously. These results are consistent with a study published in the August 2000

- 84 -

report of the Panel on Audit Effectiveness (also known as the "O'Malley Report") entitled, *Analysis of SEC Accounting and Auditing Enforcement Releases,* which found that approximately 70% of the cases in the study involved overstatement of revenues – again, either premature revenue recognition or fictitious revenue.

Given the results of these studies and the current economic environment where companies are struggling to achieve revenue forecasts, it is critical that auditors conduct adequate and appropriate audit procedures on revenues. After all, the investing public relies on the independent auditors to ensure the integrity and credibility of the numbers.

*     *     *

In some entities, the nature of the business is such that the majority of revenues are comprised of complex, large, or non-recurring transactions evidenced by individual contracts. Auditors should read and understand the terms of these contracts, since the terms could have a significant impact on the appropriate accounting treatment for the transactions, including ***when*** the revenue is recognized. For these types of transactions, auditors should ***confirm directly with the customer ALL*** significant contract terms which could have an impact on the accounting for the contracts, such as payment terms, right-of-return and refund privileges, customer acceptance criteria, termination provisions, or ***bill and hold arrangements***.

Turner also stated:

Let me emphasize – cut-off testing, confirmations, ***understanding sales terms and arrangements***, assessing an entity's ability to estimate returns - all these are not new methods of auditing revenues. This is textbook auditing – or, I suppose, one may even call it "Auditing Revenues 101." ***If you have not done these procedures, you have not done an audit and you are not in a position to issue an opinion on the financial statements***.

(Some emphasis in original).

200.    In light of the nature and pervasiveness of the revenue recognition and other accounting errors admitted in the restatement and with the specific audit risk procedures and alerts referred to above which KPMG was required to incorporate into audits of Diebold's financials statements,  along with the various other red flags described herein, any auditor which was not acting recklessly would have discovered that the Diebold's financial statements were materially misstated.

201.    Despite all of the red flags referred to above, KPMG allowed investors to continue to rely upon its unqualified audit reports during the Class Period.  Had KPMG withdrawn its

- 85 -

unqualified audit opinions and/or required the Company to restate its financial statements for those years, investors would not have continued to purchase Diebold shares at inflated prices.  It was not until January 15, 2008 that KPMG and Diebold management finally acknowledged that its previous audit reports, along with the Company's financial statements, were materially false and misleading and should no longer be relied on.  By then, investors had already suffered the consequences of KPMG's silence and inaction.

### DISCLOSURE OF DEFENDANTS' INVOLVEMENT IN THE FALSIFICATION OF DIEBOLD'S FINANCIAL STATEMENTS

202.    As alleged herein, Diebold first disclosed that there were problems with the information in the Company's financial statements on July 25, 2007.  On January 15, 2008, the Company warned investors not to rely on its previously released financial statements, advising investors that Diebold's FY03-FY06 and 1Q07 financial statements would need to be restated.  The Company, however, did not provide any information about the amount of the restatements and only indicated that the restatements were necessary due to an "error" in the Company's previous "bill and hold" revenue policy.  No information was given concerning the conduct that resulted in the "error" in applying the "bill and hold" revenue recognition policy, nor was any information given that the conduct undertaken was intended to manage the Company's reported earnings as described in ¶¶21-67, 141-187.

203.    In February 2006, the Company announced that the SEC had opened a formal investigation of Diebold's accounting practices.  As part of its investigation, the SEC had access to Diebold's internal documents and personnel, and had the legal authority to compel the production of relevant information and testimony.  On June 2, 2010, the results of the SEC's investigation into Diebold's accounting practices was first made public.  As described in ¶¶21-67, 141-187, the SEC disclosed substantial information concerning fraudulent accounting practices being employed by the Diebold Defendants.  On this date, the SEC also revealed for the first time that KPMG had

- 86 -

discovered evidence of accounting fraud in the application of "bill and hold" accounting in January 2004.

204.    Despite a thorough and diligent investigation by Lead Plaintiff from reasonably available resources, the conduct undertaken to misstate Diebold's financial results during FY03-FY06 and 1Q07, and defendants' knowledge and participation in it, were not discovered.  This action was commenced within two years of the date Lead Plaintiff discovered defendants' fraudulent conduct and intent, and within five years of the dissemination of the false and misleading statements at issue here.

## LOSS CAUSATION/ECONOMIC LOSS

205.    During the Class Period as detailed herein, defendants engaged in a wrongful course of business by engaging in the accounting fraud and manipulation of the Company's actual financial results, as detailed herein, which inflated the price of Diebold securities and operated as a fraud or deceit on Class Period purchasers of Diebold's securities.  Defendants caused Diebold's earnings to be improperly inflated by as much as $127 million.  When the impact of defendants' fraudulent conduct was disclosed to the market, Diebold's stock price fell precipitously as the inflation created by defendants' misrepresentations and wrongful course of business came out of the Company's stock price.  As a result of their purchases of inflated Diebold securities during the Class Period – and the subsequent decline in the price of those securities – Lead Plaintiff and other members of the Class suffered damages under the federal securities laws.

206.    Defendants' conduct was designed to and did cause Diebold securities to trade at inflated levels throughout the Class Period, with Diebold's stock price reaching as high as $54.50 per share on July 23, 2007.  That inflation was removed from Diebold's securities in a series of disclosures.

207.    The price decline in Diebold's securities as a result of the July 25, 2007, October 2, 2007, December 21, 2007 and January 15, 2008 disclosures was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  Although defendants' participation in the fraudulent conduct was not then revealed or reasonably ascertainable, the timing and magnitude of the decline in the price of Diebold securities in response to these revelations negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic issues, industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.

208.    The damages suffered by Lead Plaintiff and other members of the Class were a direct result of: (a) defendants' fraudulent conduct which inflated the price of Diebold's securities during the Class Period; and (b) the subsequent significant decline in the value of Diebold's securities when the impact of defendants' prior misrepresentations and other fraudulent conduct became known to the market.

**NO SAFE HARBOR**

209.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was

- 88 -

false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Diebold who knew that those statements were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD-ON-THE-MARKET DOCTRINE

210.    At all relevant times, the market for Diebold's publicly traded securities was an efficient market for the following reasons, among others:

(a)    Diebold's securities met the requirements for listing, and were listed and actively traded on the NYSE, which is a highly efficient and automated market;

(b)    As a regulated issuer, Diebold filed periodic public reports with the SEC and the NYSE;

(c)    Diebold regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Diebold was followed by numerous securities analysts employed by major brokerage firms, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

211.    As a result of the foregoing, the market for Diebold's publicly traded securities promptly digested current information regarding Diebold from all publicly available sources and reflected such information in the prices of Diebold's publicly traded securities.  Under these circumstances, all purchasers of Diebold's publicly traded securities during the Class Period suffered similar injury through their purchase of Diebold's publicly traded securities at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

212.    Lead Plaintiff brings this action as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all persons who purchased Diebold publicly traded securities during the Class Period (the "Class").  Excluded from the Class are defendants and members of their families, directors and officers of Diebold and KPMG, and their families and affiliates as well.

213.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Diebold had more than 65 million shares of stock outstanding owned by thousands of persons.

214.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a)    Whether the 1934 Act was violated by defendants;

(b)    Whether defendants caused statements to be disseminated which omitted and/or misrepresented material facts;

(c)    Whether defendants caused statements to be asserted which omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading; and

(e)    Whether Lead Plaintiff and the members of the Class were damaged, and the proper measure of damages.

## CLAIMS FOR RELIEF

### COUNT I

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

215.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

216.    During the Class Period, defendants participated in the preparation of and/or caused to be disseminated the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

217.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Diebold securities during the Class Period.

218.    Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and financial performance of Diebold as specified herein.

219.    These defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course

- 91 -

of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Diebold securities during the Class Period.

220.    The defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with recklessness disregard for the truth, and for the purpose and effect of concealing Diebold's operating condition from the investing public and supporting the artificially inflated price of its publicly traded securities.

221.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Diebold's publicly traded securities was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of the Company's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Diebold securities during the Class Period at artificially high prices and were damaged thereby, as demonstrated, in part, by the declines in the price of the Company's stock following its July 25, 2007, October 2, 2007, December 21, 2007 and January 15, 2008 announcements.

222.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff

- 92 -

and the other members of the Class and the marketplace known the truth regarding the problems that

Diebold was experiencing, which were not disclosed by defendants, Lead Plaintiff and other

members of the Class would not have purchased or otherwise acquired their Diebold securities, or, if

they had acquired such securities during the Class Period, would not have done so at the artificially

inflated prices which they paid.

223.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and

Rule 10b-5 promulgated thereunder.

224.    As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff

and the other members of the Class suffered damages in connection with their purchases of Diebold

securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act Against
### Defendants Geswein, Krakora and Miller

225.    Lead Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

226.    Defendants Geswein, Krakora and Miller acted as controlling persons of Diebold

within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high level

positions, and their ownership and contractual rights, participation in and awareness of the

Company's operations and intimate knowledge of the false statements and omissions made by the

Company and disseminated to the investing public, these defendants had the power to influence and

control and did influence and control, directly or indirectly, the decision making of the Company,

including the content and dissemination of the various statements which Lead Plaintiff contends are

false and misleading.  These defendants were provided with or had unlimited access to copies of the

Company's reports, press releases, public filings and other statements, alleged by Lead Plaintiff to be

- 93 -

misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

227.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day finance and accounting operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

228.     As set forth above, each of these defendants violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## PRAYER

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action by certifying it under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such equitable, injunctive or other relief as the Court may deem just and proper.

585867_1

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  December 6, 2010

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DEBRA J. WYMAN


                           s/ Debra J. Wyman
_____
DEBRA J. WYMAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

LANDSKRONER • GRIECO • MADDEN, LLC
JACK LANDSKRONER (0059227)
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

Liaison Counsel

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

BUILDING TRADES UNITED PENSION TRUST FUND ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.  (a)  Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Osborn v. Couch, Inc., et al.*, No. 09-cv-03789 (S.D.N.Y.)
*Building Trades United Pension Trust Fund v. Kenexa Corporation, et al.*, No. 2:09-cv-02642-JS (E.D. Pa.)
*Building Trades United Pension Trust Fund v. EnergySolutions, Inc., et al.*, No. 09-cv-08648 (S.D.N.Y.)
*In re St. Jude Medical Inc. Sec. Litig.*, No. 0:10-cv-00851-JNE-JJK (D. Minn.)

(b)  Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

(c)  Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Rubin v. MF Global, Ltd., et al.*, No. 1:08-cv-02233-VM (S.D.N.Y.)
*Public Pension Fund Group, et al. v. KV Pharmaceutical Co., et al.*, No. 4:08-cv-01859-CEJ (E.D. Mo.)
*Coad v. Sequenom, Inc., et al.*, No. 3:08-cv-00921-LAB (S.D. Cal.)
*Hughes v. Huron Consulting Group Inc., et al.*, No. 1:09-cv-04734 (N.D. Ill.)
*Jean v. STEC, Inc., et al.*, No. SACV-09-01304-JVS(MLGx) (C.D. Cal.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __16__ day of __august__, 2010.

BUILDING TRADES UNITED PENSION TRUST FUND

By: _____

Its: _____

By: _____

Its: _____

- 2 -

DIEBOLD

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 05/01/2006 | 600 | $42.63 |
| 05/08/2006 | 1,500 | $45.59 |
| 07/19/2007 | 100 | $53.89 |
| 07/20/2007 | 100 | $54.11 |
| 07/20/2007 | 500 | $54.10 |
| 07/20/2007 | 700 | $53.81 |
| 07/20/2007 | 1,300 | $53.96 |
| 07/23/2007 | 300 | $54.24 |
| 07/23/2007 | 2,900 | $54.28 |
| 07/24/2007 | 600 | $53.82 |
| 07/24/2007 | 1,800 | $53.77 |
| 07/24/2007 | 7,400 | $53.62 |
| 07/25/2007 | 15,000 | $52.69 |
| 10/16/2007 | 17,500 | $42.43 |
| 10/19/2007 | 5,100 | $41.90 |
| 10/29/2007 | 800 | $40.97 |
| 10/30/2007 | 3,000 | $41.11 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 07/05/2006 | 200 | $39.89 |
| 07/06/2006 | 1,900 | $40.32 |
| 01/08/2008 | 16,100 | $26.87 |
| 01/15/2008 | 14,700 | $25.08 |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 6, 2010, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 6, 2010.

s/ Debra J. Wyman
DEBRA J. WYMAN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:debraw@rgrdlaw.com

# Mailing Information for a Case 1:10-cv-01461-CAB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Erin R. Barker-Brown**
  ebarkerbrown@bakerlaw.com

- **John J. Carney**
  jcarney@bakerlaw.com

- **Jocelyn D. Francoeur**
  jfrancoeur@mwe.com

- **Geoffrey M. Johnson**
  gjohnson@scott-scott.com,efile@scott-scott.com

- **Jack Landskroner**
  jack@lgmlegal.com,debra@lgmlegal.com

- **Jeffrey J. Lauderdale**
  jlauderdale@calfee.com,dmichalski@calfee.com

- **Adrienne F. Mueller**
  afmueller@jonesday.com,nmadamczyk@jonesday.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com

- **John M. Newman , Jr**
  jmnewman@jonesday.com,nmadamczyk@jonesday.com,pgarver@jonesday.com

- **John D. Parker**
  jparker@bakerlaw.com,lreece@bakerlaw.com

- **Geoffrey J. Ritts**
  gjritts@jonesday.com,nmadamczyk@jonesday.com

- **Darren J. Robbins**
  e_file_sd@rgrdlaw.com

- **Kathryn E. Schill**
  kschill@bakerlaw.com

- **Stephan J. Schlegelmilch**
  sschlegelmilch@bakerlaw.com

- **Steven S. Scholes**
  sscholes@mwe.com

- **William P. Schuman**
  wschuman@mwe.com

- **David J. Tocco**

djtocco@vorys.com,pabrown@vorys.com,rnwebner@vorys.com,kshowe@vorys.com,rkadlakha@vorys.com

- **Debra J. Wyman**
  debraw@rgrdlaw.com,strremblay@rgrdlaw.com

- **Melissa L. Zujkowski**
  mzujkowski@ulmer.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`